IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Maryland)


Robin Ann Burkhart                              *

     Plaintiff                              *

v.                                              *

Officer Ryan Dickel, et al.                     *

     Defendants                          *          Civil Action No.:  CCB-12-CV-3320

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW, Plaintiff Robin Burkhart, by and through her undersigned counsel, Anton Iamele and IAMELE & IAMELE, LLP, who hereby opposes Defendant's Motion for Summary Judgment. In Support of the Opposition Plaintiff states as follows:


## TABLE OF CONTENTS

I.  **Introduction** ........................................................................................................ 3

II.  **Relevant Factual Background** ........................................................................... 3

III.  **Disputed Material Fact** ...................................................................................... 7

      a.   Plaintiff never blocked Officer Dickel's path to David Henninger nor did she hinder any efforts to communicate with him. ................................................. 8

      b.   Robin Burkhart did not lunge at, or otherwise attempt to assault, Defendant Dickel at the 2926 Aspen Hill Residence. .......................................................... 14

      c.  Plaintiff Burkhart was never told that she was under arrest on the scene or told to place her hands behind her back. .................................................................. 18

      d.   Plaintiff was forcefully taken to the ground and her left lower extremity was manipulated while she was lying prostrate on the ground. There was no legal justification for either action. ......................................................................................................... 19

      e.  Plaintiff Burkhart was not taken to the ground to be handcuffed. ..................... 21

f. Plaintiff Burkhart was not resistive or combative while she was on the ground and there was no need for the application of force to her lower extremity. ........................... 22

g. Plaintiff Burkhart's left leg was injured when it was forcefully pulled up and away from the ground after she had been detained. .............................................................. 23

h. The evidence in this case, both factual and medical, unequivocally demonstrates that Plaintiff Burkhart suffered injuries when her leg was manipulated after she had been taken to the ground. ......................................................................................... 28

IV. **Argument**........................................................................................................................... 31

A. Summary Judgment Standard and Causes of Action........................................ 31

B. Because there is dispute of fact in this case relative to the justification for detention/arrest and the existence of probable cause, Plaintiff's claims for false arrest, false imprisonment are viable components for claims under 42 U.S.C. § 1983. .................. 32

C. Plaintiff's excessive force claims under 42 U.S.C. § 1983 and the Maryland Declaration of Rights exist irrespective of the existence of probable cause determination and must be decided by a the trier of fact............................................................................. 39

D. Plaintiff's independent causes of action for the false arrest, false imprisonment and batter are also issues to be decided by the trier of fact in this case. ........ 43

V. **Conclusion** ......................................................................................................................... 47

<u>**AFFIDAVITS**</u>

Robin Burkhart

Dr. Christopher Chapman

<u>**LIST OF ATTACHED EXHIBITS**</u>

Exhibit No. 1          Deposition of Robin Burkhart

Exhibit No. 2          Photographs Depicting Entranceway at Home

Exhibit No. 3          Deposition of John Burkhart

Exhibit No. 4          Deposition of Officer Michael S. Barber

Exhibit No. 5          Deposition of Officer Michael Vlach

Exhibit No. 6          Deposition of Officer Ryan Dickel

Exhibit No. 7          Affidavit of Robin Burkhart

Exhibit No. 8          Maryland Ambulance Information System Report

Exhibit No. 9          Deposition of Robert Freund

Exhibit No. 10         Franklin Square Hospital, Attending Physician Reports

Exhibit No. 11         Deposition of Barry Daly,  M.D.

Exhibit No. 12         Deposition of Stephen Belkoff, PhD

Exhibit No. 13         Deposition of Leon Bell

Exhibit No. 14         Affidavit and Preliminary Report of Dr. Christopher Chapman

Exhibit No. 15         Excerpt from Report of Charles Joseph Key

Exhibit No. 16         Use of Force Report authored by Michael Vlach

## I.   <u>Introduction</u>

This is a police misconduct case in which Plaintiff Robin Burkhart asserts that she was detained without legal justification and subjected to excessive force carried out by defendant officers Ryan Dickel and Michael Vlach during the course of a police encounter on July 23, 2011. Plaintiff Burkhart further asserts that defendant officer Ryan Dickel generated a Statement of Probable Cause including a fraudulent statement of material fact in an effort to obfuscate those happenings. Contrary to the defendants' assertion, there are genuine disputes of fact regarding Mrs. Burkhart's conduct on the scene, the justification for arrest, the need for force, and the manner in which force was applied that make Summary Judgment inappropriate in this.  In support of the instant Opposition, Plaintiff states further:

## II.   <u>Relevant Factual Background</u>

Robin Burkhart is a fifty-two year old mother of two children who has been married for twenty years. (Attached Exhibit No. 1, Deposition of Robin Burkhart, p. 5). At the time of the subject incident, Plaintiff Robin Burkhart was present in her home at 2926 Aspen Hill Road,

Parkville, Maryland. This is a split level home with an entryway foyer connecting to a flight of stairs leading up to the first floor (living room and kitchen), and another set of stairs descending into the basement (bedroom, bathroom and utility room). (Attached Exhibit No. 2, Photographs depicting entranceway at home; Attached Exhibit 3, Deposition of John Burkhart, pp 8-9). The house was occupied by the Plaintiff, her husband John Burkhart, her daughter Brianna Burkhart, her son Zachary Burkhart, and her daughter's boyfriend Leon Bell. (Attached Exhibit No. 3, Deposition of John Burkhart, pp. 10-15). Plaintiff's itinerant brother, David Henninger, was also living in the home on a temporary basis. (Attached Exhibit No. 3, Deposition of John Burkhart, pp. 10-15; Attached Exhibit No. 1 Deposition of Robin Burkhart, p. 13).

Prior to the incident at issue in this case, Plaintiff was playing the game "Yahtzee" with her daughter, Leon Bell, and David Henninger. (See Attached Exhibit No. 1, Deposition of Robin Burkhart, pp. 8-9). The night took an unfortunate turn when Mr. Henninger began touching Brianna Burkhart in an a manner that she believed to be inappropriate. This escalated into a physical confrontation during which Mr. Henninger "bit" Brianna and Brianna retaliated by striking Mr. Henninger on the forehead. (Attached Exhibit No. 1, Deposition of Robin Burkhart, p. 9-11). Plaintiff Burkhart and Leon Bell deescalated the confrontation. (Attached Exhibit No. 1, Deposition of Robin Burkhart, pp. 9-11). Thereafter, Mr. Henninger called 911 and advised the responding operator that "he needs police because he has been assaulted by his niece." (Attached Exhibit No. 4, Deposition of Officer Michael S. Barber, p. 21; Attached Exhibit No. 1, Deposition of Robin Burkhart, pp. 9-11). Henninger later placed

another call to police in which he claimed that Brianna Burkhart was "hanging"[1] in the basement as described in Defendants' Motion for Summary Judgment.

Defendant officers Dickel and Vlach responded to Henninger's call for service at 2926 Aspen Hill Road along with Baltimore County police Officer Barber at approximately 12:15 a.m. on July 23. (Attached Exhibit No. 4, Deposition of Officer Michael Barber, pp. 24-25; Defendants' Motion for Summary Judgment, Attached Exhibit 2, 3 & 4). The three responding officers knocked on the front door at the time of their arrival. (Attached Exhibit No. 1, Deposition of Robin Burkhart, pp. 17-19). All were permitted entry into the home when David Henninger opened the front door. (Attached Exhibit No. 4, Deposition of Officer Michael Barber, pp. 24-25; Attached Exhibit No. 5, Deposition of Detective Michael Vlach, p. 14-15). John Burkhart then escorted Vlach and Barber to the basement. (Attached Exhibit No. 3, Deposition of John Burkhart, p. 22). Robin Burkhart did not prevent either officer from gaining access to her basement nor did she obstruct their investigation in any fashion (Attached Exhibit No. 6, Deposition of Officer Ryan Dickel, pp. 81-83), and they readily determined that no person was "hanging" in the basement. (Attached Exhibit No. 3, Deposition of John Burkhart, pp. 25-26). At some point thereafter, Officers Barber and Vlach advised Defendant Officer Dickel that the basement had been cleared. (Attached Exhibit No. 6, Deposition of Ryan Dickel, p. 84).

Plaintiff Burkhart, who had remained on the primary floor of the residence, was subsequently assaulted by Officer Dickel later with the assistance of Officer Vlach. The events

---

[1] It is now understood by all parties that Mr. Henninger was referring to the slang term "hanging" as in "residing at or present in," and not the macabre police interpretation of likely to cause or prone to inflict death by hanging. (See Defendant's Application for Statement of Probable Cause attached to his Motion for Summary Judgment).

leading up to that confrontation and what occurred during that conformation are all in dispute and addressed in the "Disputed Material Facts" section that follows.

Plaintiff Burkhart was physically intact when the Defendant Officers arrived at the Aspen Hill residence. She was standing, walking without a limp and capable of negotiating stairs in her home. (Attached Exhibit No. 5, Deposition of Detective Michael Vlach, p. 62; Attached Exhibit No. 7, Affidavit of Robin Burkhart). She was injured on the scene by defendant officers (Attached Exhibit No.7, Affidavit of Robin Burkhart), and made a contemporaneous report of that injury to all of the officers who were present in her home. (Attached Exhibit No. 5, Deposition of Detective Michael Vlach, pp. 49-50; Attached Exhibit No. 6, Deposition of Officer Ryan Dickel, p. 121). Because the officers had (1) "employed force outside of the ordinary procedure of handcuffing" and (2) Plaintiff Burkhart complained of injuries on the scene, Defendant Officer's Dickel and Vlach later authored the Use or Force Reports, one of which has been attached to Defendants' Motion for Summary Judgment as Exhibit 3. (Exhibit No. 6, Deposition of Officer Ryan Dickel, p. 45-46; See Also Exhibit No. 16, Use of Force Report authored by Michael Vlach)

Emergency medical personnel were summoned to 2926 Aspen Hill Road shortly after Plaintiff Burkhart was injured and arrived on the scene at approximately 12:30 a.m. Mrs. Burkhart advised Baltimore County Fire Department EMS Robert Freund, who provided the first medical treatment, that she had been injured by way of an altercation with the police and was experiencing pain in her left leg, knee, and foot. (See Attached Exhibit No. 8, MAIS Report; Exhibit No. 9, Deposition Transcript of Robert Freund, pp. 8-10). Plaintiff Burkhart was removed from her home at 12:50 a.m. transported to Franklin Square Hospital where she arrived at 1:03 a.m. (*Id.*)

At Franklin Square Hospital, Plaintiff Burkhart was diagnosed with a posterior dislocation of the left knee, including a fractured tibial plateau, fractured fibula head, and damaged popliteal artery. (Attached Exhibit No. 10, Franklin Square Attending Records). The severe injuries suffered by Plaintiff Burkhart were the "type typically seen in the setting of a fall from significant height or a high speed motor vehicle accident or a major sports injury occurring in [] full contact…." (Attached Exhibit No.11, Deposition of Barry D. Daly, M.D., p 15; Attached Exhibit No. 12, Deposition of Stephen Belkoff, PhD p. 54). She underwent emergency surgery and was then transferred into the Intensive Care Unit. (Attached Exhibit No. 10, Franklin Square Attending Records).

By the time John Burkhart arrived at Franklin Square Hospital at 4:30 a.m., Robin Burkhart had already undergone one surgery and was being rushed into a second surgical procedure for a related blood clot. (Attached Exhibit No. 3, Deposition of John Burkhart, p. 41). Mr. Burkhart was advised at the hospital that Mrs. Burkhart had suffered

> "a torn popliteal artery and a torn vein, and a shattered knee and a broken tibia, but they had to do the operation on the artery, and I imagine the vein too. She had no feeling in her foot and it was cold, no pulses, and her life was on the line."

(Attached Exhibit No. 3, Deposition of John Burkhart, p. 41). Since the time of her release from Franklin Square Hospital, Plaintiff Burkhart has undergone additional vascular surgeries, a total knee replacement, and tendo-Achilles lengthening. (Defendants' Motion for Summary Judgment, Attached Exhibits 6-8).

### III.  Disputed Material Fact

The Defendant Officers generally suggest that they should be entitled to Summary Judgment in this case because they had legal justification to detain Robin Burkhart on the scene. In support of this proposition they argue that Mrs. Burkhart:

(1) "Blocked Officer Dickel's path" to David Henninger (Defendant Motion, pp. 7, 11, 14; Dickel Affidavit, para. 6);

(2) Hindered Officer Dickel from gaining access to David Henninger "whom he believed was in need of medical assistance" (Defendant's Motion, pp. 11, 13, 14; Dickel, Affidavit, para. 7);

(3) "Lunged" at Officer Dickel and thereby committed an assault (Defendant's Motion, p. 7, 11; Dickel, Affidavit, para. 7);

(4) "[W]as advised to submit, but refused to cooperate" (Defendant's Motion, p. 11);

(5) Resisted arrest by "refusing to place her hands behind her back" (Defendant's Motion, pp. 7, 14; Dickel, Affidavit, para 7; Vlach Affidvait, para 12); and

(6) "continued to fight the defendant officers" after being taken to the ground (Defendant's Motion p. 14).

The Defendant Officers further assert that they employed reasonable force to take Plaintiff Burkhart to the ground (and never touched her lower extremity) once it was determined that she would be detained. These assertions are all disputed. The Plaintiff and various fact witnesses have offered divergent accounts of what happened on the scene. Moreover, the positions adopted by the Defendant Officers are inconsistent with their own testimony and reports, as well as, the testimony of their own experts.

   a. *Plaintiff never blocked Officer Dickel's path to David Henninger nor did she hinder any efforts to communicate with him.*

The Defendant Officers' claims that Officer Dickel had been denied access to David Henninger are contrived. This claim was first used as a pretext to support the Statement of Probable Cause authored by Defendant Officer Dickel, two days after the subject occurrence, which prompted Mrs. Burkhart's arrest. It is now being used in the instant matter to justify her unlawful detention for purposes of the dispositive motion.

In fact, Henninger was the first person that police encountered when they arrived at the Aspen Hill residence. (Attached Exhibit No. 4, Deposition of Officer Michael Barber, pp. 24-

25). Officer Barber was asked to confirm that Henninger was the person who allowed them access into the home and testified: "I'm positive. [David Henninger] opened the door." (Attached Exhibit No. 4, Deposition of Officer Michael Barber, p. 25). At deposition Defendant Dickel initially echoed Officer Barber's testimony that David Henninger was present at the front door and stated: "I remember him being present in the foyer area. That's the last I remember with him." (Attached Exhibit No. 6, Deposition of Officer Ryan Dickel, p. 79, l. 7-11). Officer Dickel later altered his testimony and claimed that David Henninger was on the "primary floor of the residence" and that the male who had answered the door was actually Leon Bell. (Attached Exhibit No. 6, Deposition of Officer Ryan Dickel, p. 79-81). However, this assertion is inconsistent with the testimony of Leon Bell who explained that he was "not in the house" when the police arrived on the scene. (Attached Exhibit No. 13, Deposition of Leon Bell, pp.15-16). This incongruity is not incidental; because both Defendant Dickel and Defendant Vlach recall Officer Barber having a "general conversation" with the person who answered the front door (Attached Exhibit No. 6, Deposition of Officer Ryan Dickel, p. 77; Attached Exhibit No. 5, Deposition of Detective Michael Vlach, pp. 16-17), Defendant Dickel has necessarily identified the person answering the door as someone other than Henninger to support his claim of hindrance and obstruction.

The claimed hindrance centers on Defendant Dickel's assertion that Henninger "appeared at the top of the steps on the main floor" at a time when Plaintiff Burkhart was in the same area. (Attached Exhibit No. 6, Deposition of Officer Ryan Dickel, p. 88). Defendant Dickel has asserted this claim of physical proximity as a necessary predicate fact for defendants' core argument:

> "There came a time when Officer Dickel saw an unnamed male at the top of the stairs bleeding from the face. (Dickel Aff. Para 6) When Officer Dickel went to

investigate, the Plaintiff got in his face in a confrontational manner and would not permit Officer Dickel to attend to the bleeding David Henninger."

(Defendant's MSJ, p. 11, See also MSJ, p. 13, 14). According to Plaintiff Burkhart, however, Henninger was not present in her vicinity prior to the time of her arrest. She explained at deposition:

Q: While you were on the step, did David Henninger appear at the top of the stairs at any time?

A: No

Q: Are you sure?

A: As sure as I can be.

(Attached Exhibit No.1, Deposition of Robin Burkhart, pp. 22). Leon Bell has also testified that, at the time that he witnessed Plaintiff Burkhart and Defendant Dickel on the primary floor of the residence, he could not see Henninger in the vicinity. (Attached Exhibit No. 13, Deposition or Leon Bell, pp. 21-22; Attached Exhibit No. 7, Affidavit of Robin Burkhart).

Plaintiff Burkhart's and Leon Bell's respective statements that Henninger was not present in the vicinity where the Plaintiff was arrested are supported by the testimony of the defendants. Defendant Officer Vlach also did not see Henninger on the first floor at the time of Burkhart's arrest and acknowledged the same during his deposition:

Q: …[after you handcuffed Robin Burkhart] you're essentially in the floor space that goes to the living room, in between the kitchen and the stairs in the living room?

A: Yes.

Q: Who, if anybody, else is on that level the house when you stand up?

A: All I can remember is myself, Officer Dickel, Ms. Burkhart, and at that point in time. *I don't even remember seeing Henninger.*

Q: So Henninger is gone?

A: He might've been gone, might not have been. I don't remember where he was. *I don't remember seeing him.*

(See Attached Exhibit No. 5, Deposition of Detective Michel Vlach, pp. 51-52, 57, l. 14-16). Even Officer Dickel has conceded that he does not "recall [David Henninger] being" in the area where plaintiff Burkhart was detained, and cannot offer any explanation as to where he had gone at that time. (Attached Exhibit No. 6, Deposition of Officer Ryan Dickel, pp. 128).

Moreover, Defendant Dickel has admitted that Plaintiff Burkhart never physically blocked his path to David Henninger prior to the time of her arrest. (Attached Exhibit No. 6, Deposition of Officer Ryan Dickel, pp. 95, 104). The absence of a physical obstruction has been confirmed by Plaintiff Burkhart. (See Attached Exhibit No. 7, Affidavit of Robin Burkhart). In an effort to circumvent the absence of a physical impediment, Defendant Dickel has offered an alternative theory that he was some passive hindrance that resulted from Plaintiff Burkhart's verbal distraction. He explained this position during the course of his deposition:

> Q: What is it that she was being arrested for? What crime had she committed?
>
> A: Hindering an obstruction and assault?
>
> Q: And what had she done to hinder and obstruct?
>
> A: I was still unable to conduct an investigation and asking good cause--I'm sorry.--In good faith to complete my investigation as far as being able to speak to Mr. Henninger as far as his injuries and also be able to render aid to his medical injuries.
>
> Q: And that's because [Robin Burkhart] was distracting you and she kept yelling?
>
> A: Correct.

(Attached Exhibit No. 6, Deposition of Ryan Dickel, pp. 102-103). Such verbal actions could not have amounted to a hindrance or obstruction. (Attached Exhibit No. 14, Affidavit and Preliminary Expert Report of Dr. Christopher Chapman; Attached Exhibit No. 7, Affidavit of Robin Burkhart).

Officer Dickel has also belied his own testimony regarding Plaintiff Burkhart's alleged hindrance, when he admitted that he had no need or reason to interview Henninger on the scene:

"Q: During that time. When the paramedics, and even before then, from the time period of Robin Burkhart was cuffed up and until the time when you left [the Aspen Hill residence], did you have any conversation with David Henninger?

A: Not that I can recall.

Q: Did you have any need to have any conversation with David Henninger?

A: Me personally, no. Officer Barbara took care of that part.

Q: And that because he was assigned to 812?

A: That's correct.

Q: And he would have been the lead investigator on this call?

A: Correct.

(Attached Exhibit No. 6, Deposition of Officer Ryan Dickel, pp. 127-128). Because Officer Barber was responsible for conducting the entire investigation and intended to speak with all of the residents in the home, Officer Dickel had no investigatory responsibility nor did he have any attendant need to speak with Henninger. (Attached Exhibit No. 4, Deposition of Michael S. Barber, pp. 37-38; Attached Exhibit No. 14, Affidavit and Preliminary Expert Report of Christopher Chapman). [2]

If Officer Dickel had, in fact, had any genuine purpose in speaking to Henninger he could have done so at his leisure. (Attached Exhibit No. 7, Affidavit of Robin Burkhart). When Plaintiff Burkhart had been debilitated and was lying prostrate on the floor, there was no impediment that would have prevented him from conducting a field interview of Henninger. (Attached Exhibit No. 4, Deposition of Officer Michael Barber, pp. 47-48). Still, Defendant

---

[2]   At deposition Officer Dickel acknowledged that a hindrance or obstruction could only occur where an officer is "acting in good faith and within their duties to perform a function" such as an interview or interrogation. (See Attached Exhibit No. 6, Deposition of Ryan Dickel, pp. 31-32).

Dickel made no effort to conduct any interview of Henninger at that point in time. (Attached Exhibit No. 7, Affidavit of Robin Burkhart). Defendant Dickel's suggestion that he sought access to Henninger in an effort to provide medical assistance also rings hollow, as he never rendered any first aid to Henninger on the scene. (Attached Exhibit No. 6, Deposition of Ryan Dickel, p. 128).

Because defendant officer Vlach did not witness "Robin Burkhart prevent Defendant Officer Dickel from gaining access to David Henninger at any point in time" (Attached Exhibit No. 5, Deposition of Detective Michael Vlach, p. 36), the only officer that can attest to the hindrance in this case is defendant officer Dickel. The record evidence supports a conclusion that defendant Dickel manufactured the hindering claim on some occasion after his encounter with Plaintiff Burkhart. When he was asked about the reason for the arrest at the Aspen Hill residence, he made no mention of any attempts to speak with Henninger or having been impeded in an attempt to access Henninger. Rather, he reported that he had arrested Burkhart for attempting access the basement:

> Q: Do you remember any indicia of a physical struggle between Ms. Burkhart and Officer Dickel and Officer Vlach?
>
> A: No.
>
> Q: Did you ask, when you came upstairs, did you ask officer Dickel what had happened up there?
>
> A: He told me before I could ask.
>
> Q: And what specifically did he tell you?
>
> A: He said that [Plaintiff Burkhart] tried to come down [to] the basement. He said that, I believe, she pointed in my face and screaming[sic] at me. He said there's nothing I could do. I told her I would place her under arrest. I think that was pretty much the extent of our conversation as far as that went for that…."

(Attached Exhibit No. 4, Deposition of Officer Michael Barber, p. 53, 56-57). Incidentally, Officer Dickel's statement to Officer Barber on the scene contradicts his own deposition

testimony that Robin Burkhart "never tried to go around the bend to the basement" and "never

passed the landing area off the front door." (Attached Exhibit No. 6, Deposition of Ryan Dickel,

pp. 88, l. 1-6).

At this juncture, defendant Dickel's claimed need for access to Henninger must be

considered for what it is, a contrivance meant to obfuscate his unlawful actions. The record

supports a conclusion that he had no legitimate purpose in speaking with Henninger on the

scene. The record also supports a conclusion that Henninger was not impeded, in any fashion,

in his attempt to access Henninger. Finally, the evidence in this case supports a conclusion that

officer Dickel's claim about hindering was manufactured after the time of the subject

occurrence. There is accordingly a dispute of fact relative to this issue.

> b. *Robin Burkhart did not lunge at, or otherwise attempt to assault, Defendant Dickel at the 2926 Aspen Hill Residence.*

In their Motion for Summary Judgment, the Defendant Officers emphasize the fact that

Plaintiff Burkhart was "cursing and telling the police to get out" of her house. However,

Defendant Officer Dickel has acknowledged that this conduct is not contrary to any law in the

State of Maryland.[3] (Attached Exhibit No. 6, Deposition of Ryan Dickel, pp. 96-97).

Defendant Dickel has further acknowledged that verbal action including "threatening words"

do not constitute an assault in the absence of some physical act.  (Attached Exhibit No. 6,

Deposition of Ryan Dickel, pp. 28).  Defendant Dickel understands that an assault occurs only

---

[3] This position is consistent with Maryland State law. *Diehl v. State*, 294 Md. App. 466 (1982) (A person's act of communicating disagreement or outrage with police conduct, that does not include fighting words designed to provoke violence against an officer is protected conduct under the First Amendment.)

in instances where there is a "strong suspicion that [a person is] going to commit a battery and/or commit[s] battery." (Attached Exhibit No. 6, Deposition of Ryan Dickel, pp. 25-27). When asked to explain the conduct that might be interpreted as an assault, Defendant Dickel testified as follows:

> Q: And that's what I was going to ask you. Is movement alone sufficient or would there have to be some component of it that's an attempt to strike?
>
> A: There has to be an attempt to be struck.
>
> Q: You would agree with me that in order to have the potential of a battery there has to be some movement that is meant to be a strike movement?
>
> A: Correct.

(Attached Exhibit No. 6, Deposition of Ryan Dickel, p. 27).

Pursuant to Defendant Dickel's own definition, the lunging motion that he attributes to Plaintiff Burkhart was not assaultive. At deposition, he was thoroughly questioned about Plaintiff Burkhart's movement and conceded she never attempted to strike him:

> Q: Now, when Ms. Burkhart is standing next to you and you say she got within two inches of you and put her finger up and says get the fuck out of my house, she never touches you, does she?
>
> A: No.
>
> Q: And you would agree with me that she never balled her hand up to make a fist?
>
> A: No.
>
> Q: She never reached back to try to slap you?
>
> A: No.
>
> Q: Never tried to kick you?
>
> A: No.
>
> Q: Never tried to strike you?
>
> A: No.
>
>             *               *             *
>
> Q: And she never drew that arm back as if she were preparing to strike you?
>
> A: She never drew it back because she was pointing it forward in my face.

Q: Was it fully extended?

A: I don't recall. I just remember the finger.

(Attached exhibit No. 6, Deposition of Ryan Dickel, p. 98, 100-101). This testimony, along with the remainder of the factual record in this case has prompted Dr. Christopher Chapman (an expert in police procedures and practices) to conclude that no assault occurred during the subject occurrence. (Attached Exhibit No. 14, Affidavit and Preliminary Expert Report of Christopher Chapman).

      For her part, Plaintiff Burkhart denies that this close quarter confrontation described by Dickel even occurred. She testified at deposition that she was actually standing on the stairs "pointing to the front door" when she was telling the police officers to get out of her home. (Attached Exhibit No.1, Deposition of Robin Burkhart, pp. 20-21). At that time, Defendant Officer Dickel was still at the "landing" area by the front door (*Id.*) She testified further that she began walking from her vantage point on the steps "into the kitchen" (located on the primary floor) when Officer Dickel told her to be quiet. (Attached Exhibit No.1, Deposition of Robin Burkhart, pp. 22-27). She explained the sequence of events as follows:

Q: Okay. So then you went into the kitchen?

A: Yes.

Q: And Officer Dickel, when you went into the kitchen, was Officer Dickel still down by the front door?

A: As far as I know.

Q: Okay. So then what happened?

A: I got hit very hard in the back of the head. It felt like a hand hit me right here in the back of the head, hit me so hard that I couldn't even break my fall with my hand.

(Attached Exhibit No.1, Deposition of Robin Burkhart, pp. 22-27).

Leon Bell witnessed the subject events from immediately outside of the home. At deposition, he was questioned by defense counsel as to what had transpired from the moment that the officers descended into basement of the 2926 Aspen Hill residence through the time when Plaintiff was forced to the ground. (See Attached Exhibit No. 13, Deposition of Leon Bell, pp. 18-26). His testimony does not include any reference to the close proximity or lunging motion claimed by Officer Dickel. (*Id.*) According to Mr. Bell, Plaintiff Burkhart was standing "on the step leaning over the railing a little bit" and Officer Dickel was still in the entranceway foyer, when she indicated her desire for the officers to leave her home. (*Id.*) Mr. Bell has also testified that Plaintiff Burkhart was moving toward the kitchen when she was forcefully taken to the ground. (*Id.*)

John Burkhart was asked about what he had witnessed from the vantage point of the steps leading into the basement and testified as follows:

> Q: From your vantage point at the steps, did you ever see your wife make any lunge at any of the three officers that were in your home?
>
> A: No.
>
> Q: And from your vantage point on the steps; did you ever see your wife try to strike any of the officers?
>
> A: No.
>
> Q: And from your vantage point, did you ever see your wife try to kick any of the officers?
>
> A: No.

(Attached Exhibit No. 3, Deposition of John Burkhart, p. 53-54). Defendant Officer Vlach also testified at deposition that he did not personally witness any assault by Robin Burkhart against Defendant Officer Dickel. (Attached Exhibit No. 5, Deposition of Officer Michael Vlach, p. 36).

The claim that Plaintiff Burkhart lunged at Officer Dickel was also invented to obfuscate the force utilized at the scene. The issue of whether any assault actually occurred is disputed issue of material fact in this case.

     *c. Plaintiff Burkhart was never told that she was under arrest on the scene or told to place her hands behind her back.*

Defendants' suggestion that plaintiff failed to heed instructions to place her hands behind her back is also the subject of a factual dispute. At no time was Plaintiff Burkhart advised that she was subject to arrest prior to the time of being taken to the ground. (Attached Exhibit No. 7, Affidavit of Robin Burkhart). The lack of an instruction was also addressed during John Burkhart's deposition:

> Q: Did you ever hear officer say you're under arrest?
> A: No.
> Q: Did you ever hear an officer say stop resisting?
> A: No.
> Q. Did you ever hear officer say give me your arms, I want to put you in handcuffs?
> A: No.
> Q: Did you ever see an officer attempt to handcuff your wife before he took her to the ground?
> A: No.
> Q : How long was your wife on the ground after she been taken down before she was put in handcuffs, if you can say?
> A: A few long minutes, 5 minutes.
> Q: And what exactly was he doing at that point in time?
> A: Just still agonizing in pain, screaming, saying they wanted her to get up, she said I can't, there's something wrong with my leg.

(Attached Exhibit No. 3, Deposition of John Burkhart, p. 52-53).

*d.* *Plaintiff was forcefully taken to the ground and her left lower extremity was manipulated while she was lying prostrate on the ground. There was no legal justification for either action.*

Plaintiff Burkhart was struck without provocation and propelled to the ground. She was not facing either of the defendant officers at the time, nor was she afforded any opportunity to comply before force was escalated. She described the sequence of events at her deposition:

Q: So the last time you saw Officer Dickel before you walk into the kitchen, he was down by the door and you were up on the second step coming from the living room kitchen area towards the door?

A: As far as I can remember, yes.

Q: Then you went up, went in the kitchen?

A: Uh-huh.

Q: And while you were in the kitchen, something or someone struck you in the back of the head?

A: That's correct.

Q: Do you recall, was it a fist, was an open hand, could you tell?

A: It kind of felt like an open hand because it went all the way across the back of my head, like a gloved hand.

Q: And then you couldn't break your fall because it like startled you, I guess?

A: It was so quick and so hard, I went right down.

Q: Did you fall face first and land on the floor, your whole body?

A: Yes, Sir.

Q: So you're laying face down on the floor in the kitchen?

A: Uh-huh, half in the kitchen, half in the foyer.

                    *              *              *

Q: All right, half in the kitchen, half in the foyer. So, then what happens?

A: Then the officer grabs me by my leg, pulled me out of the kitchen. *He pushes my leg up, like why I don't know, pushes my leg up,* and then begins to twist and twist and twist and twist, and then I knew it was officer Dickel, because I read his badge, okay.

Q: Okay. So, I want to see if I understand this now. At this point you got hit by, you don't know who hit you?

A: No, I can't say who did.

Q: And then somebody pulled you from the kitchen to the foyer?

A: Which was officer Dickel, because I turned my head and I looked.

                      \*                  \*                \*

Q: Okay. So he pulls you out of the kitchen into this foyer, and then you said he pushes your leg up. Which leg?

A: My left leg.

Q: Now when he pushes the leg up, did he bend it, or is he just pushing it?

A: *Pushing it. My leg is hyperextended* so he must have been awfully -- *all I know is it hurt very, very badly he pushed it up, and then began to twist and twist and twist*, that I ended up on this side facing the closet when he was done with me.

(Attached Exhibit No.1, Deposition of Robin Burkhart, pp. 23-27 (emphasis supplied)).

Leon Bell also watched these events unfold from outside of the home. At deposition he testified that Mrs. Burkhart had been responsive to police instruction. (See Attached Exhibit No. 13, Deposition of Leon Bell, p. 21). He explained that he nevertheless witnessed one of the officers "strike" Plaintiff Burkhart "in the back of her head", thereby causing her to be knocked to the ground. (See Attached Exhibit No. 13, Deposition of Leon Bell, p. 23-24). According to Mr. Bell, Plaintiff Burkhart was not oriented in the direction of the officer, but rather facing "towards the kitchen" when she was struck and knocked down. (See Attached Exhibit No. 13, Deposition of Leon Bell, pp. 37-38). Mr. Bell subsequently witnessed the officer (identified by plaintiff Burkhart to be defendant Dickel) manipulating Plaintiff Burkhart's left leg:

Q: Now, did you have an unobstructed view, in other words, nothing obstructed your view?

A: No, nothing was in my way.

Q: So after this one officer dragged Mrs. Burkhart back towards the top of the stairs towards the living room, then what did you see?

A: He dragged her out and *he had bent her leg up* and started twisting on her leg.

Q: Which leg?

A: Her left leg.

(See Attached Exhibit No.13, Deposition of Leon Bell, p. 26 (emphasis supplied)). He further

explained that the officer was using "two hands" to manipulate her left lower extremity. (See

Attached Exhibit No. 13, Deposition of Leon Bell, p. 43).

John Burkhart described his observation of the events as follows: "He knocked her

down, he did something to her, there was a bunch of ruckus, and 2 seconds later my wife is

screaming. It was definitely from the officer."(Attached Exhibit No. 3, Deposition of John

Burkhart, p. 42). He explained:

> "The next thing that I saw that I can remember, because I was about halfway up
> those steps, I could see up, and I saw an officer standing over, like knocking my
> wife down and she was now on the ground, and then I saw the officer basically
> hovering over her, standing above her. And then I guess he went down to the
> ground, and then I couldn't see much more than that at this point."

(Attached Exhibit No. 3, Deposition of John Burkhart, p. 29). Plaintiff later explained the

sequence of events as follows:

> "[S]he said he hit her in the back of the head and knocked her face down on the
> ground, and then went down and proceeded to twist her over and twisted her leg
> like he was doing some kind of karate move or something. She said that he
> raised her leg up and then proceeded to twist her leg."

(Attached Exhibit No. 3, Deposition of John Burkhart, p. 43).

> e. *Plaintiff Burkhart was not taken to the ground to be handcuffed.*

Defendants' contention that they were taking Plaintiff Burkhart to the ground in an

effort to place her in handcuffs is also the subject of dispute. Plaintiff has denied the

application of handcuffs when she was taken to the ground. (Attached Exhibit No. 1,

Deposition of Robin Burkhart, p. 30). John Burkhart has also testified that Plaintiff Burkhart

was not handcuffed when he came up from the basement. (Attached Exhibit No. 3 Deposition

of John Burkhart, p. 32). In fact, he recalls that approximately five (5) minutes elapsed between the time when she was taken to the ground and the time when she was handcuffed on the scene. (Attached Exhibit No. 3, Deposition of John Burkhart, p. 53).

f. *Plaintiff Burkhart was not resistive or combative while she was on the ground and there was no need for the application of force to her lower extremity.*

No witness in this case has provided any explanation as to why it was necessary for Defendant Officer Dickel to manipulate Plaintiff's left leg after she was taken to the ground. Plaintiff did not advance at Defendant Dickel nor did she attempt to strike him while he was retrieving his handcuffs. (Attached Exhibit No. 6, Deposition of Ryan Dickel, p. 107). According to Leon Bell, Plaintiff Burkhart was not "doing anything" during the time period when she was on the ground and Defendant Officer Dickel engaged her left leg. (See Attached Exhibit No. 13, Deposition of Leon Bell, pp. 45-46). This observation is wholly consistent with Use of Force Report authored by Officer Dickel in which he claims to have "gained compliance" with the initial force and denies the necessity to use any additional force. (Defendants' Motion for Summary Judgment, Attached Exhibit 3). Defendant Dickel has also testified at deposition that he did not have any problem placing Plaintiff Burkhart in handcuffs after she had been taken to the ground. (Attached Exhibit No. 6, Deposition of Ryan Dickel, p. 120). There is no record evidence indicating that Plaintiff Burkhart was resistive or assaultive after being taken to the ground.

Given these circumstances, the application of force to Plaintiff Burkhart's lower left extremity was wholly unreasonable. (See Attached Exhibit No. 14, Affidavit and Preliminary Expert Report of Christopher Chapman). Significantly, Defendant's police expert, Charles Joseph Key, has conceded this point, and stated as follows:

"Plaintiff Burkhart alleges that Officer Dickel grabbed her by her left leg, twisted it, and pushed it after she was on the floor. She also testified that she did not resist nor struggle in any way. When considering that account, if Officer Dickel twisted and pushed her leg and she was neither struggling nor resisting, the twisting and pushing of her leg would not have been objectively reasonable nor consistent with nationally accepted standards of police policies, practices and training."

(Attached Exhibit No. 15, Report of Charles Joseph Key, pp. 18-19).

g. *Plaintiff Burkhart's leg was injured when it was forcefully pulled up and away from the ground after she had been detained.*

The defendant officers deny that Plaintiff Burkhart's left leg was manipulated after she was taken to the ground. The defendant officers have generally described the sequence of events that transpired while they were detaining Plaintiff Burkhart as follows: (1) they had control of Burkhart's arms and never lost contact with her person; (2) they used "very minimal force" or "basically, no force" to "guide and guard" Burkhart to the ground; and (3) they never manipulated or otherwise contacted Burkhart's knee during these efforts. (See Attached Exhibit No. 6, Deposition of Ryan Dickel, pp. 116-123; Attached Exhibit No. 5, Deposition of Detective Michael Vlach, pp. 41-49). Both officers have conceded that Plaintiff Burkhart immediately called out in pain "after she was on the ground", but do not offer any explanation as to what caused the injury. Defendant Dickel cannot offer any explanation as to how Plaintiff Burkhart came to be injured. (See Attached Exhibit No. 6, Deposition of Ryan Dickel, pp. 122; Attached Exhibit No. 5, Deposition of Detective Michael Vlach, p.49). Defendant Vlach also claims that the injuries are shrouded in mystery:

Q: As you sit here today, do you have any knowledge of the nature of Robin Burkhart injuries?
A: Other than what I've learned from her deposition in talking to Mr. Ruckel, no.

Q You are aware that she [] suffered a tibial plateau fracture and damaged one of her arteries?

A: Yes.

Q: Do you have any idea as to how that occurred?

A: No.

Q: Did you witness any movement on July 23, 2011 that would have caused those type of injuries?

A: No.

Q: Did you ever see Robin Burkhart strike her knees against the ground?

A: No.

Q: Did you ever see officer Dickel twisting Robin Burkhart's leg when she was down on the ground?

A: No, I did not.

(Attached Exhibit No. 5, Deposition of Detective Michael Vlach, pp. 60-61).

Defendants' suggestions that Plaintiff Burkhart's injuries were spontaneous and inexplicable have been rejected as implausible by their own expert witnesses. Dr. Barry D. Daly, an expert radiologist for the defendants, "was asked to examine the radiology studies which Mrs. Burkhart had following fracture of her tibia and fibula in July 2011…." (See Attached Exhibit No. 11, Deposition of Dr. Barry D. Daly, p. 9). At deposition he testified as follows:

Q: Let's do it this way. Would you at the beginning agree with me that Ms. Burkhart would not have suffered this injury or these injuries in a vacuum, meaning you wouldn't see a tibial plateau fracture, a posterior dislocation, femoral head fracture, a nerve injury, and an artery injury absent some happening, some trauma?

A: I agree.

Q: So you agree with me that something had to happen at the house that particular night?

A: Yes.

                    *                *                *

Q: Let me ask it in this context, and this is a hypothetical again. I want you to assume for purposes of this hypothetical that the officers have testified at

24

deposition[4] that they grabbed each of Ms. Burkhart's respective wrists, that they glided her to the ground, that her torso made contact with the ground first, and this is the officers' testimony for purposes of this hypothetical, and that her knee did not hit the ground. Based on that hypothetical, with that hypothetical testimony, would you expect to see the injuries that are present in Ms. Burkhart's knee?

A: No, I wouldn't.

Q: In looking at the radiographs of Ms. Burkhart's knee, are you able to give me a general description of the mechanism of injury? Where was the force applied? How did the knee bend?

A" We can see that there is clear evidence of a depressed fracture of the tibial plateau which extends from the medial side of the tibial plateau across to the lateral side. This is demonstrated, if you will, I'm using information which is not only partially from radiographs, but also from the CT scan. It would actually – this kind of injury is typically seen in a setting such as, as I stated earlier, major blunt trauma with say a fall from height, or an injury occurring – where a high velocity injury has occurred, such as being hit by an auto moving at a speed where the actual front of an the auto hits the knee of the person who is injured.

(Attached Exhibit No. 11, Deposition of Barry D. Daly, pp. 19-22).

Dr. Stephen Belkoff,  a biomechanical engineer, has been retained in this case by the defendants to offer opinions regarding the mechanism of Plaintiff Burkhart's injury. (See Report of Dr. Stephen Belkoff attached to Defendants' Motion for Summary Judgment as Exhibit No. 11). For purposes of this case, Dr. Belkoff has evaluated Plaintiff Burkhart's injuries (Attached Exhibit No. 12, Deposition of Stephen Belkoff, Ph.D., p. 14), which he describes as a "knee dislocation caused by posterior translation of the tibia" resulting in, among other things, a comminuted fracture of the proximal tibia and a fracture of the fibula head. (Attached Exhibit No. 12, Deposition of Stephen Belkoff, PhD, pp. 23-24). According to Dr. Belkoff, these injuries were the result of "some mechanical insult" caused by the application of an "external force" exacted to Plaintiff Burkhart's lower limb.  (Attached

_____

[4] Dr. Daly had not been provided with a copy of the defendant officers' deposition, and had only been advised that they had used "ordinary force" by counsel for the defendant. (See Attached Exhibit No. 11, Deposition of Barry D. Daly, p. 12).

Exhibit No. 12, Deposition of Stephen Belkoff, PhD, pp. 31-32, 52-63, 100-122). Dr. Belkoff has also established that it would be possible to manually effect a posterior translation of knee, as suffered by Robin Burkhart, by "push[ing] the knee all the way back…." (Attached Exhibit No. 12, Deposition of Stephen Belkoff, Ph.D., pp. 62-63).

At deposition, Dr. Belkoff was asked to address the origin of Plaintiff Burkhart's injuries in the context of the record evidence. He first established that Plaintiffs injuries were not caused during the process of being taken to the ground. (Attached Exhibit No. 12, Deposition of Stephen Belkoff, Ph.D., pp. 85). Dr. Belkoff then explained that Plaintiff's injuries were caused when her lower leg was pulled up and away from the floor while she was lying face down on the ground:

> Q: Assuming for the moment that Robin Burkhart is lying prostrate on the ground, face down, stomach down, as she testified [], as officer Dickel testified [], as officer of Vlach testified[]. Okay? Are you able to say where the force would have to be applied to cause the injuries that you know to happen in this case, based on your review of the medical records?
>
> A: In this position, in order to move the tibia relative to the femur, I can't tell you exactly where the force would have to be applied, but certainly the femur can't go into the ground anteriorly, so that would mean the tibia has to be translated posteriorly.
>
> Q: So, when you say the femur can't go into the ground anteriorly, the femur can't go forward, right?
>
> A: The femur can't go into the floor. You can't penetrate, interpenetrate the floor, it's constrained.
>
> Q: And so the moment would have to be—
>
> A: The tibia would have to go posteriorly.
>
>             *                 *                *
>
> Q: At some point [Robin Burkhart's] tibia was moved posteriorly?
>
> A: Posteriorly.
>
> Q: Would you agree with that, sir?
>
> A: To have a posterior translation dislocation, the tibia would have to be moved posteriorly.

Q: Can you offer that to a reasonable degree of scientific certainty?

A: That's the mechanism of injury for a posterior tibial translation.

               *              *            *

Q: And [Robin Burkhart's] tibia would have to be moved away from the ground?

A: Normal to the surface of the ground, yes, in this picture.

Q: And that tibia would have to be moved away from the ground by some external force?

A: We agree barring internal force, yes.

Q: And we've also agreed that the chances of an internal force causing this injury are miniscule to almost impossible?

A: Correct.

Q: And the force, the force that would move the tibia would be forced that would be applied to some portion of the lower limb, meaning from the knee, down, correct?

A: Would you have to--in order to--you have to provide a posteriorly directed translational force and, by definition, it would have to be somewhere in the lower extremity.

Q: Well, lower extremity is, basically, from the hip, down, but we agreed this would be from the knee, down?

A: From the knee, down, below the knee.

Q: So, we can agree that on July 23, 2011 there was at least some force, and I know you can't say exactly what it was, but you can say, to a scientific certainty, that there was at least some force applied to Robin Burkhart's tibia to move it posteriorly?

A: Yes, in order to create the injury, there had to be posteriorly directed force.

Q: And you can offer that opinion to a reasonable—

A: Reasonable degree of scientific certainty, that's—

Q: --reasonable degree of scientific certainty?

A: -- the mechanism of injury.

(Attached Exhibit No. 12, Deposition of Stephen Belkoff, Ph.D., pp. 116-122). The

mechanism of injury described by Dr. Belkoff, is wholly consistent with the motion that

Plaintiff Burkhart and Leon Bell described at deposition.

Dr. Belkoff has also been asked to reconcile the defendants officers' respective accounts of the subject encounter with the medical/scientific evidence in the case. He testified that neither of the officers had offered any explanation that might account for the injuries suffered by Plaintiff. (Attached Exhibit No. 12, Deposition of Stephen Belkoff, pp. 115). He testified further that the Use of Force Reports generated by the Defendant Officers made no mention of any happening that might have given rise to Plaintiff Burkhart's injuries. (Attached Exhibit No. 12, Deposition of Stephen Belkoff, p. 32). Given these circumstances, Dr. Belkoff was compelled to reject the sanitized account of events claimed by the defendant officers:

> Q: So, now you've heard officer Dickel's account of what happened that day. Would you agree with me sir, that something in addition to what he testified you had to have happened on the scene to cause Ms. Burkhart to suffer the injuries that you suffered?
>
> A: In order to create an injury, there had to have been a force, either internal or external, applied, which is not clarified in Officer Dickel's testimony. There is no evidence to point me toward what force that was.
>
> Q: It's not just not clarified, it's totally omitted, is it not?
>
> A: It's not obvious to me where that force came from?

(Attached Exhibit No. 12, Deposition of Stephen Belkoff, PhD, pp. 108-118). Of course, the missing element in the police reports is reference to the leg manipulation described by Plaintiff Burkhart and Leon Bell.

h. *The undisputed evidence in this case, both factual and medical, unequivocally demonstrates that Plaintiff Burkhart suffered injuries when her leg was manipulated after she had been taken to the ground.*

Prior to the time for encounter with the defendant officers, Plaintiff Burkhart was physically intact without any injury to her left lower extremity. (Attached Exhibit No. 7, Affidavit of Robin Burkhart). The absence of any injuries supported by the statement of probable cause authored by defendant Dickel who has indicated that Robin Burkhart was

"standing on the steps inside of the front door on the upper level of the residence" at the time

of his arrival. (Defendant' Motion for Summary Judgment, Exhibit No. 2, p. 2). Because

Plaintiff Burkhart was no longer able to stand up after suffering from the posterior dislocation

of her left knee (Attached Exhibit No. 12, Deposition of Stephen Belkoff, p. 56-57), there is no

temporal dispute in this case regarding onset. The injuries occurred during the course of

Plaintiff Burkhart's encounter with the defendant officers.

Defendant Dickel conceded as much in his Statement of Probable Cause concerning the

subject happening:

> "Myself and Officer Vlach then placed [Plaintiff] Burkhart face down on the
> floor and were able to place handcuffs on her. Defendant Burkhart then
> complained that her leg was injured as a result of the struggle. I then requested a
> medic unit to respond to treat her. Medic #11 arrived at the location and treated
> the [Mrs. Burkhart]. She was then transported To Franklin Square Hospital. I
> then followed Medic #11 to the hospital. Once at the hospital, [Plaintiff]
> Burkhart was treated. It was discovered that she had a fracture in her leg and
> needed to have surgery. She was expected to be hospitalized for several
> days…."

(Defendant' Motion for Summary Judgment, Exhibit No. 2, p. 4).

Dr. Kenneth Lippman, an orthopedic expert identified by the Plaintiff, has opined that

Mrs. Burkhart "sustained injury to her left lower extremity when the leg was manipulated."

(Defendants' Motion for Summary Judgment, Exhibit No. 8, Dr. Kenneth Lippman's Report,

p.1). Dr. Theodore Manson, a treating orthopedic surgeon who has been designated as an

expert by the plaintiff, described the injuries as follows:

> "Ms. Burkhart has sustained severe injuries to her left knee. They comprise
> a severe left tibial plateau fracture that went on to posttraumatic
> osteoarthritis, a left peroneal and probable tibial neurapaxia that has
> resolved somewhat, but not completely; and they left popliteal artery and
> vein transection that required emergent repair and then later revision bypass.
> We converted her to a total knee arthroplasty. I think that her function is
> much better than it would have been without conversion to a total knee

arthroplasty, but may not be equivalent to a standard total knee replacement for standard osteoarthritis."

(Defendants' Motion for Summary Judgment, Exhibit 7, Dr. Theodore Manson's Report, p.3).

Dr. Rajabrata Sarkar, a treating vascular surgeon identified as an expert for Plaintiff Burkhart, also opined that Mrs. Burkhart "suffered a traumatic injury to the left knee with fracture dislocation of the knee as well as a disruption of the popliteal artery and vein." (Defendants' Motion for Summary Judgment, Exhibit 6, Dr. Rajabrata Sarkar's Report, p.1). Dr. Sarkar went on to explain the basis for his conclusion:

> "I evaluated the patient in consultation on 3/8/12 at the request of our orthopedic surgeons. At that point she had severe resting ischemia of the left leg, with a brachial index of 0.29 and a leftover pressure of zero measured on 3/8/12. The non-involved right leg had an ankle brachial index of 0.86 at the same exam date, indicating essentially normal perfusion. This demonstrates that the poor perfusion and extensive tibial occlusive disease discovered later in the left leg were not due to peripheral artery disease (PAD) *but rather to the unilateral injury suffered on 7/23/12 and subsequent thrombosis and embolism*."

(Id., Emphasis Supplied) These opinions regarding a traumatic happening are wholly consistent with the testimony of Drs. Daly and Belkoff that Plaintiff's injuries were not spontaneous and had resulted from the application of external forces her lower left extremity.

In an effort to overcome this daunting evidence relative to a traumatic injury, Defendants have requested that their experts consider Plaintiff Burkhart's injuries in the context of a "twisting" mechanism without regard to the testimony that her leg was pulled up and away from the ground. (Attached Exhibit No. 12, Deposition of Stephen Belkoff, Ph.D., pp.53-55). This request prompted the limited opinions that were attached in support of Defendants' Motion for Summary Judgment.  Because these opinions have been artificially limited, however, they do not support the proposed conclusion that Plaintiff has failed to make a prima facie showing of casually related injuries. (See generally, Attached Exhibit No. 12,

Deposition of Dr. Stephen Belkoff, all referenced pages). Nor do they support a dispositive ruling at this juncture of the case.

## IV.    <u>Argument</u>

### A.    Summary Judgment Standard and Causes of Action

A judgment under the Federal Rules of Civil Procedure Rule 56 may be entered only where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." The Court's role under Rule 56 is limited to assessing the threshold issue of whether a genuine issue exists as to material facts requiring a trial. *Anderson Liberty v. Lobby, Inc.*, 477 U.S. 242, 249 (1986). In the context of this evaluation, the evidence of the non-moving party is to be believed as true, all doubts will be resolved against the moving party, all evidence will be construed in the light most favorable to the non-moving party, and all reasonable inferences will be drawn in the non-moving party's favor. *See, Hunt v. Cromartie*, 526 U.S. 541, 550-55 (1999); *see also Anderson Liberty*, 477 U.S. at 255. "Summary Judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson Liberty*, 477 U.S. at 248.

In the instant case, Plaintiff Burkhart's claims sounding in battery, false arrest, false imprisonment and conspiracy, have been alleged both as independent torts and as component pieces of her causes of action under 42 U.S.C. § 1983 and for a violation of the Maryland Declaration of Rights. (See Plaintiff's Original Complaint, Para. 50 and 55, each incorporating all causes of action as the predicate for the constitutional tort claims). Plaintiff categorically denies the existence of any probable cause or legal justification supporting her detention on

July 23, 2011, and giving rise to her subsequent arrest. Plaintiff further contends that the defendant officers caused her to be severely injured by manipulating her lower left extremity.

Plaintiff nevertheless agrees that the causes of action to be decided by the trier of fact should be limited in some respects. At the outset, Plaintiff concedes that the cause of action for conspiracy should be allowed as components of the claims under 42 U.S.C. § 1983 and the Maryland Declaration of Rights, but should not be maintained as an independent claims. Plaintiff also hereby withdraws her claims of False Arrest and False Imprisonment as to defendant Michael Vlach only. Plaintiff intends to proceed with, and argues against summary judgment, with respect to the following causes of action:

> Count 1 – Battery, against Defendants Dickel and Vlach
>
> Count II – False Arrest, against Defendant Dickel only
>
> Count III – False Imprisonment, against Defendant Dickel only
>
> Count V – Relief under 42 U.S.C. § 1983, against Defendants Dickel and Vlach
>
> Count VI – Violation of Maryland Declaration of Rights, against Defendants Dickel and Vlach

Genuine disputes of fact exist with respect to each of these causes of action.

### B. Because there is dispute of fact in this case relative to the justification for detention/arrest and the existence of probable cause, Plaintiff's claims for false arrest, false imprisonment and battery are viable components for claims under 42 U.S.C. § 1983.

The Fourth Amendment prohibits law enforcement officers from making unreasonable seizures, and seizure of an individual effected without probable cause. U.S. CONST. AMEND. IV. "The Fourth Amendment prohibits law enforcement officers from making unreasonable seizures, and seizure of an individual without probable cause is unreasonable." *Brooks v. City of Winston-Salem*, 85 F.3d 178, 183 (4th Cir. 1996); see also *Malley v. Briggs,* 475 U.S. 335,

106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)*; Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed. 2d (1978).

Defendants point to a series of Seventh Circuit decisions in support of their assertion that "the existence of probable [sic] cause for arrest totally precludes any § 1983 action for unlawful arrest, false imprisonment or malicious prosecution regardless of whether the defendants had malicious motive for arresting the plaintiff." (Defendants' Motion for Summary Judgment, pp. 11-12). This proposition is incorrect. The Seventh Circuit actually held that plaintiffs

> "could establish an unconstitutional deprivation of liberty by showing that the defendant police officer had procured retroactive authorization to arrest the plaintiff… by misrepresenting or omitting certain material facts."

*Mark v. Furay,* 769 F.2d 1266, 1269 (7th Cir. 1985) (citing *Whitley v. Seibel*, 613 F.2d 682 (7th Cir. 1980), *cet. denied*, 459 I.S. 942, 103 S.Ct. 254, 74 L.Ed.2d 198(1982)).  The threshold determination in such circumstances where

> "'there was no valid warrant executed' when the defendant initially made the arrest… [is whether] 'the evidence … may be interpreted to suggest that the defendant intentionally misled and misrepresented the facts and circumstances of the case to the assistant state's attorneys involved.'"

*Mark*, 769 F.2d at 1269 (quoting *Whitley v. Seibel*, 613 F.2d 682, 686)).  Accordingly, where there is evidence supporting a conclusion that a defendant officer omitted or misrepresented material fact a dispositive ruling is not appropriate.

The Seventh Circuit's consideration is wholly consistent with the Supreme Court's holding that a police officer violates the Fourth Amendment if, in order to obtain a warrant, he deliberately or "with reckless disregard for the truth" makes material false statements or omits material facts.  *Franks*, 438 U.S. at 155. It is also consistent with the analysis of the Fourth Circuit which has stated that:

> "A plaintiff's allegations that police seized him 'pursuant to legal process that
> was not supported by probable cause and that the criminal proceedings
> terminated in his favor are sufficient to state a…claim alleging a seizure that
> was violative of the Fourth Amendment."

*Miller v. Prince George's County,* 475 F.3d 621, 627 (4th Cir. 2007) (quoting *Brooks,* 85 F.3d 178, 183-84).

This is not, as defendants now suggest, a case in which an arrest was made pursuant to facially valid warrant. Rather, this is a case in which Plaintiff Burkhart contends that the warrant was obtained after the subject occurrence based on an intentional omissions or misrepresentations of fact. To succeed on her claim, Plaintiff must prove that the Officer Dickel

> "deliberately or with a 'reckless disregard for the truth' made material false
> statements in his affidavit…. or omitted from that affidavit 'material facts with
> the intent to make, or with reckless disregard of whether they thereby made, the
> affidavit misleading.'"

*Miller*, 475 F.3d at 627-28 (quoting *Franks*, 438 U.S. at 171, and *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990)).

> "'Reckless disregard' can be established by evidence that an officer acted 'with
> a degree of awareness of [a statement's] probable falsity,' that is 'when viewing
> all the evidence, the affiant must have entertained serious doubts as to the truth
> of his statements or had obvious reasons to doubt the accuracy of the
> information that he reported.'… With respect to omissions 'reckless disregard
> can be established by evidence that a police officer 'failed to inform the judicial
> officer of facts he knew would negate probable cause."

*Miller*, 475 F.3d at 627 (internal citations omitted)

Officer Dickel authored his Statement of Probable Cause on July 25, 2011, two days after the alleged incident. (See Defendants Motion for Summary Judgment, Exhibit No. 2; Attached Exhibit No. 6, Deposition of Ryan Dickel, p. 154, 157, 164-165, 168-170). At the time, he understood that Plaintiff had been seriously injured on the scene and thus had motive

to obfuscate his unconstitutional activities, as well as, those of Defendant Officer Vlach by prompting criminal charges.   The evidence in this case supports a conclusion that he manufactured the claim of hindering, and resisting arrest /assault in effort to cloak the misconduct that occurred at the scene.

Both the Maryland Court of Appeals and Maryland Court of Special Appeals have said that resisting, hindering, or obstructing an officer of the law in the performance of his duties is an offense at common law. *See Busch v. State*, 289 Md. 669, 675 (1981); *Roddy v. Finnegan*, 43 Md. 490, 505 (1876); *Howard v. State*, 32 Md. App. 75, 82 (1976). In general, the elements of the offense of obstructing or hindering a police officer are:

(1) A police officer engaged in the performance of a duty;

(2) An act, or perhaps an omission, by the accused which obstructs or hinders the officer in the performance of that duty;

(3) Knowledge by the accused of facts comprising element (1); and

 (4) Intent to obstruct or hinder the officer by the act or omission constituting element (2).

*Cover v. State*, 297 Md. 398, 413 (1983). At deposition, defendant Dickel confirmed his understanding of these general elements. (Attached Exhibit No. 6, Deposition of Ryan Dickel, pp. 30-32)  He further explained that a hindering or obstruction could only occur in instances where an "officer is acting in good faith… to perform a function." (Attached Exhibit No. 6, Deposition of Ryan Dickel, pp. 31)

Given this understanding of the law of hindering and obstruction, it is apparent that defendant Dickel drafted his Statement of Probable Case to prompt an otherwise unsupported conclusion that he had been hindered by Plaintiff Burkhart. Among other things, Defendant Officer Dickel omitted from his Statement of Probable Cause the facts that (1) he had no

35

legitimate investigative purpose to speak with David Henninger at the scene; (2) Plaintiff

Burkhart never physically blocked his access to David Henninger at the scene; (3) David

Henninger was not present in the area where he arrested Plaintiff Burkhart; and (4) he never

actually undertook any effort to speak with David Henninger at the scene. These facts share

the common trait of being dispositive of defendant Dickel's claim that he had acted in "good

faith" to perform the function of interviewing Henninger.[5] These omissions were intentional,

and a reasonable officer would necessarily understand these facts to be material to the issue of

probable cause to believe that a hindering or obstruction had occurred. (See Attached Exhibit

No. 14, Affidavit and Expert Report of Christopher Chapman).

In his Statement of Probable Cause, defendant Dickel also asserted that Plaintiff

Burkhart had "lunged" in his direction in an effort to prompt assault charges. However, he

omitted or failed to make mention of the facts that Mrs. Burkhart had never actually attempted

to strike him. This must also be interpreted as knowing omission given Officer Dickel's

acknowledgment at deposition that an assault could not occur where there is "no attempt to be

struck." (Attached Exhibit No. 6, Deposition of Ryan Dickel, pp. 25 – 28) Officer Dickel also

omitted any reference to the fact that Mrs. Burkhart had been taken to the ground and

restrained while she was walking to the kitchen, and that she did not resist arrest in any fashion

after being taken to the ground. Again, the omission was material as it was dispositive of the

---

[5] In *Cover v. State*, 297 Md. 398, 415-416 (1983), the Maryland Court of Appeals explained that there must be an actual hindrance to support criminal charges and explained:

"The State argues that '[a]n obstruction or hinderance need not be wholly or partially successful; it need not make the job of the police officer impossible or even more difficult; rather it is the *intent* to hinder or obstruct that is important.'(Emphasis in original).… Contrary to the implication of the State's argument, where the alleged hindering is as indirect as that presented here, we cannot conclude that the crime may be based solely on intent, without regard to whether there has in fact been some degree of hindrance. 'To uphold such an argument would be to ignore a basic premise of Anglo-American law that no crime is committed by the mere harboring of evil intent not accompanied by an act, or an omission to act where there is a legal duty to act.'" Id. (qouting *In re Leroy T.*, 285 Md. 508, 513, 403 A.2d 1226, 1229 (1979))

claimed assault and resisting arrest charges. (See Attached Exhibit No. 6, Deposition of Ryan Dickel, p. 174). There is a questions of fact in this case as to whether the foregoing information which is all relevant to the determination of probable cause was knowingly withheld from the magistrate that issued the arrest warrant. (See Attached Exhibit No. 14, Affidavit and Expert Report of Christopher Chapman).

Because there is an inferential question as to Defendant Dickel's intentional omission and misstatement of fact when acting to obtain the warrant, he is not shielded by any qualified immunity in the context of the claim under section 1983. *See e.g. Stewart v. Donges*, 915 F.2d 572 (10th Cir. 1990) (Fourth Amendment is clearly violated by affirmative misstatement of fact or omissions of fact that would vitiate probable cause). The Supreme Court has plainly stated that in circumstances where an officer secures a warrant by submitting information that "is so lacking in indicia of probable cause as to render official belief in its existence unreasonable," there is no immunity from suit. See *Malley*, 475 U.S. at 345 (holding that a magistrate's finding of probable cause and issuance of a warrant does not shield an officer from damages liability). The Fourth Circuit explained that "the judicial determination of probable cause does not 'break[] the casual chain between the application for the warrant and the improvident arrest' if the officer who sought the warrant did not posses probable cause." *Brooks v. City of Winston Salem*, 85 F.3d 178, 184, n.7 (quoting *Malley,* 475 U.S. at 344, n. 7*).*

Application of an objective consideration as to probable cause also bars the defendants' claim of qualified immunity in this case. *See McLenagan v.* Karnes, 27 F.3d 1002, 1007 (4th Cir. 1994) ("Regardless of whether probable cause actually existed, if a reasonable officer possessing the same particularized information as [the defendant] could have... believed that his conduct was lawful, then [the defendant] is entitled to qualified immunity."). Officer

Dickel has candidly admitted that there cannot be an assault in the absence of an attempted

striking. He has also candidly admitted that he had no legitimate purpose to speak with David

Henninger on the scene. Given the circumstances, a reasonable officer could not have

concluded that either an assault or hindrance have been perpetrated by Plaintiff Burkhart. The

impossibility of such consideration was cemented by Dr. Christopher Chapman who has

offered the following expert opinions in this case:

> 8. Officer Dickel indicated within his reports and deposition that he arrested Ms. Burkhart for hindering due to him being unable to conduct an investigation regarding Mr. Henderson injuries and not being able to render medical aid. However, Officer Barber indicated that Officer Dickel had no responsibility to conduct any such investigation. Officer Dickel also testified at deposition that he had no responsibility to interview Mr. Henninger on the scene. Accordingly, a reasonable officer on the scene would not have reached a conclusion that Mrs. Burkhart and hindered or obstructed Officer Dickel's access to David Henninger in any fashion.

> 9. Is my professional opinion, which is held to a reasonable degree of professional certainty, that Ms. Burkhart did not use any force against Baltimore County police officer, did not prevent officer Dickel from interviewing or observing Mr. Henninger.

> 10. Mrs. Burkhart's actions, as described by officer Dickel, did not constitute an assault. It is my professional opinion, which is held to a reasonable degree of professional certainty, that no reasonable police officer would have used force against Robin Burkhart because she pointed her finger at them know what a reasonable police officer have been fearful of Robin Burkhart because she was pointing her finger absent some additional effort to strike.

(Attached Exhibit No. 14, Affidavit and Preliminary Expert Report of Dr. Christopher

Chapman).  Because no reasonable police officer would have believed that Plaintiff Burkhart

had committed any crime at 2926 Aspen Hill Road, no immunity is available to the defendant

officers in this case.

Fortunately for Plaintiff Burkhart, the assistant state's attorney who later assumed the

handling of the case easily understood that the defendant officers had misrepresented material

fact in an effort to secure the arrest warrant. The criminal case was resolved in Plaintiff

Burkhart's favor when the State of Maryland agreed Plaintiff Burkhart would not be prosecuted so long as she did "not file an Internal Affairs Complaint." (Attached Exhibit No. 6, Deposition of Ryan Dickel, pp. 209-210).

Based on the factual record in this case and the testimony elicited directly from Officer Barber and Officer Dickel, a reasonable jury could determine that Officer Dickel did not have legal justification or probable cause to arrest Plaintiff Burkhart for obstruction and hindering, resisting arrest, or assault. The criminal charges have all been resolved in her favor. Accordingly, summary judgment is inappropriate to as to the claims of false arrest and false imprisonment as component of Plaintiff Burkhart's claim under 42 U.S.C. §1983.

### C. Plaintiff's excessive force claims under 42 U.S.C. § 1983 and the Maryland Declaration of Rights exist irrespective of the existence of probable cause determination and must be decided by a trier of fact.

The Fourth Amendment's prohibition against unreasonable seizures protects not only against arrests made without probable cause, but also against the use of excessive force in making arrests that are themselves supported by probable cause. *See Tennessee v. Garner*, 471 U.S. 1, 7-8, 105 S.CT. 1694, 85 L.Ed. 2d 1 (1985) (Court flatly rejected the suggestion that the Fourth Amendment's reasonableness requirement is satisfied so long as the seizure itself is supported by probable cause, holding that the reasonableness of a seizure depends not only on when it was made but also on how it was carried out); *See also Graham v. Connor*, 490 U.S. 386, 395, 104 L. Ed. 2d 443, 109 S. Ct. 1865 (1989) (Claims that law enforcement officers used excessive force when making an arrest "should be analyzed under the Fourth Amendment."); *Jenkins v. Averett*, 424 F.2d 1228, 1232 (4th Cir. 1970) (Fourth Amendment provides constitutional protection against use of excessive force during arrest that is vindicable through § 1983). Reasonableness in the context of an excessive force claim is determined by

the "facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

In the instant case, it has been agreed by all parties that Plaintiff Burkhart was compliant and did not pose any threat to the arresting officers at the scene once she was on the ground. (See Attached Exhibit No. 16, Use of Force Report authored by Michael Vlach; Defendants' Motion for Summary Judgment, Attached Exhibit No. 3, Officer Ryan Dickel's Use of Force Report)  It is further understood, through the testimony of the defendants' own experts, that Plaintiff's injuries would not have occurred absent some external force applied to her lower extremity. Plaintiff indicates that her leg was manipulated by the officers without cause while she was on the ground; Defendant officers deny having perpetrated such an action.[6] The trier of fact must determine whether the defendant officers manipulated Plaintiff Burkhart's lower left extremity in the manner that she and Leon Bell described at deposition. Because the determination of reasonableness depends on which of the two conflicting stories is to be believed, there must be a trial on the excessive force action asserted under 42 U.S.C. § 1983.

---

[6]  Plaintiff Burkhart contends that Officer Dickel, individually, pulled Mrs. Burkhart from the kitchen into the foyer and pushed her leg up. (Attached Exhibit 1, Robin Burkhart Deposition, pp. 25-27). She further contends that Officer Vlach did not appear on the main floor of the residence until after Officer Dickel had her on the ground and manipulated her leg.  (Attached Exhibit 1, Robin Burkhart Deposition, pp. 30, 35-36). However, it is Officer Vlach's and Dickel's contention that they were both involved in guiding Mrs. Burkhart to the ground in an attempt to place handcuffs on Mrs. Burkhart of the primary floor of the residence. (Attached Exhibit 6, Officer Ryan Dickel Deposition, pp. 114-120; Attached Exhibit 5, Officer Michael Vlach, pp. 39-41). Officer Vlach further implicated himself by generating the Use of Force Report that is attached to this Opposition as Exhibit No. 16. Acceptance of the defendants' testimony, compels a conclusion that both defendant Dickel and defendant Vlach participated in the sequence of events that culminated in the manipulation of Plaintiff Burkhart's lower left extremity. Stated another way, the dispute of fact relative to defendant officer Vlach's use of excessive force has been established through his own testimony, as well as, that or defendant officer Dickel.

Given the parameters of this issue, there also can be no claim of immunity in the context of Plaintiff's excessive force complaint. The defendants' own expert, Charles Key, has conceded that if Plaintiff Burkhart's leg was manipulated as she described no reasonable officer would conclude that such force was warranted. This opinion is shared by Christopher Chapman, Plaintiffs own police procedure expert, who has opined that the force was unnecessary and unreasonable. (Attached Exhibit No. 14, Affidavit and Preliminary Expert Report of Dr. Christopher Chapman). Because the conduct attributed to the defendant officers is the type deemed to be clearly excessive and violative of the constitution even in the absence of case law regarding a clearly established rights, there can be no claim of immunity by the defendant officers. *See Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009) (law was sufficiently clear to inform reasonable officer "that it was unlawful to catering nonviolent, suspected misdemeanant who was not fleeing resisting arrest, who posed little to no threat to anyone's safety, and whose only noncompliance with the officer's command was to disobey two orders to end her phone call to 911 operator"); *Giles v. Kearney*, 571 F.3d 318, 327 (3rd Cir. 2009) ("No reasonable officer could agree that striking and kicking a subdued, non-resisting inmate in the side, with force enough to cause a broken rib and collapsed lung, was reasonable or necessary under established law."); *Valladares v. Cordero*, 552 F.3d 384, 390 (4th Cir. 2009) (clearly unlawful to break jaw of suspect after he surrendered); *Morelli v. Webster*, 552 F.3d 12 (1st Cir. 2009) (clearly unlawful to use force that resulted in torn rotator cuff a woman who was unarmed, nonviolent, and suspected of theft of $20.00); *Reese v. Herbert*, 520 7F. 3B 1253, 1274 (11th Cir. 2008) (no particularized, pre-existing case law needed to inform officer that he is not entitled to qualified immunity for severe beating of a restrained, nonresisting suspect); *Hadley v. Guiterrez*, 526 F.3d 1324, 1333 (11th Cir. 2008)

("We hold that a handcuffed, nonresisting defendant's right to be free from excessive force was clearly established in February 2002."); *Jones v. Buchanan*, 325 F.3d 520, 532 (4th Cir. 2003) (courts have consistently held that "officers using unnecessary, gratuitous, and disproportionate force to seize a secured, unarmed citizen, do not act in an objectively reasonable manner…").

The Maryland Declaration of Rights is the rule of law which secures the liberty interests of citizens residing in this State and mirrors the federal Constitution. *See Beeman v. Department of Health and Mental Hygiene*, 107 Md. App. 122, 666 A.2d 1314, 1323 (1995) ("state constitutional rights are... considered in *pari materia* with their federal counterparts."); *Kirch v. Prince George's County*, 331 Md. 89, 626 A.2d 372, *cert. denied*, 510 U.S. 1011, 114 S.CT. 600 (1993). "Excessive force in making an arrest is a violation of [Maryland Constitution, Declaration of Rights] Article 24, for which a civil claim for damages may lie." *Tavakoli-nouri v. State*, 139 Md. App 716, 730 (2001).

The defendants also do not enjoy any immunity from Plaintiff Burkhart's claims of excessive force under the Maryland Declaration of Rights. In *Clea v. Baltimore*, 312 Md. 662, 680-685 (1988), the Court of Appeals explained:

> "There are sound reasons to distinguish actions to remedy constitutional violations from ordinary tort suits. The purpose of an ordinary tort suit is not specifically to protect individuals against government officials or to restrain government officials....
> On the other hand, constitutional provisions like Article 24 or 26 of the Maryland Declaration of Rights... are specifically designed to protect citizens against certain types of unlawful acts by government officials. To accord immunity to the responsible government officials, and leave an individual remediless when his constitutional rights are violated, would be inconsistent with the constitutional provisions. It would also... largely render nugatory the cause of action for violation of constitutional rights...."

312 Md. At 684-8.  In the context of Plaintiff Burkhart's State constitutional rights case, the issue to be decided is again whether the defendant officers manipulated her leg in the fashion described at her deposition.

Contrary to the defendants' assertions, the undisputed evidence in this case demonstrates that Plaintiff Burkhart suffered traumatic injuries when external forces were applied to her lower left extremity at some point during the course of a police detention at 2926 Aspen Hill Road. The defendants' denial of any happening is not dispositive of causation. At this juncture in the case, the only plausible explanation for the injuries is that which has been offered by plaintiff Burkhart and Leon Bell. Accordingly, summary judgment is inappropriate and the defendants do not enjoy any qualified immunity in the context of plaintiffs excessive force claims.

### D. Plaintiff's independent causes of action for the false arrest, false imprisonment and battery are also issues to be decided by the trier of fact in this case.

In order to set forth a prima facie cause of action for false arrest "the plaintiff must establish that 'the defendant deprived him or her of his or her liberty without consent and without legal justification.'" *Okwa v. Harper*, 360 Md. 161, 190, 757 A.2d 118, 133 (2000). "The elements of false imprisonment are the same as the elements for false arrest." *Green v. Brooks*, 125 Md. App. 349, 367, 725 A.2d 596, 605 (1999).  A police officer making a warrantless arrest is liable for false arrest if he acted without legal authority to arrest under the circumstances that exist on the scene. *See Green*, 725 A.2d at 596. The Maryland Court of Appeals "has consistently held that probable cause is not a defense in an action for false imprisonment based upon a police officer's warrantless arrest for the commission of a non-felony offense..." *Ashton v. Brown*, 339 Md. 70, 121-122 (1995); *Great Atl. & Pac. Tea Co. v.*

*Paul*, 256 Md. 643, 654, 261 A.2d 731 (1973) ("probable cause is not a defense to an action for false imprisonment but legal justification is"); *Clark's Park v. Hranicka*, 246 Md. 178, 186, 227 A.2d 726, 730 (1967) ("probable cause to suspect the plaintiffs and thus detain them . . . could be considered in mitigation of damages, but not as a defense to the charge of false imprisonment"); *Safeway Stores, Inc. v. Barrack*, 210 Md. 168, 173-174, 122 A.2d 457 (1956) ("in the . . . action for false imprisonment, there must be a deprivation of the liberty of another without his consent and without legal justification. Although intent is necessary, 'malice' is not, nor is probable cause a defense"); *Mahan v. Adam*, 144 Md. 355, 365, 124 A.901, 905 (1924); *Fleisher v. Ensminger*, 140 Md. 604, 620, 118 A.153 (1902) (an unlawful detention "is false imprisonment, without regard to whether it is done with or without probable cause"). The objective lawfulness of the arrest, rather than the good faith or reasonable belief of the arresting officer, determines liability for the tort. *See Great Atl. & Pac. Tea Co. v. Paul*, supra, 256 Md. at 654, 261 A.2d at 738; *Safeway Stores, Inc. v. Barrack*, supra, 210 Md. at 173-174, 122 A.2d at 460; *Fleisher v. Ensminger*, supra, 140 Md. at 620, 118 A. at 159.

> "Thus, while the presence or absence of probable cause to believe that a crime was committed may be pertinent in some cases with regard to the lawfulness of the arrest, the actual element of the tort of false imprisonment is legal justification rather than probable cause. To the extent that the lawfulness of an arrest does not turn upon probable cause under Maryland law, probable cause will not be determinative of the legal justification issue in a false imprisonment action based on that arrest."

*Ashton v. Brown*, supra, 339 Md. at 120.

Maryland's appellate courts have also addressed the issue of whether probable cause was established as a matter of law or whether a factual dispute warranted submission of the probable cause issue to the jury. The Court of Appeals has explained that "under conflicting evidence 'the issues as to probable cause and malice, however great the preponderance of

probability may [seem] to be on the side of [the] defendant, [are] issues of fact, not law, and under our theory and system of trials their submission to the jury [is] necessary.'" *Exxon Corp v. Kelly*, 281 Md. 689, 698 (1978), (quoting *Veid v. Roberts*, 200 Ala. 576, 76 So. 934, 934 (1917)). Accordingly, where the parties dispute the facts supporting probable cause, the absence of probable cause is a question for the jury. See *Montgomery Ward & Co. v. Cliser*, 267 Md. 406, 298 A.2d 16 (1972) (where store detective claimed that customer put merchandise in his pocket, but customer denied this, probable cause was a jury issue); *Safeway Stores, Inc. v. Barrack*, 210 Md. 168, 122 A.2d 457 (1956) (where security guard claimed that customer had concealed items, but customer denied this, probable cause was a jury question); *Kennedy v. Crouch*, 191 Md. 580, 62 A.2d 582 (1948) (where Crouch called Kennedy a "screwball," but Crouch contended that he had not made "loud and unseemly noises," probable cause for prosecution on disorderly conduct charge was a jury question); *Glover v. Fleming*, 36 Md. App. 381, 373 A.2d 981, cert. denied, 281 Md. 738 (1977) (where initial suspect in theft stated that he had seen Fleming steal the money, but Fleming denied this, probable cause was a jury issue). In this case the jury must decide the facts based on the differing accounts presented by the various witnesses; based on the factual determination the jury must then decide whether the Defendant Officers had probable cause to arrest the Plaintiff.

Defendant officers are not shielded in this case by any qualified public immunity with respect to the individual tort counts. In *DiPino v. Davis*, 354 Md. 18, 49, 729 A.2d 354 (1999), Judge Wilner, writing on behalf of the Court of Appeals, explained that "a police officer, who might otherwise have the benefit of this immunity, does not enjoy it if the officer commits an intentional tort or acts with malice." 354 Md. At 49 (quoting *Cox v. Prince George's County*, 296 Md. 162, 460 A.2d 1038 (1983)); *See also Lovelace v. Anderson*, 366 Md. 690, 705, 785

A.2d 726 (2001) (".... the defense of public immunity generally applies only to negligent acts."); *Parker v. State*, 337 Md. 271, 285, 653 A.2d 436 (1995) (contrasting absolute judicial immunity and qualified public immunity and stating that the later constitutes a defense only to negligence actions); *Cox v. Prince George's County*, 296 Md. 162, 460 A.2d 1038 (1983) (police officer held not to have qualified immunity relative to claims of false arrest, intentional infliction of emotional distress and false imprisonment); *James v. Prince George's County*, 288 Md. 315, 323-24, 148 A.2d 1173 (1980) ("once it is established that the individual is a public official and that the tort was committed while performing a duty which involves the exercise of discretion, a qualified immunity attaches... in the absence of malice...."); *Robinson v. Bd. of County Comm'rs*, 262 Md. 342, 278 A.2d 71 (1971) (public official unsuccessfully asserted qualified public immunity relative to charges of assault, battery and malicious prosecution).

Plaintiff's intentional tort claims are viable, because the evidence demonstrates that the Defendant Officers acted without legal justification to affect an arrest or utilize force. *See Ford v. Baltimore City Sheriff's Office*, 149 Md. App. 38 (2002) (claim of qualified immunity trumped by showing of malice); *see also Arrington v. Moore*, 31 Md. App. 448, 464, 358 A.2d 909, 918, cert. denied, 278 Md. 729 (1976). It has also been averred that the defendant officers acted maliciously. Questions of malice require a determination of motive and intent and generally present an issue to be entertained by the finder of fact. *See Thacker v. City of Hyattsville*, 135 Md. App. 268, 300-301 (2000) (speaking to issue of summary judgment ruling based on absence of malice) The Maryland Court of Appeals has explained that, in situations such as the instant case, inferences arising from evidence presented by an arrestee challenging

a claim of qualified immunity must be drawn in favor of the arrestee. *See e.g. Okwa v. Harper*, 360 Md. 161, 757 A.2d 118 (2000) (reviewing a decision regarding a Motion for Summary).

Plaintiff Burkhart contends that the defendant officers detained her subsequently assaulted her without justification or warning. The records supports such a conclusion and the related inference that the officers elected to physically arrest Plaintiff Burkhart, because they had grown frustrated or angry when she lawfully refused to be quite down without acting any way that was contrary to the laws of the State of Maryland. *See Leese v. Baltimore County*, 64 Md. App. 442, 480, cert. denied, 305 Md. 106, (1985) (showing of malice necessary to defeat official immunity requires "an act without legal justification or excuse..."). Inferences of personal animus or malice that can also be drawn from Plaintiff's assertions and supporting factual evidence in this case. *See e.g. Nelson v. Kenny*, 121 Md. App. 482, 494-95, 710 A.2d 345 (1998) (inference of malice raised by evidence that reasonably could be interpreted to suggest that the decision to arrest was motivated or unduly influenced by the arresting officer's racial hostility and animus). Because malice can be inferred in this case, summary judgment cannot be granted in this case. *See Lessee*, 64 Md. App. at 497 ("Actual malice does not always have to be shown with specificity; it can be inferred."); *see also Keys v. Chrysler Credit,* 303 Md. 397, 408, 494 A.2d 200 (1985) (From the lack of probable cause, a jury could infer malice).

The inference of malice that can be drawn in this case, supports jury questions as to Plaintiff's claims for false arrest, false imprisonment and battery.

### V.   <u>Conclusion</u>

There are genuine disputes of material fact in this case which preclude summary Judgment with respect to Plaintiff Burkhart's claims of Battery, (against Defendants Dickel

and Vlach), False Arrest (against Defendant Dickel only), False Imprisonment (against Defendant Dickel only), for the violations of her federal constitutional rights under 42 U.S.C. § 1983 (against Defendants Dickel and Vlach), and her claims for violations of Maryland Declaration of Rights (against Defendants Dickel and Vlach). The same disputes of fact vitiate the defendants' respective claims of qualified immunity.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court deny Defendants Motion for Summary Judgment with respect to each of the claims referenced above, and grant such further and additional relief as it deems to be necessary and appropriate.

Respectfully submitted,

_____- s _____
Anton L. Iamele, Federal Bar No. 14845
201 North Charles Street, Suite 700
Baltimore, Maryland 21201
aiamele@iamelelaw.com
Telephone: 410-779-6160
Facsimile: 410-779-6161
*Counsel for Plaintiff Robin Ann Burkhart*

## HEARING REQUEST

Plaintiff hereby requests that a hearing be held on Defendants' Motion for Summary Judgment, and the instant Opposition to the same.

_____ - s-_____
Anton L. Iamele


## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY, that on this 14th day of January, 2014, a copy of the foregoing Opposition to Defendants' Motion for Summary Judgment was transmitted by way of this Court's electronic filing system and posted sent by first-class, postage prepaid mail, to the following:

James S. Ruckle, Jr., Esquire
Old Courthouse, Room 219
400 Washington Avenue
Towson, Maryland 21204


_____ - s-_____
Anton L. Iamele