## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ROBIN ANN BURKHART | : | |
| | : | |
| | : | |
| v. | : | Civil No. CCB-12-3320 |
| | : | |
| | : | |
| OFFICER RYAN DICKEL, ET AL. | : | |
| | : | |

### MEMORANDUM

Plaintiff Robin Burkhart brings this action against Officers Ryan Dickel and Michael Vlach.  She raises several constitutional and state law claims related to her encounter with officers on July 23, 2011, during which she was arrested and injured.   The defendants' motion for summary judgment and motion to strike and the plaintiff's motion to strike are now pending before the court.  The parties have fully briefed the issues and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2014).  For the reasons stated below, the motion for summary judgment will be denied.[1]  The plaintiff's motion to strike will be granted in part, and the defendant's motion to strike will be granted.

### BACKGROUND

On July 23, 2011, Burkhart's daughter, Brianna Burkhart, was involved in a physical altercation with Burkhart's brother, David Henninger, at Burkhart's home, after Henninger allegedly touched Brianna inappropriately.  (*See* Burkhart Dep., ECF No. 22-1, 8:12-10:19.) After Burkhart and Brianna's boyfriend, Leon Bell, separated the two, Henninger called police. (*Id.* at 10:17-21.)  Burkhart grabbed the phone, however, and told the dispatcher that her children

---

[1] Burkhart withdraws her claim for civil conspiracy and, as against Officer Vlach only, her claims for false imprisonment and false arrest.  The court thus does not need to address the defendants' motion for summary judgment with respect to these claims.

were playing with it and there was no reason to send police.[2]   (*Id.* at 11:13-20.)  Henninger later

called back and told the dispatcher he had been assaulted.  (Pl.'s Opp'n, ECF No. 20, at 5.)

Either in that call, or yet another call after that, Henninger advised that someone was "hanging"

in the basement.  (Application for Statement of Charges, Dickel Aff. Ex. 1, ECF No. 19-2, at 2.)

Officers Dickel and Vlach, along with Officer Michael Barber, responded to the home.  (Vlach

Aff., ECF No. 19-3, ¶ 3; Dickel Aff., ECF No. 19-2, ¶ 2.)  When they arrived, someone

answered the door and allowed them to enter.  (Barber Dep., ECF No. 22-3, at 25:4-10.)  The

responding officers have conflicting memories as to whether it was David Henninger or Brianna

Burkhart's boyfriend, Leon Bell, who answered the door.  (*Compare* Barber Dep. at 25:4-10,

*with* Dickel Dep., ECF No. 22-5, at 79:19-22.)  Leon Bell claimed in his deposition that he was

outside, in the front of the house, when the police arrived, and that they walked past him to

knock on the door.  (Bell Dep., ECF No. 21-6, at 16:2-20.)  Burkhart testified in her deposition

that the officers walked in without anyone answering the door, but that John Burkhart, her

husband, was on his way to open the door at the time.  (Burkhart Dep. at 19:4-11.)

   The parties vigorously dispute what occurred after the officers entered the home.  The

defendants' version of events is as follows:  After the officers entered the home, Burkhart

immediately began yelling at them to get out of her house because they did not have a warrant.

(*E.g.*, Dickel Aff. ¶ 4.)  Officers Barber and Vlach went downstairs to the basement to

investigate the "hanging" that was called in, while Officer Dickel remained on the entry landing

trying to get Burkhart to return upstairs.  (*Id.* ¶¶ 4-5.)  As he did so, Dickel observed a man at the

top of the stairs leading to the upper level bleeding from the head.  (*Id.* ¶ 6.)  Dickel attempted to

---

[2] The parties provide conflicting evidence as to whether there was an initial call placed to police in which the caller
hung up before speaking to the dispatcher.  (*See* Application for Statement of Charges, Dickel Aff. Ex. 1, ECF No.
19-2, at 2.)  Any difference in the parties' recollections on that point, however, is not material.

go to the man to investigate his injuries, but Burkhart continued to yell at Dickel and block the path up the stairs. (*Id.*) Dickel eventually got Burkhart up the stairs to the top landing where the injured male was standing. (*Id.* ¶ 7.) At the top of the stairs, Burkhart pointed her finger in Dickel's face and continued to yell at him to leave her home, making Dickel feel uncomfortable. (*Id.*) "Without warning," Burkhart then "lunged" at Dickel. (*Id.*) He then told her she was under arrest and ordered her to put her hands behind her back. (*Id.*) When she refused to comply, Dickel "took control" of one of her arms so he could handcuff her, but Burkhart tried to pull away. (*Id.* ¶ 8.) At that point, Vlach had come upstairs from the basement, and he then assisted Dickel by "[taking] control" of Burkhart's other arm. (*Id.*) Both officers gave Burkhart "verbal commands to comply, but she continued to refuse." (*Id.*) They eventually "were able to place" Burkhart face down on the floor and handcuff her. (*Id.*) Officer Vlach did not see Burkhart obstruct Dickel's access to Henninger or assault him. (*See* Vlach Dep., ECF No. 22-4, at 36:1-18.)

Burkhart's version of what occurred is quite different. She admits that she was yelling at the officers to get out of her house. (Burkhart Dep. at 20:1-11.) Further, it is undisputed that she was heavily intoxicated. (Daly Report, ECF No. 19-13, at 2 (noting that Burkhart's medical records indicate she had a blood alcohol level of 138 mg/dl (.138 g/dl)).) She claims, however, that she never came down the stairs toward the officers, but remained on the steps yelling at them. (Burkhart Dep. at 21:2-8.) Dickel remained on the entry landing when Vlach and Barber went down to the basement and told Burkhart to be quiet. (*Id.* at 21:16-22:3, 22:15-19.) Burkhart claims she then went up the stairs to the kitchen, leaving Dickel, as far as she was aware, on the entry landing below. (*Id.* at 22:20-21, 23:8-11.) She also testified that Henninger

3

never came to the top of the stairs as Dickel claims.  (*Id.* at 22:9-14.)  She claims that, once

upstairs, she was hit from behind and, as a result, fell face-first to the floor.  (*Id.* at 23:12-16,

24:8-25:6.)  While she was lying on the floor, an officer, who she later saw was Dickel, pulled

her out into the foyer and then grabbed her leg, pushed it up, and then began to "twist and twist

and twist and twist."  (*Id.* at 25:13-18.)  According to Burkhart, Dickel's twisting of her leg

forced her onto the side of her body, and caused her leg to hurt "very, very badly."  (*Id.* at 26:19-

27:16.)  Although Burkhart only testifies as to Dickel's involvement in the struggle, the

defendants admit that Officer Vlach also aided Dickel in taking Burkhart to the floor and

arresting her.  (Vlach Aff. ¶ 14.)

   Leon Bell's memory of the events leading up to Burkhart's arrest is similar to Burkhart's.

He testified at his deposition that Burkhart yelled at the officers from the steps and that Dickel

yelled at Burkhart to go up the steps and be quiet.  (Bell Dep. at 21:2-8.)  Bell testified that he

saw Burkhart go back up the stairs, and that Dickel also went up the stairs while Burkhart was

standing at the top.  (*Id.* at 21:12-17, 22:7-9.)  Further, Bell testified that Dickel struck Burkhart

high on her body from behind, she fell to the ground, and that Dickel then dragged her from the

kitchen doorway to the top of the stairway.  (*Id.* at 23:6-7, 23:15-25:12, 37:4-12.)  He also saw

Dickel bend Burkhart's left leg up and twist it.  (*Id.* at 26:9-15.)

   John Burkhart, the plaintiff's husband, testified that he never saw his wife lunge at the

officers or attempt to strike them.  (John Burkhart Dep., ECF No. 22-2, at 53:21-54:14.)  John

Burkhart did not see how his wife fell to the ground, but testified at his deposition that she

relayed the events to him essentially as referenced above.  (*Id.* at 43:10-21.)  Both Burkhart and

her husband state that they never heard any officer advise Burkhart that she was under arrest or

that she needed to allow the officers to handcuff her.  (*Id.* at 52:20-53:7; Burkhart Aff., ECF No. 22-6, ¶¶ 11-13.)

Once on the ground, Burkhart began complaining that her leg hurt.  (*E.g.*, Dickel Dep. at 121:13-122:2.)  The officers called medical personnel to attend to Burkhart.  (*Id.* at 122:19-123:2.)  She was transported to Franklin Square Hospital where it was determined that she had suffered a tibial plateau fracture and the complete severing of her popliteal artery and vein, which carry blood to the lower leg.  (Franklin Square Hosp. Records, ECF No. 21-2, at 2.)  She immediately underwent several surgeries to repair her artery and vein.  (*Id.*)  Burkhart has since undergone several more procedures, including total knee replacement surgery.  (*See, e.g.*, Sarkar Report, ECF No. 19-9, at 2; Manson Report, ECF No. 19-10, at 3.)  She still faces a risk that her left leg will need to be amputated.  (Sarkar Report at 2-3.)

## ANALYSIS

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (emphasis added).  Whether a fact is material depends upon the substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Id.*  "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).  The court must

view the evidence in the light most favorable to the nonmovant and draw all justifiable

inferences in his favor.  *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted); *see also*

*Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*,

721 F.3d 264, 283 (4th Cir. 2013) (citation omitted).  At the same time, the court must not yield

its obligation "to prevent factually unsupported claims and defenses from proceeding to trial."

*Bouchat*, 346 F.3d at 526 (citation and internal quotation marks omitted).

## I.      Burkhart's Constitutional Claims

Burkhart brings federal and state constitutional claims, alleging that she was unlawfully

seized and that Officers Dickel and Vlach used excessive force.[3]  To bring federal constitutional

claims under § 1983, a plaintiff must prove (1) that the defendant deprived her "of a right

secured by the Constitution or laws of the United States" and (2) that such deprivation was

committed under the color of state law.  *Phillips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180

(4th Cir. 2009) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970); *Mentavlos v.*

*Anderson*, 249 F.3d 301, 310 (4th Cir. 2001)).  The defendants do not appear to dispute that any

deprivation of rights here was committed under the color of state law.  Instead, they argue the

officers did not engage in unconstitutional conduct.

## A.  Unreasonable Seizure

Burkhart claims she was unlawfully seized on July 23, 2011, in violation of the Fourth

Amendment because Officer Dickel did not have probable cause to arrest her.  The defendants

---

[3] The standards for determining whether the officers violated Maryland's Declaration of Rights by effecting an
unlawful arrest and using excessive force are the same as under the Fourth Amendment of the U.S. Constitution.
*See Richardson v. McGriff*, 762 A.2d 48, 56 (Md. 2000) (stating that Article 26 of the Declaration of Rights is *in
pari materia* with the Fourth Amendment with respect to an excessive force claim); *Gadson v. State*, 668 A.2d 22,
26 n.3 (Md. 1995) (addressing an unreasonable seizure claim and stating that the standards are the same under the
federal and Maryland constitutions).  The court, therefore, does not need to conduct a separate analysis for
Burkhart's state constitutional claims.

seek to dismiss her claim because, they argue, she was arrested pursuant to a valid arrest warrant.

Although Dickel applied for criminal charges against Burkhart two days after the incident, and,

according to the defendants, a probable cause finding was made based on his application,[4] he had

no warrant at the time of her arrest on July 23, 2011.[5]   Thus, the defendants' reliance on cases in

which courts have articulated the standard for challenging arrests effected pursuant to a warrant

are inapposite.   Instead, to recover on the basis that her July 23rd arrest was unlawful, Burkhart

must demonstrate that Dickel lacked probable cause to believe that a criminal offense had been

or was being committed.   *See Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).   "Whether

probable cause exists depends upon the reasonable conclusion to be drawn from the facts known

to the arresting officer at the time of the arrest."   *Id.*   In other words, Burkhart must provide

evidence of facts "which made it unjustifiable for a reasonable officer to conclude that she was

violating" the law.   *Brown v. Gilmore*, 278 F.3d 362, 368 (4th Cir. 2002).

Dickel claims he had probable cause to arrest Burkhart for assault and hindering and

obstructing.[6]   (*See* Dickel Dep. at 102:17-19.)   Under Maryland law, a person obstructs and

hinders when she knows an officer is engaged in the performance of a duty and intentionally tries

to obstruct or hinder that performance by acts or omissions.   *Nieves v. State*, 866 A.2d 870, 875

(Md. App. 2004).   Under Maryland law, an assault occurs when a person intentionally commits

an act to put another in fear of immediate physical harm, of which the first person has the ability

---

[4] There is no evidence in the record that a probable cause finding was made in the record.  Burkhart, however, does not dispute that such a finding was made.

[5] The defendants state that an arrest warrant was issued on July 25, 2011, after Dickel applied for criminal charges.  Again, there is no evidence in the record of a warrant issuing.  Further, there is no evidence that Burkhart was arrested a second time.  The court assumes, therefore, that Burkhart is challenging her warrantless arrest on July 23rd.

[6] Burkhart was later charged with resisting arrest as well.  To the extent the evidence demonstrates she was in fact resisting, however, whether Dickel had probable cause to arrest her on that basis turns on whether he was attempting to make a lawful arrest in the first place.  *See Olson v. State*, 56 A.3d 576, 591 (Md. App. 2012) (noting that an element of resisting arrest is that the officer had probable cause to believe that the defendant had committed a crime).

to bring about, and the victim is aware of the impending harm.[7]  *See Jones v. State*, 73 A.3d

1136, 1142 (Md. App. 2013).

Here, there are disputes of material fact as to whether Dickel had probable cause.  To

support their claim of probable cause, the defendants offer Dickel's affidavit in which he states

that Burkhart, who both parties appear to agree was heavily intoxicated, lunged at Dickel and

prevented him from providing aid to an injured male, allegedly David Henninger, whom Dickel

saw standing at the top of the Burkharts' stairs.  (Dickel Aff. ¶¶ 6-7.)  According to Dickel in his

deposition, Burkhart, although never physically blocking his path to Henninger, hindered his

ability to speak to and provide aid to Henninger by yelling at Dickel and posing a physical threat

such that Dickel could not turn his attention from her in fear she would attack him.  (Dickel Dep.

at 95:1-96:2, 102:17-104:17.)  Burkhart has provided evidence that, although she did stand on

the stairs and yelled at Dickel to get out of her house, Dickel remained on the lower landing, she

never saw Henninger at the top of the stairs, never lunged at Dickel, and was moving away from

Dickel when she was arrested.  (Burkhart Dep. at 21:2-25:6; *see also* Bell Dep. 21:2-22:9

(corroborating Burkhart's account).)

Were a reasonable jury to find Burkhart's recollection of events credible, it could

conclude that a reasonable officer would not have believed Burkhart's yelling at Dickel from the

steps to get out of her house, with no other action or threats, constituted action taken with the

intent to place him in fear of immediate physical harm, as required for assault.  *See Jones*, 73

A.3d at 1142 (noting that, to commit an assault, a person must commit an act with the intent to

place another in fear of immediate physical harm).  Further, if a jury finds Henninger was not, in

---

[7] The defendants do not appear to argue that Dickel had probable cause to arrest Burkhart for the type of assault in which a person actually makes an offensive physical contact.

fact, at the top of the stairs, there was no lawful duty Dickel would have been attempting to perform from which Burkhart could have blocked him and thus Dickel would have had no probable cause to arrest Burkhart for obstruction and hindering.[8]  *See Bretemps v. Town of Brentwood, Md.*, -- F. Supp. 2d --, 2014 WL 1225620, at \*7 (D. Md. Mar. 24, 2014) (holding an officer did not have probable cause to arrest for obstructing and hindering where there was no lawful duty he was attempting to perform).  There are thus disputes of fact as to whether probable cause existed for Burkhart's arrest barring summary judgment in the defendants' favor.

### B.  Excessive Force

Burkhart claims the officers used excessive force when they manipulated her leg after she was restrained on the ground.[9]  A claim for use of excessive force in effecting an arrest is judged under the Fourth Amendment's reasonableness standard.  *Graham v. Connor*, 490 U.S. 386, 395 (1989).  "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Id.* at 397.  Whether the officers' conduct was reasonable is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.* at 396-97.  The standard's "proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is

---

[8] Office Vlach also states in his affidavit that Burkhart attempted to block the officers' access to the basement, where the officers had heard someone was "hanging."  (Vlach Aff. ¶ 7.)  There is no evidence to conclude this fact was known to Dickel, the officer making the arrest, (*see* Dickel Aff. ¶¶4-6), but even if there was, whether Burkhart was ever at the entrance to the basement is in dispute.  Further, to the extent the defendants are claiming Burkhart's attempts to tell dispatch not to send police constituted obstruction and hindering, there is no evidence that Dickel was aware of those facts when he arrested Burkhart, even if he became aware of them before filing his application for charges.  (*See* Barber Dep. at 21:1-13 (stating Officer Barber received notice that Burkhart attempted to cancel the call to police but not indicating whether he relayed that information to Dickel prior to Burkhart's arrest).)
[9] Burkhart does not appear to claim that hitting her in the back of the head and knocking her to the ground constituted excessive force.

actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396; *see also Elliot v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996) ("[T]he question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force."). Although the degree of injury is evidence of the force used, it is not determinative of whether there was a constitutional violation. *Bibum v. Prince George's Cnty.*, 85 F. Supp. 2d 557, 563 (D. Md. 2000).

Although neither party disputes that, once face-down on the ground, Burkhart was not struggling with the officers such that the officers were required to employ additional force, (*see, e.g.*, Vlach Use of Force Report, ECF No. 21-9 (stating that the initial force to move Burkhart to the ground gained compliance and no additional force was required)), a dispute of material fact exists as to whether any additional force was, in fact, used after she was on the ground. Burkhart alleges that once she was on the ground, the officers pulled her by her legs into the hallway and extended her left leg, pushed it up, and twisted it. (*See, e.g.*, Burkhart Dep. at 25:11-18, 26:13-27:16 (describing the application of force to her leg once she was on the ground); Bell Dep. at 26:9-15 (Bell's testimony describing Officer Dickel's application of force to Burkhart's leg as he viewed it from outside the front door of the house).) The officers dispute that they manipulated Burkhart's left leg once she was on the ground.[10] (*See, e.g.*, Dickel Aff. ¶ 11.) Neither party disputes that Burkhart suffered serious injuries as a result of the struggle between her and the officers. Finding Burkhart's recollection of events credible, a reasonable factfinder could conclude that the officers did push on and twist Burkhart's leg and that such force was unreasonable. According to Burkhart's proffered evidence, at the time force was applied to her

---

[10] The officers, however, do not appear to deny that both Dickel and Vlach were involved in bringing her to the ground and restraining her there while she was handcuffed. (*See* Vlach Aff. ¶¶ 12-13 (stating Vlach aided in bringing Burkhart face down on the floor).)

leg, she was not resisting arrest, she was controlled on the floor posing no threat to the officers, and, she had only yelled at the officers to get out of her house.  *See Jones v. Buchanan*, 325 F.3d 520, 532 (4th Cir. 2003) (noting that courts consistently have held that an officer's use of force is not objectively reasonable where it is unnecessarily and gratuitously used to seize "a secured, unarmed citizen").

The defendants claim, however, that, even if the force applied to Burkhart's leg was excessive, Burkhart has failed to provide evidence from which a jury could conclude that the force used was the proximate cause of her injuries.[11]  For this, the officers rely on expert reports from doctors concluding that the kind of injury Burkhart suffered could not have resulted from the officers twisting her leg.  (*See, e.g.* Fowler Report, ECF No. 19-12, at 2 (stating that injuries typically associated with "twisting forces on the knee" were not documented in Burkhart's medical records); Daly Report at 3 (stating that twisting of the leg and knee could not explain Burkhart's fractures if her bones "were of normal thickness and strength"); Belkoff Report, ECF No. 19-14, at 1 (stating that "within a reasonable degree of medical engineering certainty, the injuries sustained by Ms. Burkhart's left leg were not the result of twisting").)  There is evidence in the record, however, from which a jury could conclude the manipulation of Burkhart's leg did cause Burkhart's injuries.  First, one of the defendants' experts, Dr. Barry Daly, a professor of radiology at the University of Maryland School of Medicine, states in his report that, although the injuries Burkhart suffered likely would not result from twisting of the leg where bones are of normal thickness and strength, such fractures could occur from "minor trauma" where the bones are weak due to osteoporosis, a condition from which Burkhart suffers.  (Daly Report at 3.) Further, the experts on whom the defendants rely only considered the likely effect of twisting of

---

[11] Because Burkhart does not claim that the initial force applied to move her to the ground was excessive, if her injuries resulted from the application of force at that time, she cannot recover.

the leg.  Burkhart, however, testified at her deposition that the officers also pushed her leg up, which Leon Bell corroborated.  One of the defendants' experts testified at his deposition that an external force on the lower leg could cause the type of injuries Burkhart suffered given her position, face down on the floor, at the time.[12]  (Belkoff Dep., ECF No. 21-5, 117:12-121:17.)  A reasonable factfinder thus could conclude that the officers' pushing on Burkhart's leg—especially given the weakness of Burkhart's bones acknowledged by Dr. Daly—caused her injuries.  With disputes of material fact as to the use of excessive force, the court cannot grant summary judgment in favor of the defendants.

### C.  Qualified Immunity

The defendants argue that, even if their conduct as alleged by Burkhart was unconstitutional, they are entitled to qualified immunity because they did not violate any clearly established rights.  Government actors are entitled to qualified immunity from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)) (internal quotation marks omitted).  "To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right," and "existing precedent must have placed the statutory or constitutional question beyond debate."  *Reichle v. Howards*, 132 S.Ct. 2088, 2093 (2012) (internal quotation marks and citations omitted).  The determination of whether a right was clearly established is "essentially [a] legal question," to be

---

[12] With their reply memorandum, the defendants include an affidavit from Dr. Belkoff created after the plaintiff submitted her opposition stating that pushing up of the leg could not have led to the injuries.  (Belkoff Aff., ECF No. 25-4, ¶¶ 8-9.)  The court must view the evidence in the light most favorable to Burkhart at this stage.  Any inconsistency in Dr. Belkoff's opinions is for the factfinder to resolve.

made by the court. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). This court should look to case law from the Supreme Court, the Fourth Circuit, and, in some cases, the Maryland Court of Appeals in assessing whether a right is clearly established. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999).

Although the court should determine the issue of qualified immunity as soon as possible so as to protect reasonably competent officials from litigation, summary judgment on qualified immunity grounds is inappropriate where there are factual issues remaining as to the defendants' actual conduct. *Vathekan v. Prince George's Cnty.*, 154 F.3d 173, 179-80 (4th Cir. 1998). Such a dispute exists here as to Burkhart's unlawful arrest and excessive force claims. If a factfinder were to conclude Burkhart's recollection of events is more credible, there is no evidence to suggest Dickel made a reasonable mistake as to the existence of probable cause—i.e. by mistakenly, but reasonably, perceiving Burkhart's conduct to be criminal. *See Anderson v. Creighton*, 483 U.S. 635, 640-41 (1987) (noting that qualified immunity is meant to protect officers who "reasonably but mistakenly conclude that probable cause is present"). Further, a reasonably competent official would have been aware that applying additional, gratuitous force after Burkhart was compliant and controlled on the ground was barred by the Fourth Amendment. *See Kane v. Hargis*, 987 F.2d 1005, 1008 (4th Cir. 1993) (holding a reasonable officer would have been aware that applying additional force after the officer had secured a suspect on the ground such that she did not pose a threat was an unreasonable application of force). The officers are not entitled to summary judgment on the basis of qualified immunity at this time.

## II.     State Law Claims

Burkhart's state common law claims cannot be resolved at the summary judgment stage because they depend on deciding the same disputes of fact barring judgment as to her constitutional claims.  Burkhart's false arrest and false imprisonment claims turn on whether Officer Dickel had legal justification—in this case, probable cause—to arrest her.  *See Ashton v. Brown*, 660 A.2d 447, 472 (Md. 1995).  Burkhart's battery claim turns on whether the officers were making a lawful arrest or using excessive force.  *See French v. Hines* (*Hines II*), 957 A.2d 1000, 1037 (Md. App. 2008) (holding that officers commit a battery when making an arrest where they use excessive force).  Summary judgment will be denied as to all of Burkhart's state common law claims.

## III.     Motions to Strike

### A.  Burkhart's Motion to Strike

Burkhart moves to strike the defendants' reply memorandum because it was not timely. (Pl.'s Mot. to Strike, ECF No. 26.)  Even if it was, she moves to strike the portion that relies on Dr. Belkoff's new affidavit, authored after Burkhart filed her opposition memorandum, and the portion of the reply challenging Dr. Christopher Chapman's expert opinions.  She claims both represent new evidence and argument not raised in the defendants' original motion or previously disclosed.

The court will accept the reply as timely.  The motion for extension of time on which the defendants rely to excuse their late filing arguably is unclear as to whether they received a twelve-day extension beyond the normal time period for filing a reply.  (*See* Consent Mot., ECF No. 17.)  Further, the court will not strike the defendants' challenge to Dr. Chapman's expert

opinions.  The defendants were responding to the plaintiff's opposition in which she relied in

part on Dr. Chapman's opinions to argue that Officer Dickel did not have probable cause and

that both Dickel and Vlach used excessive force.[13]  *See DNT, LLC v. Spring Spectrum, LP*, 750

F. Supp. 2d 616, 630 (E.D. Va. 2010) (refusing to strike exhibits filed for the first time with the

defendant's reply in support of its motion for summary judgment where the evidence merely

responded to arguments raised for the first time in the plaintiff's opposition memorandum).

      The court will strike Dr. Belkoff's affidavit and any portion of the reply that relies on it.

In his affidavit, Dr. Belkoff offers new opinions regarding the likely cause of Burkhart's injuries

that were not previously disclosed to the plaintiff and were disclosed well after the deadline for

making such disclosures.  (*See* Consent Mot., ECF No. 12 (setting disclosure deadlines for expert

reports and supplementations as October 21, 2013).)  The only new evidence on which he relies

is Burkhart's affidavit, submitted with her opposition memorandum, in which she states that the

officers bent her knee.  Burkhart's statements in her affidavit with respect to the officers'

manipulation of her leg, however, are not materially different from the statements she made in

her deposition, complaint, and answers to interrogatories, which Dr. Belkoff had available to him

when making his first expert report.  The affidavit is not, therefore, properly characterized as a

supplement to Dr. Belkoff's initial report.  *See E.E.O.C. v. Freeman*, 961 F. Supp. 2d 783, 797

(D. Md. 2013) (stating that an expert report can be supplemented to correct inaccuracies or

address evidence not previously available).  Instead, the affidavit appears to be an attempt by the

defendants to respond to the plaintiff's challenges to Dr. Belkoff's initial conclusions, which is

not a proper basis for supplementation in the absence of new evidence.  *See id.*

---

[13] In any event, the court does not rely on Dr. Chapman's opinions in denying summary judgment.

**B.  The Defendants' Motion to Strike**

The defendants also have filed a motion to strike Burkhart's supplemental response, (Supp. Resp., ECF No. 28), claiming that it and the attached affidavit from Dr. Kenneth Lippman are untimely because they were filed after the defendants filed their reply.  (Defs.' Mot. to Strike, ECF No. 29.)  They also argue it should be struck because Lippman's affidavit is a mere restatement of Burkhart's version of events and does not create a dispute of material fact.  These latter two arguments, however, go only to whether the court should give weight to Dr. Lippman's opinions, not to the propriety of admission.  Thus, the supplement will be struck only if it is untimely.  Like Belkoff's affidavit, the supplemental opinions from Dr. Lippman were provided well after the deadline for expert disclosures.[14]  Further, according to the plaintiff, the affidavit and supplemental response are provided only in response to Dr. Belkoff's affidavit submitted with the defendant's reply, which the court has just struck from the record.  Accordingly, the court will strike Burkhart's supplemental response.

**CONCLUSION**

For the foregoing reasons, the defendants' motion for summary judgment will be denied. The plaintiff's motion to strike will be granted in part, as to Dr. Belkoff's affidavit, and otherwise will be denied.  The defendant's motion to strike will be granted.  A separate order follows.

September 4, 2014
Date

_____/S/_____
Catherine C. Blake
United States District Judge

---

[14] The court is not now ruling on whether Dr. Belkoff's or Dr. Lippman's supplemental opinions would be admissible at trial.