In the Matter Of:

*ROBIN ANN BURKHART*

*v.*

*OFFICER RYAN DICKEL, ET AL*

---

*DAVID RICHARD FOWLER, M.D.*

*June 11, 2015*

---

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MARYLAND
2                (Northern Maryland)

3    ---------------------------------------------------

4    ROBIN ANN BURKHART,

5                    Plaintiff,

6    v.                      CASE NO.:  CCB-12-CV-3320

7    OFFICER RYAN DICKEL, ET AL.,

8                    Defendants.

9    ---------------------------------------------------

10       VIDEO DEPOSITION OF DAVID RICHARD FOWLER, M.D.

11                  Baltimore, Maryland

12               Thursday, June 11, 2015

13                    10:02 a.m.

14

15

16

17

18

19

20   Job No.: WDC-041909

21   Reported by:  Sheri D. Hayhurst-Smith, RPR

22   Pages:  1 - 189

Page 2

1   VIDEO DEPOSITION OF DAVID RICHARD FOWLER, M.D.,
2   held at the Offices of:
3
4           CHIEF MEDICAL EXAMINER
5           900 West Baltimore Street
6           Baltimore, Maryland  21223
7
8
9
10
11
12
13
14
15
16
17
18
19
20        Pursuant to Notice, before Sheri D.
21   Hayhurst-Smith, Registered Professional Reporter and
22   Notary Public in and for the State of Maryland.

Page 3

1              A P P E A R A N C E S
2
3   ON BEHALF OF THE PLAINTIFF:
4      ANTON L. IAMELE, ESQUIRE
5      IAMELE & IAMELE, L.L.P.
6      201 North Charles Street
7      Suite 700
8      Baltimore, Maryland  21201
9      (410) 779-6160
10  ON BEHALF OF THE DEFENDANTS:
11     JAMES RUCKLE, ESQUIRE
12     BALTIMORE COUNTY OFFICE OF LAW
13     400 Washington Avenue
14     Old Courthouse, Room 219
15     Towson, Maryland  21204
16     (410) 887-4420
17
18
19
20
21
22

Page 4

1                C O N T E N T S
2   EXAMINATION OF DAVID RICHARD FOWLER, M.D.      PAGE

3           By Mr. Iamele                          6
4           By Mr. Ruckle                        134
5           By Mr. Iamele                        150
6           By Mr. Ruckle                        166
7           By Mr. Iamele                        172
8           By Mr. Ruckle                        184
9   EXHIBITS:  (ATTACHED)                        PAGE
10  Exhibit No. 1 - Notice To Take Deposition      16
11  Exhibit No. 3 - Report of September 20, 2013   30
12  Exhibit No. 4 - Addendum                       30
13  Exhibit No. 5 - MRI Report                     74
14  Exhibit No. 6 - CT Scan Report                 74
15  Exhibit No. 7 - Medical Records                74
16  Exhibit No. 11 - Radiographic Studies          74
17  Exhibit No. 12 - Statement of Probable Cause by  108
                     Officer Dickel
18
    Exhibit No. 13 - Officer Dickel's Transcript    126
19
    Exhibit No. 14 - Transcript of Robin Burkhart   143
20
21
22

Page 5

1         THE VIDEOGRAPHER:  This is the beginning
2   of Disk Number 1 in the deposition of Dr. David
3   Richard Fowler.  And this is in the matter of
4   Robin Ann Burkhart versus Officer Ryan Dickel,
5   et al.
6         This is in the United States District Court for
7   the District of Northern Maryland, Case Number:
8   CCB-12-CV-3320.
9         Today's date is Thursday, June 11th, 2015.  The
10  time is 10:04 a.m.
11        The video operator today is Larry Newman, and
12  our court reporter is Sheri Smith, both contracted
13  by DTI Court Reporting Solutions.
14        This video deposition is taking place at 900
15  West Baltimore Street, Baltimore, Maryland, 21223.
16        Would our counsel please identify themselves
17  and state whom they represent?
18        MR. IAMELE:  Good morning.  Anton Iamele
19  for plaintiff, Robin Burkhart.
20        MR. RUCKLE:  Good morning.  James Ruckle
21  for defendants, Officer Ryan Dickel, Officer
22  Michael Vlach.

Page 6

1    THE VIDEOGRAPHER:  Would our reporter
2    please swear in the witness?
3         THE COURT REPORTER:  Do you solemnly swear
4    that the testimony you are about to give will
5    be the truth, the whole truth and nothing but
6    the truth?
7         THE WITNESS:  I do.
8             DIRECT EXAMINATION
9    BY MR. IAMELE:
10   Q    Dr. Fowler, good morning.
11   A    Good morning.
12   Q    For purposes of the record, can you please
13   give us your full name and work address.
14   A    My full name is David Richard Fowler, and
15   I presently work at 900 West Baltimore Street in
16   Baltimore.
17   Q    And that's where we are presently?
18   A    Correct.
19   Q    You've been engaged in this case by the
20   defendants; you understand that?
21   A    Yes.
22   Q    And you've been asked to render some

Page 7

1    opinions regarding certain happenings back in 2011?
2    A    Correct.
3    Q    I'm going to ask you about those during
4    the course of today's deposition, but before we get
5    there, I want to talk a little bit about your
6    background and what you do, okay.
7         Can you first walk me through your education?
8    A    Certainly.  I graduated from medical
9    school in 1983.  Followed that with a year of
10   training in pediatric pathology at the Red Cross
11   Children's Hospital in Capetown.  That was then
12   followed by a five-year, full-time training program
13   in forensic pathology, also at the University of
14   Capetown.
15        I completed that, passed the exams, graduated
16   from that program, and at that time, was offered a
17   job here in Baltimore by the late John Smiley, the
18   chief medical examiner.
19        On arrival in the United States -- before
20   arriving in the United States, explored the
21   potential of converting my South African
22   qualification to an American one.  The system, if I

Page 8

1    had gone to the United Kingdom, Australia, New
2    Zealand, or elsewhere, would have mainly be to take
3    the final exam.  That's what I was potentially
4    anticipating, I'd have to take an examination just
5    to prove that I had the knowledge base.
6         The American Board of Pathology is a little
7    more picky than that.  They don't discriminate
8    against anybody.  If you haven't trained in the
9    United States or Canada, you have to repeat the
10   entire training again.
11        So, I went through another four-year training
12   program in general and forensic pathology at the
13   University of Maryland and then at this particular
14   institution, at our old address.  I finished that.
15   I took the board exams in anatomic and forensic
16   pathology and passed them on the first attempt.
17   Q    And when was that?
18   A    I believe it was 96.
19   Q    And you've been practicing forensics since
20   96?
21   A    Well, I've been practicing forensics since
22   86, as either a resident and/or in South Africa, at

Page 9

1    some level, but I've been intimately involved in
2    doing forensic pathology, autopsies, death
3    investigation, since 1986.
4    Q    Can you tell the ladies and gentlemen of
5    the jury how you spend a typical day here?
6    A    Well, my particular day, right now, is
7    largely administrative/supervisory.  I am
8    responsible for the entire death investigation
9    system for the state of Maryland.  So, that involves
10   insuring the correct procedures, policies,
11   protocols, staffing, budgets and then, of course,
12   the most critical part is the medical supervision of
13   the entire process.
14        So, I typically go to rounds in the morning,
15   see what cases are present within the facility, and
16   discuss those particular cases with the staff as we
17   review the cases that are available for examination
18   today.  Then I let them get on with their
19   examinations.
20        And then at some stage, certain of those cases
21   will come across my desk for further review.
22   Q    And when you say "cases," those are

Page 22

1   officers that were arresting an individual and were
2   accused of using excessive force.
3       Q    And what was the allegation to force, if
4   you recall?
5       A    I forget the exact details.  He was an
6   individual who was, I think, fleeing from the
7   police, attempted to climb over a fence, and was
8   pulled off the fence by the police and then suffered
9   various injuries.  And there was debate as to
10  whether those injuries were consistent with that or
11  the officers actually striking him.
12      Q    And what was your opinion in that case?
13      A    I forget the details of it, to be
14  absolutely certain, other than the injuries that he
15  suffered, I believe, were consistent with him being
16  pulled off a fence and falling on to a hard,
17  nonenergy absorbing surface, such as a concrete, a
18  rough concrete, or asphalt type situation.
19      But that's a couple of years ago, and I'm
20  speaking from memory now.
21      Q    And that's as opposed to a striking or a
22  beating?

Page 23

1       A    Yes.
2       Q    That was the differentiation that you made
3   in that case?
4       A    Correct.
5       Q    Are any of the other cases highlighted in
6   the last five years police misconduct cases?
7       A    If I may?
8       Q    Uh-huh.
9       A    The Timothy Brockington versus Antwon
10  Boykin, I believe was a Baltimore City Police
11  shooting case, if I remember correctly, that went to
12  Civil Court.
13      Q    Was that James Fields, the defense counsel
14  in that case?
15      A    I really do not recall.  And then Mohammed
16  versus Muir -- and I may have got those two cases
17  mixed up -- again, there was a presentation that
18  Jones Day was the attorney -- the legal firm that
19  was handling the Mohammed versus Muir case, and I
20  believe that one may have had some police
21  involvement in as part of the process.
22      But those are the only ones I recall.

Page 24

1       Q    In those cases, did you testify on behalf
2   of plaintiff or defendant?
3       A    I believe in all of them, I was called by
4   the defendant.
5       Q    In looking at your testimony list, can you
6   tell me which of the cases that you've participated
7   in the past five years, have involved a circumstance
8   where there was a nonfatal happening?
9       A    So, Walsh versus Ventura, I believe that
10  was a medical malpractice.  U.S. versus Henry, I
11  believe, was a domestic violence, and the same is
12  true for U.S. versus Parks.
13      Q    The Walsh case, the medical malpractice
14  case, what was the nature of the malpractice?
15      A    Gee, I'm trying to remember.  It was very
16  recent as well.  This was an individual -- I'm
17  sorry.  It was a fatal case.  I apologize.  But it
18  went to medical malpractice.  That individual passed
19  away.  The family claimed that he actually passed
20  away due to a pulmonary embolus and that the
21  physician did not properly apply and/or give the
22  correct prophylaxis for prevention of pulmonary

Page 25

1   embolus, and the individual did pass away --
2       Q    So, that was a death case?
3       A    It was a death case, yes.  But the U.S.
4   versus Parks and U.S. versus Henry were both
5   domestic violence type cases, husband on wife type
6   situations, and the interpretation of the bruising,
7   the age of bruising and various other bits and
8   pieces there.
9       Q    In those criminal cases, were you called
10  by the state or the defense?
11      A    In both of those, I was actually called by
12  the defense.  I think the greater majority of the
13  rest of these are fatal cases, as far as I can
14  remember.  And some of these go back a while, and I
15  would have to go back and look at the information,
16  at least, to be absolutely certain.
17      Q    Sure.  But as far as your recollection
18  today, the only two cases that are nonfatalities
19  there are the two domestic violence cases that you
20  just mentioned?
21      A    Correct.
22      Q    In any of those cases that are not

Page 34

1    A    Correct.  It would be straightened,
2  then --
3    Q    Right.
4    A    -- to the point of there, and
5  hyperextension would be tend to push it out further.
6    Q    Do you know if Robin Burkhart knew what
7  hyperextension meant?
8    A    I have not interviewed her.  So, I do not.
9  That would be speculation on my part.
10   Q    Would you be able to say whether or not
11 she was trying to speak to flexion, which is the
12 opposite movement?
13   A    Again, it would be speculation.  I really
14 have no idea as to exactly what she was trying to
15 articulate, other than what's written in her
16 report -- I mean, her deposition.
17   Q    You would agree with me, Dr. Fowler, that
18 during the course of Dr. Robin Burkhart's
19 deposition, she really wasn't asked a lot about how
20 her leg moved in this encounter?
21   A    Correct.  There wasn't a huge amount of
22 detail in that deposition.

Page 35

1    Q    And she was never asked any follow-up
2  questions in order to determine what it is she was
3  trying to express when she said "hyperextended?"
4    A    Yeah.  I did not see anything to clarify
5  that.
6    Q    And would you also agree with me,
7  Dr. Fowler, that if Robin Burkhart is laying face
8  down with her stomach on the ground, her leg could
9  not be hyperextended?
10   A    It would be extremely difficult to imagine
11 a scenario that that could be achieved.  I would
12 agree with you.
13   Q    But certainly, it could be placed into
14 extreme flexion?
15   A    Yes.
16   Q    Meaning bent backwards?
17   A    Up towards her -- the heel coming up
18 towards her buttocks.
19   Q    Sure.
20   A    Correct.
21   Q    Now, if you would, I'm going to ask that
22 you take a look at Exhibit Number 3.  That's your

Page 36

1  first report, September 20th, 2013, okay.
2        This begins with the statement, "I have
3  reviewed the following records," okay?
4    A    Yes.
5    Q    And I'm assuming that you generated this
6  list based on the materials that you reviewed?
7    A    Yes.
8    Q    I'm going to ask you about them.  Some of
9  them are self-explanatory.
10   A    Yes.
11   Q    Others, I want to know what it is, in
12 particular, that you looked at, okay?
13       First and foremost, you said you looked at the
14 deposition of Robin Burkhart?
15   A    Correct.
16   Q    And you had occasion to read through the
17 entirety of that?
18   A    Yes.
19   Q    The second entry, it says "Maryland
20 Ambulance Information Sheet," MAIS report?
21   A    Yes.
22   Q    And you've had occasion to read that?

Page 37

1    A    Yes.
2    Q    And that was a document, where you just
3  fill in the bubbles and some writing on there?
4    A    I believe it was the old format, manual
5  version, but I would have to --
6    Q    Franklin Square Hospital records, can you
7  give me an indication of which records you looked at
8  from Franklin Square Hospital?
9    A    Offhand, no.  I'm sorry.  I can't.
10   Q    That's okay.  Do you know if you looked at
11 multiple disciplinary records, meaning records from
12 vascular surgeons, records from orthopedic surgeons,
13 records from the ER?
14   A    It was an extensive medical record.  My
15 interpretation, when I looked at it and from
16 previous experiences, it appeared to be the
17 entire -- or what I would expect from a complete
18 medical record for that event.
19   Q    The next line says, "Daniel L. Picard,
20 M.D."
21   A    Yes.
22   Q    What was that record?

DAVID RICHARD FOWLER, M.D. - 06/11/2015     Pages 46..49

Page 46

1    Q    And, finally, it says "Police report?"
2    A    Yes.
3    Q    And the police report that you looked at,
4    can you tell me what it was?
5    A    This document here, dated --
6    Q    June 23rd, 2011?
7    A    It looks like it, yes.
8    Q    And as a medical examiner, you have
9    occasion to look at the police reports with some
10   frequency; do you not?
11   A    Almost 100 percent of our cases will have
12   a police report.
13   Q    And you've looked, not just at
14   administrative reports, you have also looked at use
15   of force reports?
16   A    We look at anything that we can get our
17   hands on --
18   Q    Sure.
19   A    -- that may be pertinent to our case.
20   Q    Well, I'm going to ask you this way:
21        You have been called upon, at times, to look at
22   use-of-force reports completed by police officers?

Page 47

1    A    Yes.
2    Q    And you've been called upon to look at
3    statements of probable cause?
4    A    Yes.
5    Q    And you've been called upon to look at
6    administrative reports?
7    A    Yes.
8    Q    And that's part and parcel to what you do?
9    A    Yes.
10   Q    In this particular case, the police report
11   that is referenced in your September 20th, 2013
12   report, that is a statement of probable cause; is it
13   not?
14   A    Yes.
15   Q    You weren't given --
16   A    I believe so.
17   Q    -- any use-of-force report?
18   A    I'm sorry.  I cannot recall exactly
19   whether or not that was in addition to the other
20   extensive materials that I was supplied.
21   Q    Your meeting with Mr. Ruckle to prepare
22   for deposition, when was that, sir?

Page 48

1    A    For today's one, we had a telephone
2    conversation yesterday for about ten or 15 minutes.
3    Q    And how about prior to yesterday?
4    A    There was one meeting, which was just
5    prior to the addendum report that I provided in May,
6    I believe.
7    Q    So, it was sometime shortly before May?
8    A    Several days or weeks before that one,
9    yes.
10   Q    During those meetings, did you discuss the
11   materials that you had reviewed in this case at all?
12   A    We didn't go back through all of it again,
13   no.
14   Q    Did you discuss your forensic work in this
15   case?
16   A    My opinions, yes.
17   Q    And, obviously, you discussed the
18   deposition and kind of questions you would be asked
19   today?
20   A    Not in the -- I don't recall any from the
21   May conversation.  This morning, briefly, Mr. Ruckle
22   indicated that you would ask questions on why I

Page 49

1    generated the second report, but that was about the
2    only indication that I've been given as to what
3    questions you may or may not ask.
4    Q    Why did you generate a second report?
5    A    Mr. Ruckle asked me to, based on our
6    conversation during the preparation for the other
7    deposition.  I proposed a plausible -- what I
8    thought a plausible and/or potential mechanism by
9    which this injury may have occurred, based on the
10   statements of the individuals and my knowledge of
11   the nature of the injury and the type of
12   osteoporosis and bone deficits that Ms. Burkhart
13   had.
14        So, I put that forward to Mr. Ruckle, and he,
15   at some stage after that, asked me to put it into an
16   addendum.
17   Q    Is it your practice, Dr. Fowler, when you
18   do a forensic review, to include reference to all of
19   the records and materials that you review?
20   A    Yes.
21   Q    So, when I look at this report from
22   September 20th, 2013, at the time, these were all

Page 50

1  the records that you had reviewed?

2      A    To the best of my knowledge, yes.

3      Q    And as I look at your report from May

4  13th, 2015, there's no reference to any additional

5  materials that you reviewed?

6      A    Correct.

7      Q    Is it accurate and correct to say that you

8  did not review any additional materials for purposes

9  of preparing your addendum?

10     A    Correct.

11     Q    So, this initial grouping of materials is

12 what you've reviewed in this case?

13     A    Yes.

14     Q    In your forensic work in the prior cases

15 you've been involved in, have you had occasion to

16 see deposition transcripts from the police officers

17 who were involved in the case?

18     A    Yes.  I do recall cases where I've

19 actually seen deposition transcripts of virtually

20 all individuals involved in the case.

21     Q    In this particular case, you did not

22 receive a deposition transcript from Officer Dickel?

Page 51

1      A    Not that I recall.

2      Q    It's also correct, Dr. Fowler, that you

3  did not receive a deposition transcript from Officer

4  Vlach?

5      A    I don't have it noted.  So, I would

6  presume not at this stage.

7      Q    And you also don't have a deposition

8  transcript from Officer Barber?

9      A    Correct.  Same as before, I presume I did

10 not.  I have not noted it.

11     Q    Has, at any point in time, has Mr. Ruckle

12 or anybody else from the Baltimore County Office of

13 Law, indicated to you that there were witnesses to

14 this event?

15     A    Yes.  He has indicated that there were

16 other individuals within the dwelling at the time

17 the incident took place.

18     Q    And did he tell you how many?

19     A    I do not know that information, no.

20     Q    Did you ever ask Mr. Ruckle to have access

21 or gain access to witness statements or depositions

22 from the individuals who were present?

Page 52

1      A    No, I did not.

2      Q    Do you think that that is important for

3  purposes of your forensic consideration in this

4  case?

5      A    More information is obviously better, but,

6  again, I recognize that the attorneys have the

7  right, A, to submit what they believe is pertinent,

8  and, B, to limit the amount of time that I spend on

9  a case for various reasons.

10          So, I leave it to the discretion of the

11 attorney to provide me with materials they believe

12 are significant.

13     Q    So, it's filtered through the attorney for

14 whom you are working?

15     A    In many circumstances, yes.  This is not

16 my independent investigation.

17     Q    Sure.  And in this particular case, the

18 materials that you reviewed were filtered as they

19 came to you by Mr. Ruckle or someone else from the

20 Baltimore County Department of Law?

21     A    Correct.

22     Q    Did Mr. Ruckle ever offer to provide you

Page 53

1  with any witness statements or depositions in this

2  case?

3      A    I don't specifically recall that offer,

4  no.

5      Q    Did you ever ask Mr. Ruckle to see the use

6  of force reports in this case?

7      A    I don't believe I have had made any

8  specific requests to Mr. Ruckle for any additional

9  materials.

10     Q    Did Mr. Ruckle ever offer to provide you

11 with the use of force reports in this case?

12     A    Not that I recall.

13     Q    As we sit here today, do you have any

14 concept of what the police officers say happened on

15 June 23rd, 2011?

16     A    Other than the summary that's in the

17 police reports that I've read -- and I'm not sure if

18 this is the entirety -- but other than that, no, not

19 that I recall.  I'm sorry.  I can't find that

20 binder.  That would have clarified many of these

21 questions.

22     Q    In a case like this, a nonfatality case,

Page 54

1  where you're being called upon to do a forensic
2  investigation by a party in a civil case, can you
3  tell me what your forensic process is?
4       A    Well, this is hardly a forensic
5  investigation.  This is a biomechanical
6  interpretation of the injuries within the context of
7  the situation.
8       So, this is not a complete forensic
9  investigation.
10      Q    Recognizing that this is not a complete
11  forensic investigation, in the context of your work
12  in this case -- which is a biomechanical
13  interpretation of the circumstances and the ultimate
14  outcome -- can you tell me what your process is, how
15  you went about making that interpretation?
16      A    Firstly, ascertaining the injuries.  So,
17  reviewing the medical records, the radiology
18  reports, the surgical procedure notes, everything
19  that's in the medical records, to make a
20  determination as to the nature or the type of
21  injury.  That would be the first part of the
22  process.

Page 55

1       Once you have an idea of what that is,
2  correlating that with the basic medical literature
3  or knowledge base that I have with regard to how
4  injuries typically occur and where we would expect
5  to see injuries of this particular nature, and then
6  going through the actual statements of various
7  individuals to see if I can correlate what I would
8  expect as a mechanism with any statements made.
9       Q    Let's take that piece by piece, okay.
10      The first part is looking at the medical
11  records to ascertain what the injuries are?
12      A    Yes.
13      Q    Those are the records that are documented
14  in your September 20th, 2013 report, Exhibit 3?
15      A    Right.
16      Q    Including the records from Franklin Square
17  Hospital, Daniel Picard, Advanced Radiology reports.
18  I'm going to skip Manor Care and Mid-Atlantic Group,
19  because I think that's not necessarily germane.
20      But University of Maryland Orthopedics, UMMC,
21  University Physicians and American Radiology; is
22  that correct?

Page 56

1       A    I believe that would be a fair assumption,
2  yes.
3       Q    And you reviewed those records for
4  purposes of forming your understanding of what the
5  injuries were in this case and what Mrs. Burkhart's
6  condition was in this case; is that correct?
7       A    Correct.
8       Q    Did you look at any other materials, aside
9  from what's listed in your September 20th, 2013
10  report, to ascertain what the injuries were?
11      A    No.
12      Q    Did you look at any other materials,
13  besides what was included in your September 20th,
14  2013 report, to ascertain what Mrs. Burkhart's
15  physical condition was back in June of 2011?
16      A    No.  Not that I recall.
17      Q    The next thing you mentioned is a
18  literature review.
19      Did you review any literature in this case?
20      A    Some basic literature.  Nothing that I can
21  specifically recall.  I have some orthopedic
22  textbooks that I use when I went through medical

Page 57

1  school in various places.  And I'll often go online.
2  I don't specifically remember exactly what I did in
3  this particular case to pull up any references from
4  PubMed, et cetera.
5       This is a fairly well -- this is a fairly
6  obvious injury, and it's one which I am familiar
7  with from my medical training.
8       Q    You say, "It's a fairly obvious injury,"
9  and that's because this happens sometimes.
10      You have posterior dislocations of the knee?
11      A    Yes.
12      Q    Is this a fairly obvious injury in the
13  context other than an automobile accident, a fall
14  from height, or a sports injury?
15      A    Typically, we see these more frequently in
16  the elderly who have advanced osteoporosis.  And
17  then you can see these with much less energy being
18  applied as part of the injury process in those
19  circumstances.
20      And osteoporosis is obviously something which
21  would predispose an individual to this type of
22  fracture or any fracture.

Page 62

1 concerns the event that's at issue in this case, it
2 says, "According to a statement, Ms. Burkhart was
3 being abusive verbally and was instructed by Officer
4 Dickel to keep quiet."
5     Where did you derive that from?
6     A    The materials that I was supplied, and I
7 cannot be specific. I'm sorry.
8     Q    "Mrs. Burkhart's statement then indicates
9 that she walked into the kitchen, and while doing
10 so, something struck in the back of the head,
11 causing her to fall to the floor."
12    A    Yes.
13    Q    Do you understand that there's an
14 assertion in this case that Officer Dickel struck
15 Mrs. Burkhart in the back of the head?
16    A    I have no idea who that assertion and who
17 may have struck her or what may have struck her.
18 All I know is -- and I believe that potentially came
19 from her deposition, but I would be happy to stand
20 corrected on that.
21    Q    You agree with me, sir, that that was not
22 offered as a component of any handcuffing or arrest

Page 63

1 procedure? She didn't say that she was in the
2 process of being handcuffed when she was struck in
3 the back of the head?
4     A    I do not recall that, no.
5     Q    And this would be something different than
6 the handcuff?
7     A    Again, I don't know.
8     Q    Mrs. Burkhart's fall to the floor as a
9 result of being struck in the head, what do you
10 understand about that?
11    A    Other than I believe that was a statement
12 I think she made in her deposition, and, so, I
13 included that as part of my synopsis.
14    Q    Do you have an understanding of which
15 portion of her body hit the floor?
16    A    No.
17    Q    And would it be correct, sir, that you
18 don't have any understanding of how she fell --
19    A    Correct.
20    Q    -- after that?
21    A    There was, I don't believe, details on the
22 description of that process.

Page 64

1     Q    At this time, Ms. Burkhart states -- and
2 you put this in quotes -- "Then the officer grabs me
3 by my leg, pulls me out of the kitchen. He pushes
4 my leg up. Like for why, I don't know. Pushes my
5 leg up. Begins to twist and twist and twist, and
6 then I knew it was Officer Dickel, because I read
7 his badge."
8     Okay. Let's take that piece by piece. Do you
9 understand which part of Mrs. Burkhart was grabbed
10 in this transaction?
11    A    My understanding of that, and from the
12 description, I interpreted that as her lower leg.
13    Q    And you made that interpretation based on
14 what?
15    A    Because he's bending it up -- "first pulls
16 from the kitchen, and then he pushes my leg up,"
17 and, so, I anticipated that was bending at the knee.
18 Obviously, it could be bending at the hip as well.
19    Q    I have little anatomical characters that
20 we can use, because I think it can use all this.
21 Pardon me. It's not as maybe precise as what you
22 use here, but it does show the human figure, and it

Page 65

1 does show movement, okay?
2     A    Uh-huh.
3     Q    Can you show me how you interpret this,
4 this piece of what Robin Burkhart is saying to you?
5     A    So, I had an anticipation that her leg was
6 being pushed up, and the leg commonly flexes in that
7 position.
8     Q    So, as we look at that, that would be
9 hyperflexion or flexion?
10    A    Or flexion. I mean, you can easily flex
11 your leg up so that your heel touches your buttock
12 with every individual. You can squat down, and your
13 heel will touch your buttock without any, shall we
14 say, serious issue.
15    Q    When Robin Burkhart said, "He pushed my
16 leg up," that's what you understood it to mean?
17    A    Yes.
18    Q    That it was being placed in flexion, okay.
19 Now, the next part of what she says is, "He
20 begins to twist and twist and twist."
21    What did you interpret Mrs. Burkhart to be
22 talking about when she said that?

DAVID RICHARD FOWLER, M.D. - 06/11/2015          Pages 66..69

Page 66

1    A    That, I could not really be absolutely
2   certain.  I mean, the choices would be twisting at
3   the foot or twisting so that it pivots of the hip.
4   I don't know because it was not clear.
5        Q    And she was never asked that?
6        A    No.
7        Q    Do you know if her leg was in flexion at
8   that point in time?
9        A    I do not know.
10       Q    And she was never asked that?
11       A    Correct.
12       Q    And do you know which portion of her leg
13  Officer Dickel was holding at that point in time?
14       A    I do not.
15       Q    And she was never asked that either?
16       A    Correct.
17       Q    You understand that after this instance,
18  where Mrs. Burkhart reports lying on the ground,
19  having her leg pushed into flexion and being
20  twisted, she reports an immediate onset of pain?
21       A    I believe that is correct, yes.  She
22  documented pain and, I think, pops.

Page 67

1        Q    And that's consistent with what the police
2   say in this case?
3        A    Again, I forget exactly what the police
4   report said.  So, I cannot answer that question.
5   I'm sorry.
6        Q    That's okay.  You have in your report, as
7   part of the synopsis of events, that Mrs. Burkhart
8   described three distinct pops?
9        A    Correct.
10       Q    Do you have any concept of what those
11  popping noises or experiences were or do you
12  attribute that to anything in this case?
13       A    I have no idea exactly what they are, and
14  I have not attributed them to anything.  It's
15  something that she stated.  So, I felt that I would
16  document it.
17       Q    One of the injuries that Mrs. Burkhart
18  suffered was an avulsion fracture of her fibula --
19  fibular head -- sorry -- do you recall that?
20       A    I believe so, yes.
21       Q    And an avulsion fracture of the fibular
22  head is basically where there is some torsion on the

Page 68

1   knee, and the top of the fibula actually pops off.
2   The ligament pulls it off; is that correct?
3        A    Yes.
4        Q    And, oftentimes, when people have fibular
5   fractures, such as that, avulsion fractures, they do
6   report a popping noise; do they not?
7        A    Correct.  Usually, popping noises are more
8   commonly associated with ligamentous injuries, such
9   as ACLs and the lateral ligaments, et cetera, being
10  torn.
11       Q    Understood.  But in circumstances where
12  the ligament holds and the bone fails, you also hear
13  a popping noise; do you not?
14       A    Again, not being involved intimately in
15  clinical work, and since many of our -- most of our
16  patients here don't actually give us information,
17  and they usually are severely injured, that's not
18  something that I am, shall we say, familiar with.
19  We don't get descriptions of the sounds of the
20  injuries.  I can't remember when we last did.
21  That's not something that commonly happens here.
22       Q    So, then you go on to the medical

Page 69

1   findings.
2        Now, this is based on your review of the
3   medical records in the case?
4        A    Yes.
5        Q    And it says, "Medical records indicated
6   left tibial plateau fracture" --
7        A    Yes.
8        Q    -- "left fibula head fracture, and damage
9   to the left popliteal artery vein."
10       A    Correct.
11       Q    And then you said, "There's no record of
12  ligament or cartilage injury to the knee?"
13       A    Yes.
14       Q    Piece by piece, the tibial plateau
15  fracture, can you verbalize what the fracture
16  pattern was in this particular case?
17       A    A depressed fracture of her left tibial
18  plateau, I believe the posterior aspect of it.
19       Q    How did you glean that?
20       A    From the radiology reports, I believe,
21  and/or somewhere else in the medical records.  But I
22  would imagine, it most likely would be in the

Page 82

1  upon to form an opinion that Robin Burkhart was
2  Osteoporotic?
3      A    Correct.
4      Q    And we can agree that the medical reports
5  from Franklin Square Hospital that I just gave you
6  from her treatment and discharge, and the
7  radiographic studies from Franklin Square Hospital,
8  are not the records that you were relying upon to
9  form an opinion that she was Osteoporotic?
10     A    Correct.  There is no mention of
11 osteoporosis in those records, and there's none in
12 my original report.
13     Q    But in putting one and one together, you
14 would agree with me, sir, that you don't have a
15 basis to conclude that Robin Burkhart was
16 Osteoporotic on June the 23rd, 2011?
17         MR. RUCKLE:  Objection.
18         THE WITNESS:  I would have to go back and
19    look at that radiology report that was issued
20    and whether or not it was based on new material
21    or original material before I could actually
22    make a conclusion as to whether or not that

Page 83

1  statement is correct or not.
2          MR. IAMELE:  Do you want to switch now?
3    Can we go off the record very briefly and
4    switch tapes?
5          THE VIDEOGRAPHER:  The time is 11:29.
6    We'll go off the video record.
7    (A brief recess was taken).
8          THE VIDEOGRAPHER:  The time is 11:34 a.m.
9    Back on the video record.
10 BY MR. IAMELE:
11     Q    Dr. Fowler, when we left off, we were
12 talking about the osteoporosis issue, okay.
13     In your report of September 20th, 2013, there's
14 no reference to osteoporosis?
15     A    Correct.
16     Q    You would agree with me, sir, that at that
17 point in time, you hadn't formed any opinion about
18 whether or not Robin Burkhart was Osteoporotic in
19 June of 2011?
20     A    I would agree.
21     Q    And would you also agree with me that, at
22 that point in time, you didn't have any materials to

Page 84

1  form an opinion as to whether or not Robin Burkhart
2  was Osteoporotic?
3      A    Again, I'm not sure whether I had the
4  original CTs or X rays to look at myself.  And given
5  that I don't spend my days looking at those, I'm not
6  the appropriate person to make that call anyway.
7      Q    Do you know how osteoporosis is measured?
8      A    No.  That's not something that I do,
9  again, on a clinical basis.  So, you know, I usually
10 rely on radiologists to give me an indication as to
11 the nature of the osteoporosis.
12     Q    And when you use the term "severe," what
13 kind of bone density does that equate to?
14     A    I really couldn't give you based on
15 whatever scale they may or may not use.
16     Q    Do you know how radiologists calculate or
17 measure the extent of osteoporosis?
18     A    No.  It's outside my area of expertise.
19     Q    Did you speak to any radiologists in this
20 case about the extent, if any, of Mrs. Burkhart's
21 osteoporosis in June of 2011?
22     A    I do not recall speaking to anybody, but I

Page 85

1  may be wrong on that.  I really don't know.
2      Q    Did you receive a deposition transcript
3  from any radiologist in this case?
4      A    I'm not sure where I got the information
5  from.  Again, I'd have to go back and see how I got
6  that information and how it was supplied to me.  I
7  do not recall.
8      Q    If you had your initial file in front of
9  you, you would be able to gather that information?
10     A    Potentially.
11     Q    And you could, assuming you find your
12 file, you could let us know how it is you came to
13 that conclusion?
14     A    My recollection is the information came
15 from Dr. Barry Daly, who is a radiologist at the
16 University of Maryland, but I cannot recall the
17 format as to whether it was a telephone
18 conversation, whether I saw a report he wrote or any
19 other means.
20     So, I can't tell you exactly how I got that
21 information.
22     Q    And I note that Dr. Daly's report is not

Page 86

1  referenced in your September 20th, 2013 report.
2      You didn't have it at that point in time?
3      A    It's not listed, and I don't believe that
4  I had access to it at that time.
5      Q    And I also see that it's not referenced in
6  your May 13th, 2015 report?
7      A    Correct.
8      Q    And there's no reference to a telephone
9  conversation with Dr. Daly in either of these
10  reports?
11     A    Correct.
12     Q    And there's also no reference to a
13  deposition transcript from Dr. Daly in either of the
14  reports?
15     A    Correct.
16     Q    Is it possible, sir, that this is
17  something that Mr. Ruckle relayed to you?
18     A    It is possible.
19         MR. RUCKLE:  Objection.
20     Q    You and Mr. Ruckle have obviously talked
21  about the case?
22     A    Correct.

Page 87

1      Q    And he's told you about different
2  circumstances?
3      A    Correct.
4      Q    Do you remember Mr. Ruckle calling you up
5  to tell you that he had a theory that Mrs. Burkhart
6  was severely Osteoporotic?
7         MR. RUCKLE:  Objection.
8      A    I believe, at some point along the way, as
9  part of my report, I indicated this was an unusual
10  injury in an individual of her age, and that the
11  issue of osteoporosis should be investigated as part
12  of the investigation.
13     Q    Where is that stated in your report?
14     A    It's stated -- I actually say that, when I
15  read it to you earlier on, tibial plateau fractures
16  are usually of two types of low energy fractures,
17  are seen in the elderly and usually of a depressed
18  type, which is this one.  And the high energy
19  fractures was weight bearing.  So, it's in the
20  sports injuries.
21     The circumstances that were described at the
22  house that night did not fit the usual patent of a

Page 88

1  high energy scenario, and the depressed nature of
2  this would suggest that at least the issue of
3  osteoporosis should being investigated.
4      Q    Well, let's talk about that.  Because
5  you've added a little bit of language to what's
6  included in the opinion.
7      In your opinion piece in your report, it says,
8  "Tibial plateau fractures are typically of two
9  types.  Low energy fractures are seen in the elderly
10  and usually of the depressed type.  High energy
11  fractures of this weight bearing surface are seen in
12  sports injuries, falls and motor vehicle accidents."
13  That's it?
14     A    Yes.
15     Q    You didn't offer any opinion as to whether
16  this was a low energy or high energy fracture at
17  that point in time?
18     A    No, I did not.
19     Q    You didn't come to a conclusion as to
20  whether or not this was a low energy or high energy
21  fracture at that point in time?
22     A    Correct.

Page 89

1      Q    And in looking at your report, there's no
2  mention of the potential of osteoporosis or that
3  some research should be done to determine whether or
4  not Robin Burkhart was Osteoporotic?
5      A    It's not in my report, no.
6      Q    And that's not something that's included
7  in the report that was given to Mr. Ruckle to be
8  tendered to me.
9      So, was there a separate conversation about
10  osteoporosis with Mr. Ruckle?
11         MR. RUCKLE:  Objection.
12     A    We've had numerous conversations, and I
13  believe, at some point, I may have actually
14  discussed the issue of the depressed nature of this
15  one and her age, and the circumstances that's being
16  described would be unusual for it to be of a high
17  energy type.
18     But I don't think I made a formal decision
19  myself that I could put into a report, within a
20  reasonable degree of medical certainty, as to which.
21  And that's why it's not in the report.
22     Q    And you would agree with me, Dr. Fowler,

Page 94

1  motion. And, so, I focused on that.

2      Q    Did you ever suggest to Mr. Ruckle or

3  anybody else at the Baltimore County Department of

4  Law, that you should also look into the other

5  motions that Robin Burkhart had described, including

6  having her leg being put forcefully into flexion?

7          MR. RUCKLE: Objection.

8      A    Yeah. I looked at, as I've already

9  stated, the flexion issue, in my own mind, and

10 decided that flexion is not a substantial risk for

11 this particular situation because, again, it's very

12 easy for an individual to take their heel up and

13 touch. It's equivalent to sitting in a squatting

14 position on the floor.

15     So, therefore, flexion of the knee so that the

16 tibia -- the back of the calf and the thigh touch,

17 is an extremely usual position for any individual to

18 achieve.

19     Q    Not this individual. I would be hard

20 pressed to have my calf touch the back of my thigh,

21 but I guess some people can probably do that if

22 they're very limber.

Page 95

1      Did you consider, for purposes of your analysis

2  of the twisting and the flexion, Robin Burkhart's

3  mobility at all?

4      A    I'm not sure I understand the question.

5      Q    Sure. Obviously, mobility in the general

6  populous is not linear. We don't all move exactly

7  the same?

8      A    Correct. You cannot apply statistics to

9  an individual.

10     Q    Right.

11     A    But you have to talk within the usual

12 framework of what the average person can achieve.

13     Q    For purposes of your mental investigation

14 and the process of ruling out that flexion caused

15 this injury, did you consider Robin Burkhart as an

16 individual -- and I'm now asking about September 20,

17 2013 -- Robin Burkhart as an individual, her ability

18 to move, her flexibility, et cetera?

19     A    Not having examined her, I used the

20 medical records and the other information supplied,

21 and then drew what I would consider to be acceptable

22 within the average person within the population and

Page 96

1  not her individually.

2      Q    When you -- and I know it's not in your

3  report -- but you had mentioned that there was some

4  discussion back in September of 2013 about whether

5  or not Robin Burkhart was Osteoporotic.

6      And you thought there should be some

7  investigation in that, correct?

8      A    That's my recollection.

9      Q    And you relayed that to Mr. Ruckle?

10     A    I believe so.

11     Q    Did you set about doing any investigation

12 into the issue of osteoporosis?

13     A    No. As I said, it's not my area of

14 expertise to make that assessment.

15     Q    And when did you hear from Dr. Daly? When

16 did you either have that conversation or receive his

17 report or get his deposition?

18     A    I cannot recall offhand.

19     Q    Can you tell me, generally, if it was

20 2013, 2014 or 2015?

21     A    It was obviously, I believe, sometime

22 after my initial report.

Page 97

1      Q    I gathered that, but we've got a two-year

2  window here, basically. So, I'm trying to get a

3  handle on when, in that two years, that may have

4  happened?

5      A    I do not know.

6      Q    And the word "severe," where did that come

7  from? Is that something Dr. Daly told you? Is that

8  something Mr. Ruckle told you? Or did you come up

9  with that on your own?

10         MR. RUCKLE: Objection.

11     Q    And I'm asking in the context of your

12 characterization of Mrs. Burkhart's osteoporosis?

13     A    I believe that was information given to

14 me, but I cannot recall the source, whether it was

15 directly from conversation with Dr. Daly or

16 information provided to me by Counsel.

17     Q    Did you undertake any independent efforts

18 to -- at that point in time, you had been told by

19 either Mr. Ruckle or Dr. Daly that Robin Burkhart

20 had severe osteoporosis.

21     Did you undertake any efforts to double back

22 and investigate the extent of her osteoporosis?

Page 98

1    A    No.

2    Q    Did you look at any radiographic studies

3    to see if there were measurements regarding her bone

4    density on it?

5    A    No.

6    Q    Did you look back at any reports to see if

7    they made mention of the extent of her osteoporosis?

8    A    No.

9    Q    So, you're taking that either from the

10   word of Mr. Ruckle or from Dr. Daly?

11   A    Correct.

12   Q    And you would agree with me, sir, that

13   there's no scientific basis for that opinion that

14   something is -- that you have formed?

15   A    Not that I independently formed, correct.

16   Q    And would you also agree with me that you

17   don't know what the scientific basis of that opinion

18   is by whomever provided it to you?

19   A    Correct.  It's not part of my usual

20   practice or training.

21   Q    I understand that.  The question was a

22   little different.  It probably -- it wasn't so

Page 99

1    artful.

2         But whomever told you, whether it be Mr. Ruckle

3    or Dr. Daly, that Robin Burkhart was severely

4    osteoporotic, did they ever explain to you how they

5    came to that conclusion?

6    A    No.  I do not recall that said

7    explanation.

8    Q    And did they ever mention the scientific

9    methodology that they utilized?

10   A    Not that I recall.

11   Q    And did either of them ever tell you that

12   it would be impossible for them to conclude what

13   Robin Burkhart's bone density was in June of 2011?

14   A    That information was not something that I

15   recall.

16   Q    Certainly, that would be something that

17   would be important if part of your opinion is the

18   extent of her osteoporosis at the time of this

19   happening?

20   A    Correct.

21   Q    Is it correct, Dr. Fowler, that you are

22   taking it on faith that someone has concluded that

Page 100

1    Robin Burkhart was osteoporotic?

2         MR. RUCKLE:  Objection.

3    A    Well, that is the normal format that

4    people work with in the medical field.  I consult

5    and have an expert who has knowledge in that

6    particular area provide with me information.

7    Q    Uh-huh.

8    A    And I'm not trained to contradict it.  I

9    will accept it.

10   Q    Well, I understand that, and that's a good

11   answer, actually.  Let me ask you this, then:

12        Did you consult with Dr. Theodore Manson, Ted

13   Manson, at all about Robin Burkhart?

14   A    The name is not familiar to me.

15   Q    Did you consult at all with Dr. Rajabrata

16   Sarkar about Robin Burkhart?

17   A    No.

18   Q    Did you consult with Daniel Picard about

19   Robin Burkhart?

20   A    No.

21   Q    Did you consult with Dr. Zia Zakai about

22   Robin Burkhart?

Page 101

1    A    No, I did not.

2    Q    Did you consult with any of Robin

3    Burkhart's treating physicians about her condition

4    or her presentation in June of 2011?

5    A    No, I did not.

6    Q    And, again, you're not able to tell us if

7    the information that was relayed to you about

8    osteoporosis came from Mr. Ruckle or Dr. Daly?

9    A    I believe it was from Dr. Daly, but I'm

10   happy to be corrected on that.

11   Q    Well, if we assume that it was from

12   Dr. Daly, would you chart that anywhere?  Would you

13   make notations of that?  Would you bill time for

14   that?

15   A    I may have.  I would have to go back and

16   look.

17   Q    And it's something that you may have

18   billed for or maybe you didn't bill for?  You don't

19   know?

20   A    Potentially.  I mean, that's a one-liner.

21   So, we're talking seconds or a minute or so to

22   communicate that kind of information.

Page 102

1    So, I'm not sure I would have actually even
2  logged it as part of a billing exercise.  I don't
3  know.
4       Q    Jumping ahead to your addendum, which I
5  recall was Exhibit 4, I believe.  This is the
6  May 13th, 2015 report, okay.
7       It begins after you say, "Further to my report
8  of September 20th, 2013, in light of the
9  osteoporotic bone changes in Ms. Burkhart's knee."
10      We have gone over this fairly at length, but
11 you don't know the extent of those osteoporotic
12 changes?
13      A    No.
14      Q    You don't know what her bone density was?
15      A    Correct.
16      Q    And you don't know if she was, in fact,
17 osteoporotic in June of 2011?
18      A    Correct.
19      Q    A review of the supplied statements and
20 the injury pattern, the circumstances consistent
21 with this injury as seen in this case are a backward
22 directed compressive force, okay.

Page 103

1    What supplied statements are you referring to
2  in that report?
3       A    The deposition and police reports and my
4  recollection of those.
5       Q    The same materials that you looked at when
6  you authored your September 20th, 2013 report?
7       A    Yes, sir.
8       Q    You didn't look at any additional
9  statements in that time frame between
10 September 20th, 2013 and May 13th, 2015?
11      A    Not that I recall.
12      Q    And which particular statements were you
13 relying upon for purposes of this addendum?
14      A    Again, I was doing this largely from
15 memory from the original assessment.  The fact that
16 she was taken to the ground by the police officers
17 made me concerned that landing on her knee, which
18 would be pushing her tibia backwards and,
19 potentially, with her body weight coming down on it
20 as her knee stops against the ground.
21      So, now, you have compression down -- this is
22 actually difficult to get into in a deposition.

Page 104

1    Sorry.  I'll get that in a second.
2       Q    That's okay.
3       A    But as she is taken down to her knees,
4  you've actually got downward energy from the body
5  weight above, and you've got this backward force on
6  the tibia.  Putting pressure on this particular area
7  here concerned me that that would be -- I'll find it
8  in a moment.
9       Q    Don't worry about that piece of it.
10      So, as I understand what you just testified,
11 you were concerned that when she went down to her
12 knees -- and this rod is unfortunate -- as she goes
13 down to her knees -- and use the surface right
14 there -- that the weight coupled with the motion --
15           MR. IAMELE:  Can you see that?
16           THE VIDEOGRAPHER:  Yes.
17           MR. IAMELE:  Not so well?
18 BY MR. IAMELE:
19      Q    Is what caused the injury?
20      A    Yes.
21      Q    In order to reach that opinion, do you
22 have to presume that the tibia or her feet hit the

Page 105

1  ground?
2       A    Well, I presume she was standing on her
3  feet to start with.
4       Q    Right.
5       A    And that she is taken down to her knees as
6  part of the take-down as on the way to potentially
7  going full down.
8       Q    And that was based on Robin Burkhart's
9  statement?
10      A    I can't recall which statement
11 specifically it's actually based on.  I mean, the
12 police said she was taken down to the floor, and I
13 think Robin Burkhart actually said she was taken to
14 the floor.  Whether she fell to the floor or struck
15 in the back of the head and fell, but --
16      Q    Well, those are two different things.
17      A    Right.
18      Q    I mean, Robin Burkhart testified that she
19 was struck in the back of the head and fell to the
20 floor?
21      A    Right.
22      Q    Are you familiar with any reports,

Page 110

1    her upper extremity.

2       Q    What if the officers on either side,

3    holding on to her upper extremity, testified in this

4    particular case that they put her on her torso

5    first?

6       A    Then I would obviously have to withdraw my

7    comments with regard to the knees.

8       Q    And you would agree with me that if that

9    was their testimony, and you consider that in

10   conjunction with Mrs. Burkhart's testimony, and in

11   conjunction with the writing in this particular

12   case, there is no evidence that Mrs. Burkhart was

13   placed on her knees as part of the restraining

14   process, as far as you know?

15      A    There's no documentation of it, no.

16      Q    Were you told to reach that conclusion or

17   form that conclusion by anybody?

18      A    No.

19      Q    That's just something you came up with on

20   your own?

21      A    During a discussion with Mr. Ruckle as to

22   potential mechanisms that this may have occurred,

Page 111

1    this is what struck me as a format that would put

2    the required energy and forces into the right format

3    to create an injury similar to what was described in

4    the medical records.  I proposed it without

5    knowledge of the circumstances or the intimate

6    knowledge of the circumstances as we've just gone

7    through.

8       Q    Did you consider any other mechanisms of

9    injury in this particular case?

10      A    In this whole circumstance, I've been

11   looking for something which is a backward motion,

12   compressive type situation as the most likely cause

13   of this type of injury.  And, so, that's why I

14   proposed this one, because it was one that struck me

15   as one that could potentially cause that injury.

16   But I certainly looked and considered all of the

17   others.

18           MR. IAMELE:  Want to switch out?

19           THE VIDEOGRAPHER:  The time is 12:05.

20   We'll go off the video record.

21      (A brief recess was taken).

22           THE VIDEOGRAPHER:  This is beginning of

Page 112

1    Disk Number 2 in the deposition of Dr. David

2    Richard Fowler.  The time is 12:09 p.m.  We're

3    back on the video record.

4    BY MR. IAMELE:

5       Q    Thank you very much.  Dr. Fowler, we're

6    back on the record.

7       A    All right.

8       Q    When we left off --

9           MR. IAMELE:  What was the last question

10   that was asked?

11      (Question read back).

12          THE WITNESS:  Yes.

13   BY MR. IAMELE:

14      Q    What else did you consider?

15      A    The twisting motions and the pulling

16   motions that were described in the materials.

17      Q    How about the motion of being forcefully

18   placed in flexion?

19      A    Again, my experience with that is I did

20   not anticipate that that would actually cause any

21   potential damage to that joint.

22      Q    Is it your belief that the medical

Page 113

1    evidence in this case is consistent with

2    Mrs. Burkhart being struck on the back of the head

3    and being knocked to the ground?

4       A    Being struck on the back of the head and

5    knocked to the ground, there's no medical evidence

6    that I saw of any injury to her head and/or to other

7    parts of her body that I can recall offhand at this

8    particular stage.

9       Q    And we understand now that there's no

10   documentation of her having been placed on her knees

11   anywhere?

12      A    Correct.

13      Q    And as I understood your earlier

14   testimony, as we look at this, if this is the floor

15   surface, it is this motion of coming on to her knees

16   that you believed, initially, before you retracted

17   that, caused the injury, correct?

18          MR. RUCKLE:  Objection.

19      A    Yes.

20      Q    Now, how do you differentiate this force

21   from lying on your stomach and having your leg

22   manipulated?

Page 114

1    A    Because in this particular force, you've
2    actually got somebody who's standing. They're then,
3    pivoted, and they come down onto their knee in that
4    particular position, which pushes this backwards,
5    putting pressure on the posterior tibial plateau --
6    Q    When you say --
7    A    -- at the same time that her body weight
8    is coming down.
9         So, you've actually got this coming to a sudden
10   halt right here, (indicating).
11   Q    This, you're saying the femur?
12   A    Well, the actual patella/upper portion of
13   the tibia, striking the ground.
14   Q    And then moving backward?
15   A    So, that stops. And at the same time,
16   you've got the body weight coming down, transmitted
17   down the actual femur, pushing onto that same area.
18   Q    And that's assuming you fall straight down
19   onto your knees or you're pushed straight down onto
20   your knees?
21   A    Well, your body weight has got to go
22   somewhere, yes.

Page 115

1    Q    Well, I do understand that, but,
2    obviously, if someone is falling out and forward,
3    the body weight is not over the knees. It's out
4    front.
5    A    It will be displaced further forward.
6    Q    Right.
7    A    But it's all going to be displaced down
8    the femur, and, actually, since the part of the
9    body, which is now, shall we say, trapped against a
10   surface and is now immobilized, is the actual tibia
11   area and pushing backwards.
12   Q    And that's in a fall. But, now, if we
13   reverse that, the part of the body that's trapped
14   against the ground is the femur, correct?
15   A    Correct.
16   Q    And you would agree with me, sir, that you
17   could exert pressure on the tibia, such that it
18   would be dislocated posteriorly while the femur is
19   static against the ground?
20   A    Yes. But in my scenario, what we're
21   looking at is the entire weight of the human
22   being --

Page 116

1    Q    Right.
2    A    -- and a sudden stop. So, you've got
3    acceleration by gravity and the weight. In the
4    other one, you've actually got somebody
5    manipulating.
6         And the degree of energy which is provided in
7    those two circumstances, in my opinion, would be
8    significantly different.
9    Q    And are you able to say the extent of the
10   energy that was involved in this particular case,
11   how much energy caused Mrs. Burkhart's injuries?
12   A    Well, this is not a, shall we say, common
13   injury. This is a substantial, weight bearing bone
14   that has a posterior -- this is, again, in young
15   people without osteoporosis, we would only see this
16   in a substantial, high energy impact -- falls,
17   sporting injuries, such as skiing, snow skiing, are
18   the typical circumstances.
19        So, that's the kind of energy that you would
20   normally expect to see. Motor vehicles, and we're
21   talking substantial --
22   Q    Right.

Page 117

1    A    -- we're talking about substantial energy
2    being -- for instance, the dashboard coming forward
3    as there's intrusion of the engine into the
4    passenger compartment, striking this area and
5    pushing things backwards.
6         That's the type of circumstance that we would
7    typically -- that is a substantially larger amount
8    of energy than somebody, you know, in a wresting
9    type format, holding onto somebody's knee and
10   twisting and pushing and pulling it and/or flexing.
11   Q    Well, I understand that. Let's back this
12   up a little bit.
13        The knee is multi-axial, meaning it can go
14   forward, backward, side to side?
15   A    There's very limited side-to-side action
16   on the knee. Those ligaments do not allow much
17   motion, unless there's an abnormality of the knee.
18   It's typically anterior and posterior. It's not
19   like the shoulder.
20   Q    In this particular case, Robin Burkhart's
21   case, did you form an opinion about the amount of
22   force that led to her injury?

Page 118

1    A    Yes.

2    Q    And how did you go about forming that

3  opinion?

4    A    If this is a normal individual, then you

5  would expect there to be a substantial amount of

6  energy.  And if this is an individual who has

7  osteoporosis, then you can decrease that energy in

8  accordance with the degree of osteoporosis.

9    Q    Well, let's break that down.  You agree

10  that you don't know the extent of Robin Burkhart's

11  osteoporosis, if any, on June of 2011?

12    A    Correct.

13    Q    Would you agree with me, sir, that you are

14  not able to render an opinion in this case about the

15  amount of force that was applied to her leg that

16  caused her injuries?

17    A    Correct.  If you exclude the osteoporosis

18  part of the equation, then I would expect it to be a

19  substantial amount of force, as I said, typical with

20  a fall from a height and/or substantial sporting

21  type injury or a motor vehicle collision, which is

22  not what is described in this situation.

Page 119

1    Q    And how was it that you were able to rule

2  out the possibility of someone pushing against her

3  tibia with their body weight as causing this injury?

4        MR. RUCKLE:  Objection.

5    A    Because I don't believe that you could

6  actually exert enough energy to do a complete

7  transverse fracture of the tibial plateau with that

8  mechanism.

9    Q    And that's an assumption?

10    A    It's not an assumption.  It's based on

11  when we typically see these injuries, that's not

12  something that -- we see that area, the tibia, is

13  typically up against the femur, and it's weight

14  bearing, and it holds up that entire person's weight

15  in the normal course of events, even allowing them

16  to jump off two-foot, three-foot, four-foot

17  circumstances and have -- so, to actually have

18  somebody merely lean on it, put their weight on it,

19  twist it, and get a transverse fracture just by

20  doing that, it's just not consistent with the

21  strength of that lower limb in the normal course of

22  events.

Page 120

1    Q    Wouldn't that depend on how hard they hit

2  it?

3    A    Well, typically, sudden transmission of

4  forces are actually much more likely to cause injury

5  than slow applications and/or twisting, because your

6  body actually has the ability to adapt to those

7  forces to a certain extent.

8    Q    This is the kind of injury that you see

9  with football players sometimes?

10    A    Sometime, yes.

11    Q    Being tackled?

12    A    Yes.

13    Q    And that's not beyond the realm of

14  possibility?

15    A    No.

16    Q    And that is a manual motion, meaning

17  somebody is exerting pressure against someone else's

18  limb?

19    A    Yeah.  You've got two individuals at 200

20  plus pounds, colliding at high speed on a football

21  field, yes.  There is a substantial amount of energy

22  in that particular circumstance.

Page 121

1    Q    Do you have any understanding of how much

2  Officer Dickel weighs?

3    A    No.

4    Q    Do you have any understanding of

5  Officer Dickel's training in martial arts?

6        MR. RUCKLE:  Objection.

7    A    No.

8    Q    Do you have any understanding if Officer

9  Dickel was or has received specific training

10  regarding the manipulation of limbs?

11        MR. RUCKLE:  Objection.

12    A    No.

13    Q    And you've testified earlier that you

14  don't have a basis to make a conclusion as to how

15  Officer Dickel manipulated Robin Burkhart's limb?

16        MR. RUCKLE:  Objection.

17    A    Correct.

18    Q    So, would you agree with me, sir, that you

19  cannot rule out the possibility that Officer Dickel

20  injured Robin Burkhart by manipulating her leg?

21        MR. RUCKLE:  Objection.

22    A    Within a reasonable degree of medical

Page 126

1  volunteered that opinion during a conversation in
2  preparation for the previous deposition time that
3  was canceled.
4       Q    And were you asked to come up with that
5  opinion for purposes of the deposition?
6            MR. RUCKLE:  Objection.
7       A    No.
8       Q    Was it your formation of that opinion that
9  caused you to write your addendum of May 13th, 2015?
10           MR. RUCKLE:  Objection.
11           THE WITNESS:  Subsequent to providing that
12      opinion, I was then asked to put it into a
13      report.
14           MR. IAMELE:  Can we mark this as the next
15      sequential exhibit?
16           (Exhibit No. 13 was subsequently marked for
17      identification and attached hereto).
18           MR. IAMELE:  Do you want to take a look?
19           MR. RUCKLE:  I assume you're not going
20      through it line for line.  So, which page are
21      you --
22           MR. IAMELE:  Well, it's already been --

Page 127

1      it's an excerpt.  I didn't put the whole
2      deposition in.
3      So, the short answer to your question,
4  Mr. Ruckle --
5  BY MR. IAMELE:
6       Q    Dr. Fowler, I'm going to offer you an
7  opportunity to read an excerpt from Officer Dickel's
8  deposition in this particular case, all right.  And
9  I think it's relevant for your --
10      First and foremost, you never received Officer
11  Dickel's deposition prior to this deposition; have
12  you, sir?
13      A    Not that I recall.
14      Q    Picking up on Page 116, Officer Dickel
15  describes his recollection of what happened --
16           THE COURT REPORTER:  Could I go off the
17      record?
18           MR. IAMELE:  Sure.
19           THE VIDEOGRAPHER:  The time is 12:26 p.m.
20      We'll go off the video record.
21           (A brief recess was taken).
22           THE VIDEOGRAPHER:  The time is 12:28.

Page 128

1       Back on the video record.
2  BY MR. IAMELE:
3       Q    Dr. Fowler, while we were off the record,
4  you had occasion to read an excerpt from Officer
5  Dickel's deposition?
6       A    Yes.
7       Q    Having now read Officer Dickel's account
8  of what happened, you would agree with me, sir, that
9  he does not describe a scenario in which Robin
10 Burkhart is moving to her knees at any velocity?
11      A    No.  He's guiding her to the ground.
12      Q    Right.  And he was specifically asked
13 whether her knees made contact with the ground, and
14 he said, "They did not."
15      And I direct you to Page 117 through 118, Lines
16 21 through 22, and then again, on 122, Lines 9
17 through 11.
18      A    No.  He says that he took her torso down
19 first.
20      Q    And her torso went to the ground first?
21      A    Yes.
22      Q    If we are to, for the moment, accept

Page 129

1  Officer Dickel's testimony as correct in this
2  particular case, you would agree me, sir, that your
3  theory about Robin Burkhart being injured when she
4  was taken to her knees would not be applicable to
5  this case?  It would not be appropriate?
6            MR. RUCKLE:  Objection.
7       A    If you can exclude the knees striking the
8  ground, then that particular scenario, as stated in
9  my second report, the addendum, would be applicable,
10 yes.
11      Q    Well, I'm not asking you to do it based on
12 conjecture.
13      I'm asking you, based on Officer Dickel's
14 testimony that he provided in this particular case
15 at deposition, if we accept Officer Dickel's
16 testimony in this case as being truthfully and
17 factually correct, is your theory about the injury
18 applicable to this case?
19      A    No, it's not.
20      Q    If you are to consider Officer Dickel's
21 testimony in conjunction with Robin Burkhart's
22 deposition testimony in this case, can you come up

Page 130

1  with a scenario under which she was injured?

2       A    No.

3       Q    Why is that?

4       A    Because her statements of the pulling,

5  twisting and the flexion, I don't believe are

6  consistent with this injury.  And, obviously,

7  Officer Dickel's statement that her knees didn't

8  strike the ground, having been excluded based on his

9  testimony, I can't think of a rational explanation

10  for this injury based on the described

11  circumstances.

12       I don't believe any of the circumstances

13  described now would, therefore, be able to

14  reasonably explain this.

15       Q    Now that you have had occasion to look at

16  Officer Dickel's testimony in this case and consider

17  that in conjunction with the police report and Robin

18  Burkhart's testimony in this case and her medical

19  records, you can't offer an explanation of how she

20  came to be injured?

21            MR. RUCKLE:  Objection.

22       A    Correct.  Other than being able to exclude

Page 131

1  the processes that I have previously stated.

2       Q    Which takes us back to your initial report

3  in which you said the twisting motion alone would

4  not have been causative in this case?

5       A    Correct.

6       Q    And at this point, is that your opinion in

7  this case?

8       A    That, and the flexion and the pulling.

9       Q    So, you're enhancing the initial report to

10  say that the flexion couldn't cause it, and the

11  pulling couldn't cause it as well?

12       A    Well, the pulling is obvious, because this

13  is a compression fracture.  So, I think that's a

14  no-brainer.

15       Q    Uh-huh.

16       A    And the flexion, as I said, this is a

17  structure in the body which is designed to flex, and

18  I don't believe its flexion capabilities are being

19  exceeded.

20       Q    And how do you reach that conclusion, that

21  its flexion capabilities were not exceeded?

22       A    Because I believe that the average person

Page 132

1  can get very close to having their heel right up

2  against their buttocks, and that's a normal position

3  for this joint.

4       Q    Wouldn't you need to know --

5            THE COURT REPORTER:  That's not me.  It

6       came from there.

7            THE VIDEOGRAPHER:  It's 12:32.  Let's go

8       off the video record.

9            (A brief recess was taken).

10            THE VIDEOGRAPHER:  12:33, back on the

11       video record.

12  BY MR. IAMELE:

13       Q    Dr. Fowler, would you agree with me that

14  you would need some further description as to how

15  Mrs. Burkhart's leg was moved while she was on the

16  ground in order to render an opinion that her leg

17  was not injured while she was on the ground?

18       A    Further description would be useful,

19  because the present description given, I believe, is

20  inconsistent with the injury.

21       Q    And the present description that you

22  received is based on the limited questions that were

Page 133

1  posed to her at deposition?

2       A    The statements in her deposition, yes.

3       Q    And she wasn't asked any follow-up

4  questions or additional questions about the manner

5  in which her leg moved, the force that was applied

6  or the speed at which it moved?

7       A    I did not see any questions to those

8  issues, no.

9       Q    And that is not something that was ever

10  posed to Mrs. Burkhart in this case?

11       A    Not that I am aware of.

12       Q    Would you agree with me, sir, that based

13  on the information at hand, you cannot, to a degree

14  of medical certainty, rule out the possibility that

15  Mrs. Burkhart's leg was injured while she was on the

16  ground?

17            MR. RUCKLE:  Objection.

18            THE WITNESS:  No.  I cannot rule that out.

19            MR. IAMELE:  Thank you, Dr. Fowler.  I

20       don't have any other questions for you at this

21       point.

22

Page 150

1    A    No. Because, again, you can flex this a
2    substantial distance.
3    Q    And in the deposition portions that you
4    read, nowhere does Mrs. Burkhart indicate that they
5    flexed her leg, just that they pushed it, they
6    pushed it up?
7    A    Yes.
8         MR. IAMELE:  Objection.
9         MR. RUCKLE:  I have no further questions.
10        MR. IAMELE:  I have a couple, based on
11        that, okay.  And we'll use this model, because
12        I think it works better for this, okay.
13             REDIRECT EXAMINATION
14   BY MR. IAMELE:
15   Q    This motion is flexion, right?
16   A    Correct.
17   Q    And that presumes that the femur is
18   sitting on the tibial plateau, correct?
19   A    Yes.
20   Q    So, when you flex, it goes in a linear
21   motion based on our anatomical design?
22   A    Uh-huh.

Page 151

1    Q    Now, that is a little different from what
2    we have in this case.
3         In this case, we have a dislocation, which
4    means the tibia, this piece, and the fibula, are
5    pushed backwards against the femur, correct?
6    A    If you're pushing in that straight,
7    downward direction, yes.
8    Q    But that's the nature of this injury,
9    correct?  I mean, whether it be this way, whether it
10   be this, or whether it be this, that's what we're
11   looking at in this case, right?
12   A    Without tearing the menisci and causing
13   injuries to the ligaments, which are designed to
14   prevent that type of movement, again, I think there
15   are issues with that particular explanation.
16   Q    Well, okay.  Let me put it this way:
17        It is beyond refute in this case that there is
18   a posterior dislocation?
19   A    Well, a fracture dislocation, yes.
20   Q    A fracture dislocation.  And that's what
21   the fracture is, and that's how tha popliteal artery
22   got injured, because the popliteal artery runs right

Page 152

1    down the back here, right, and through here?
2    A    Right.
3    Q    And, so, there has to be some shearing
4    motion for it to be severed, right?
5    A    Well, what's happened is this section here
6    has been fractured off and been displaced backwards.
7    Q    Right.
8    A    Right.
9    Q    So, when we talk about flexion, and we
10   talk about the natural flexion of a knee, we're
11   talking about something a little bit different than
12   what we're talking about in this particular case.
13        This wasn't a flexion injury, even though when
14   I talk about it being put into flexion, I'm talking
15   about the tibia moving towards the head relative to
16   the femur.  Do you understand the distinction?
17   A    Well, the tibia moving towards the head in
18   a flexion is the normal course of events.
19   Q    If we follow the arc of the -- if we
20   follow the arc of the joint, right?
21   A    Right.
22   Q    You're presuming that we follow the arc of

Page 153

1    the joint.
2         Now, what if the leg is in flexion, and there's
3    a push this way?  So, we're not following the arc of
4    the joint anymore.  The tibia is being pushed toward
5    the head.  Do you understand the distinction?
6    A    Well, this is the tibia here.  This is the
7    femur, as you've got it in that, (indicating).
8    Q    Correct.  Right.
9    A    And this is the tibia being flexed
10   towards --
11   Q    That's in the arc of flexion, correct.
12   A    Right.
13   Q    Now, that's following the arc of the
14   joint.  Now, the question is a little bit different,
15   because I'm not asking you to follow the arc of the
16   joint.
17        I'm saying what if the tibia is moved relative
18   to the femur?
19   A    Okay.  So, the movement you just did, this
20   is the front, which is where the ligament is,
21   (indicating).
22   Q    Correct.

Page 154

1   A    If you push this, you're going to
2   fracture, and you're putting pressure on the
3   anterior portion, and this is a posterior fracture.
4       So, the movements you just did actually would
5   give rise to an anterior tibial plateau fracture and
6   not a posterior tibial.
7   Q    Why don't you do this for me then.
8   Explain, with this anatomical model, the motion of
9   the knee that caused this fracture, just so we're
10  not guessing at it, and I know exactly what
11  happened.
12  A    Well, if we knew that, we would be able to
13  answer the question that everybody is asking.
14  Q    So, you are not able to offer an opinion
15  as to how the knee moved in this particular case to
16  cause this fracture?
17  A    Specifically, no.  Not with the
18  descriptions given.
19  Q    Aside from the descriptions, I want you,
20  as a forensic doctor, okay -- let's leave the
21  descriptions out of the case for the moment.  We
22  have radiographic studies.  You've looked at them.

Page 155

1   A    Okay.
2   Q    They say, very conclusively, what was
3   damaged, where the fracture was, if the fibular head
4   was fractured, the popliteal artery was ruptured.
5       Are you able to offer an opinion about how the
6   joint moved to caused these injuries?
7       MR. RUCKLE:  Objection.
8   A    Within the second report or addendum, as I
9   put it, you actually have the femur, which is this
10  section here, in my hand, (indicating), striking the
11  floor as this person is going down, and this being
12  forced into it, pushing directly onto that
13  particular area.
14  Q    Now, you've looked at Mrs. Burkhart's
15  deposition.  You've had occasion to read it here
16  today.  You've looked at Officer Dickel's
17  deposition.  You've had occasion to read it here.
18  You've looked at Officer Dickel's statement of
19  probable cause.
20      There's no explanation or no claim at any
21  point, by anybody, that she fell on her knees in
22  this case?

Page 156

1   A    Correct.  She was taken to the floor.  And
2   she has her hands held by somebody else.
3   Q    She's glided?
4   A    And I'm talking you do that to ten people
5   in a row, and every one of them will flex their
6   knees as they go down.
7   Q    I understand they will flex their knees,
8   but that's not what you are testifying to.  You're
9   testifying that her knees hit the ground.
10  A    Right.
11  Q    And we don't have that in any of the
12  stuff.
13  A    We have statements by the officers that
14  that didn't happen.
15  Q    Right.  And statements by Robin Burkhart
16  that it didn't happen.
17  A    I'm saying it's a natural tendency for
18  individuals to do that.  So, I know it's not
19  documented.
20  Q    Well, you're assuming it happened in this
21  case, and I want to know what the basis for the
22  assumption is?

Page 157

1   A    Normal activity of an individual.
2   Q    And that's based on what scientific
3   literature, what material?
4   A    None.
5   Q    None.  Okay.  So, that's just surmise?
6   A    It's what one would call common sense.
7   Q    You would agree with me, Dr. Fowler, that
8   you can certainly go from standing to being put on
9   your torso, if two people are holding your arms,
10  without ever touching your knees?
11  A    If you keep your legs rigid and straight,
12  but it would require conscious effort for the
13  individual to do that.
14  Q    What if the people that are putting you
15  down guard you and guide you down gently?
16  A    Then you could achieve that, yes.
17  Q    With little --
18  A    If they're literally carrying you to the
19  floor.
20  Q    With little or no force?
21  A    Yes.
22  Q    And isn't that exactly what Officer Dickel

Page 158

1  said, "We guided her to the ground with almost no
2  force?"
3      A    In a very gentle format, yes.
4      Q    And Officer Vlach said the exact same
5  thing, and they both testified that she never hit
6  her knees. And Robin Burkhart testifies that she
7  was never put on her knees as part of the cuffing
8  process.
9      Can we agree that your opinion here, that she
10  was injured while being placed on her knees as part
11  of the restraining process, does not fit this case?
12  It's not part of this case?
13      A    You're correct. There is no evidence to
14  support it.
15      Q    Are you prepared to withdraw that opinion?
16      A    If there's no evidence to support it, yes.
17      Q    And can you agree that you've withdrawn it
18  for purposes of this case?
19      A    Presumably, yes, because there is no
20  evidence to support it.
21          MR. IAMELE:  Now, understanding that that
22      mechanism of injury has been taken out of the

Page 159

1      game, okay, and we still have this posterior
2      dislocation, all right, and we know that if she
3      falls on her femur, like this -- and I'm going
4      to move this.
5      Can we see that?
6          THE VIDEOGRAPHER:  Yes.
7  BY MR. IAMELE:
8      Q    If you fall on your femur, like that, you
9  can get that, okay?
10      A    Yes.
11      Q    If you were to push on this leg, push and
12  push back, can you also get that?
13      A    If you put the force in that direction,
14  potentially, yes.
15      Q    Yeah. If you push down on the leg, this
16  injury can happen while it's in flexion?
17      A    Potentially, yes.
18      Q    Right. And that's not scientifically
19  impossible, and that's not even remotely impossible.
20  That could have happened in this case?
21      A    It could have happened, yes.
22      Q    And Mr. Ruckle just had you read

Page 160

1  Mrs. Burkhart's deposition, and part of what she
2  said is that he was pushing on her leg?
3      A    Correct.
4      Q    And part of what she said is that when he
5  pushed on her leg, she experienced the pain. That's
6  when this happened.
7      A    Well, that's when she experienced pain.
8  We don't know when it happened.
9      Q    Right. Okay. But according to
10  Mrs. Burkhart, when Officer Dickel is pushing on her
11  leg while she's on the ground, that's when she
12  experiences pain?
13      A    Correct.
14      Q    And that's when she feels the pops?
15      A    I didn't see the pops in the sentence that
16  I actually read.
17      Q    Well, excluding the pops for a minute, you
18  would agree with me, Dr. Fowler, to a reasonable
19  degree of forensic certainty, that pushing down on
20  Robin Burkhart's tibia while she is lying prostrate
21  against the ground, could cause this injury?
22      A    In somebody who has, shall we say, bony

Page 161

1  deficiency, osteoporosis.
2      Q    And it's possible --
3      A    Again, I would not expect it in an
4  individual who has normal bone density.
5      Q    And it's possible in this particular case?
6      If we accept what you've already accepted,
7  which is that Robin Burkhart is osteoporotic, that
8  is certainly an explanation in this case?
9      A    It could become plausible, yes.
10      Q    And, in fact, it's the only explanation in
11  this case that can explain how she came to be
12  injured?
13      A    Well, it's the only one we've come up with
14  at this particular stage, yes.
15      Q    Well, at this particular stage, we've been
16  through discovery. We've deposed the officers.
17  We've deposed Robin Burkhart. We've deposed the
18  doctors. You've looked at the medical records.
19  You've had the benefit of looking at the police
20  reports.
21      Based on all this information in this case, you
22  would agree with me, sir, that that's the only

DAVID RICHARD FOWLER, M.D. - 06/11/2015    Pages 162..165

Page 162

1  explanation for Robin Burkhart's injury in this
2  case?
3       A    According to the information supplied,
4  yes.
5       Q    And not only is it the only explanation,
6  it is a reasonable and scientifically consistent
7  explanation for her injuries?
8       A    In the face of osteoporosis, yes.
9       Q    Now, you were asked about the Doppler
10 study.  Dr. Picard did a Doppler study.  That's a
11 vascular study?
12      A    Yes.
13      Q    That was part of his process because he
14 did two vascular repairs; you understand that?
15      A    Yes.  My understanding was that is what
16 his primary specialty is.
17      Q    And as part of Exhibit Number 7, we also
18 have the benefit of Dr. Zakai's report; do we not?
19      A    Yes.
20      Q    And Dr. Zakai is an orthopedic surgeon?
21      A    Yes.
22      Q    And orthopedic surgeons don't look at

Page 163

1  Doppler studies or vascular health.  They look at
2  bones?
3       A    Correct.
4       Q    Is there anything in Dr. Zakai's report --
5  and correct me if I'm wrong, but I believe that's
6  dated June 23rd, 2011?
7       A    Yes, it is.
8       Q    Anything in there about osteoporosis?
9       A    No.
10      Q    I have what's been marked as Exhibit
11 Number 11 in this case.  This is the series of
12 X rays that were taken on June 23rd, 2011.  Those
13 are plain film X rays.
14           You testified earlier that a radiologist would
15 be able to look at those and interpret osteoporosis
16 if it exists?
17      A    Correct.
18      Q    Is there any mention in any of those of
19 osteoporosis?
20      A    None that I see.
21      Q    I have the MRI report from July 29th,
22 2011, but I don't believe it will be picked up on

Page 164

1  that study, would it?
2       A    Correct.  Usually, a MRI is good for soft
3  tissue and less effective for bony tissue and the
4  substance that surrounds.
5       Q    A CT scan of the knee, which we have the
6  benefit of from August, that would certainly pick up
7  the presence of osteoporosis if it was there?
8       A    Yes.  CTs are usually the better of all of
9  these particular processes.
10      Q    Gold standard.  You have the benefit now
11 of Mrs. Burkhart -- it's been marked, by the way,
12 for purposes of your deposition already.
13           There's no reference to osteoporosis in the CT
14 scan that was taken in August of 2011; is there,
15 sir?
16      A    No.
17      Q    One of the things that I think is
18 interesting about the CT report, by the way, is that
19 the radiologist indicates that there may be a
20 complete severing of the ACL in this particular
21 case, the anterior cruciate ligament?
22      A    Right.  And the MR would be the definitive

Page 165

1  study for that.
2       Q    Sure.  But the reason he believes that is
3  because of the extent of the dislocation, correct?
4       A    Correct.  But the MR would have been the
5  process which actually would have been the
6  definitive study for that.  So, if it's not in the
7  MR --
8       Q    Right.  And I understand that, but the
9  point that I'm trying to make is that the
10 radiologist who looked at this knee in August said
11 "there was such a significant dislocation here, I
12 think it's possible that the entire ACL has been
13 severed?"
14      A    Correct.  But then you would have had that
15 instability and --
16      Q    Right.
17      A    -- it's not documented anywhere else in
18 the records.
19      Q    Got you.  Are you going to be offering any
20 other opinions in this case, sir?
21      A    Not that I'm aware of.
22      Q    Have you been asked to offer any other

Page 170

1    Q    Keep them stiff?

2    A    Correct.

3    Q    So, if that's the case and Mrs. Burkhart's

4  description of what happened doesn't lend itself to

5  the explanation of this accident, these injuries, is

6  there any explanation whatsoever that you can think

7  of?

8    A    No.  I've already been asked that, and I

9  said "no."

10   Q    Mrs. Burkhart is not explaining the

11  injury, the cause of it, is she?

12        MR. IAMELE:  Objection.

13   A    No.

14   Q    And Mr. Iamele is indicating Officer

15  Dickel is not explaining the occasion of the injury

16  or the mechanism of injury, is he?

17        MR. IAMELE:  Objection.

18   A    Correct.

19   Q    And, yet, the only way to cause that

20  injury would be a force directed from the front of

21  the knee, pushing it posteriorly back, correct?

22        MR. IAMELE:  Objection.

Page 171

1    A    That is certainly one of them.  What

2  you're going to do is put pressure along this

3  posterior tibial plateau.

4    Q    Right.

5    A    And, so, the mechanism I have actually put

6  forward is based on what I would expect the average

7  individual to do in those circumstances.

8    Q    Can you put pressure on the posterior

9  plateau, twisting the leg?

10   A    Not twisting it, no.

11   Q    Can you put pressure on the posterior

12  knee, bending the leg up?

13   A    No.

14   Q    Can you pull it -- can you do it pulling

15  the leg?

16   A    No.

17   Q    And that's the extent of her description

18  of the injury, isn't it?

19        MR. IAMELE:  Objection.

20        THE WITNESS:  From my recollection and

21   reading of her deposition, I agree.

22        MR. RUCKLE:  I don't have anything else.

Page 172

1        MR. IAMELE:  I've got a couple based on

2   that.  And I don't mean to belabor this.

3        FURTHER DIRECT EXAMINATION

4  BY MR. IAMELE:

5    Q    But one of the things that I think is

6  important now, based on Mr. Ruckle's question, there

7  is no dispute in this case, as far as you are aware,

8  as a forensic scientist, about the time frame in

9  which Mrs. Burkhart was injured?

10   A    No.

11   Q    Will you agree that when she was standing

12  up, she did not have a tibial plateau fracture, and

13  she didn't have a ruptured popliteal artery?

14   A    Unlikely.  Very unlikely.

15   Q    And we agree that during the time frame

16  when she was walking about the house, meaning up the

17  stairs to the kitchen, she wouldn't have had a

18  posterior dislocation or a tibial plateau fracture

19  because she wouldn't have been able to walk?

20   A    Correct.

21   Q    So, we can assume, to a reasonable degree

22  of scientific certainty, that she was uninjured at

Page 173

1  the beginning of this process?

2    A    I would agree.

3    Q    And there's no dispute about that?

4    A    Correct.

5    Q    And we also know that she came to be

6  injured during the course of this encounter?

7    A    Correct.

8    Q    And there's no dispute about that?

9    A    Not that I'm aware of.

10   Q    And Mrs. Burkhart has very clearly

11  described that she was feeling pain while her leg

12  was being pushed.  No dispute about that either?

13   A    Again, that exact detail slips my mind,

14  but --

15   Q    Right.  But it's what you just read into

16  the record --

17   A    Right.

18   Q    -- after Mr. Ruckle asked you?

19   A    Yeah.  Sorry.  It hurt like a lot.  So,

20  yes, you're right.  It hurt very, very badly.

21   Q    And the nature of the pushing, okay, what

22  are you assuming about where her leg was or how it

Page 186

1  the leg, correct?

2      A    That is the statement, yes.

3      Q    Now, you have expressed the opinion that

4  based on that inartful description, as Mr. Iamele

5  puts it, the injuries that Mrs. Burkhart suffered

6  would not have been caused by those actions.

7      Would that be a fair statement?

8      A    Yes.  In my opinion, they are not

9  consistent.

10     Q    And that taking the deposition of Officer

11  Dickel, in which he said "torso struck the ground

12  first," you indicated that, "well, that kind of

13  dispels my position that when the knee struck the

14  ground, that's what caused the injury?"

15     A    Correct.

16     Q    So, would it be fair to say that we have

17  essentially thrown out any possible explanation for

18  this injury?

19     A    Based on the statements by both parties,

20  yes.

21     Q    And that right now, we have an injury, and

22  we have no explanation of the mechanism of that

Page 187

1  injury?

2      A    Based on the statements made by the

3  individuals, yes.

4      Q    Now, based on the statements by the

5  individuals that we've just all discussed, is there

6  anything that you have seen, heard or read in all

7  the information that you've taken in today, that

8  would indicate that Mrs. Burkhart was injured by any

9  action taken by Officer Dickel?

10         MR. IAMELE:  Objection.

11     A    Not as described.

12     Q    And would you agree with me that the

13  description by the party of the event, that is what

14  we have as far as what actually happened?

15         MR. IAMELE:  Objection.

16         THE WITNESS:  Yes.

17         MR. RUCKLE:  No other questions.

18         MR. IAMELE:  I don't have any, based on

19     that.

20

21

22

Page 188

1         THE VIDEOGRAPHER:  The time is 1:38 p.m.

2      This is the end of Disk Number 2 and the end of

3      the video deposition.  We'll go off the video

4      record.

5      (Signature having been waived, the deposition

6  of David Richard Fowler, M.D. was concluded at

7  1:37 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 189

1  CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2      I, Sheri D. Smith, Registered Professional Reporter,

3  the officer before whom the foregoing deposition

4  was taken, do hereby certify that the foregoing

5  transcript is a true and correct record the testimony

6  given; that said testimony was taken by me

7  stenographically and thereafter reduced to typewriting

8  under my direction and that I am neither counsel for,

9  related to, nor employed by any of the parties to this

10  case and have no interest, financial or otherwise, in

11  its outcome.

12         IN WITNESS WHEREOF, I have hereunto set my

13  hand and affixed my notarial seal this 19th day of

14  June, 2015.

15  My commission expires November 4, 2016.

16

17  _____

18  REGISTERED PROFESSIONAL REPORTER

19  NOTARY PUBLIC FOR THE STATE OF MARYLAND

20

21

22