# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|   |   |   |
|---|---|---|
| | : | |
| ROBIN ANN BURKHART | : | |
| | : | |
| v. | : | Civil No. CCB-12-3320 |
| | : | |
| OFFICER RYAN DICKEL, ET AL. | : | |
| | : | |

## MEMORANDUM

Robin Burkhart ("Burkhart") brings this action against Baltimore County Police Officers Ryan Dickel ("Dickel") and Michael Vlach ("Vlach"). She raises several constitutional and state law claims related to her encounter with the officers on July 23, 2011, during which she was arrested and injured. Now pending before the court are eight motions in limine filed by Burkhart, several of them requesting a *Daubert* hearing in the alternative, and five motions in limine filed by the defendants. The parties have briefed the issues and a hearing was held on December 7, 2015. The pending motions will be considered in turn.

## BACKGROUND[1]

On July 23, 2011, Burkhart's daughter, Brianna Burkhart, was involved in a physical altercation with Burkhart's brother, David Henninger ("Henninger"), at Burkhart's home. (*See* Suppl. Resp. Opp'n Mot. Summ. J. Ex. 1, Burkhart Dep. 8:12-10:19, ECF No. 22-1.) Henninger called the police. (*Id.* at 10:17-21.) Burkhart later told the dispatcher that her children were playing with the phone and there was no reason to send the police. (*Id.* at 11:13-20.) Officers Dickel and Vlach, along with Officer Michael Barber ("Barber"), nonetheless responded to the home. (Mot. Summ. J. Ex. 2, Dickel Aff. ¶ 2, ECF No. 19-2; *id.* Ex. 3, Vlach Aff. ¶ 3, ECF No. 19-3.) The parties dispute what happened after the officers entered the home. According to the

---

[1] The facts of this case are described in more detail in this court's memorandum opinion and order dated September 4, 2014. (*See* ECF Nos. 34, 35.)

defendants, Burkhart yelled at the officers to get out of her house, pointed her finger in Dickel's face, made him feel uncomfortable, and lunged at him without warning. (Dickel Aff. ¶¶ 4, 7.) The officers allege that Burkhart resisted arrest, but they were able to handcuff her once Vlach came to assist Dickel. (*Id.* ¶¶ 7-8.) Burkhart, on the other hand, admits that she was yelling at the officers, (Burkhart Dep. at 20:1-11), but claims that she was walking away from Dickel toward the kitchen, (*id.* at 22:20-21, 23:8-11). Burkhart testified that, as she was entering the kitchen, she was hit from behind and, as a result, fell face first to the floor. (*Id.* at 23:12-16, 24:8-25:6.) While she was lying on the floor, an officer, who she later saw was Dickel, grabbed her leg, pushed it up, and began to "twist and twist and twist and twist." (*Id.* at 25:13-18.) According to Burkhart, Dickel's twisting of her leg caused it to hurt "very, very badly." (*Id.* at 26:19.) Although Burkhart only testifies to Dickel's involvement in the struggle, the defendants admit that Vlach aided Dickel in taking Burkhart to the floor and arresting her. (Vlach Aff. ¶¶ 12, 14.)

## STANDARD OF REVIEW[2]

When testimony concerning scientific, technical or other specialized knowledge is offered in support of a party's claim, the trial judge must ensure under Rule 702 of the Federal Rules of Evidence that any such testimony is "not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-49 (1999) (extending *Daubert*'s analysis of expert testimony based on "scientific" knowledge to expert testimony based on "technical" and "other specialized" knowledge); *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001). In making the determination of admissibility under Rule 104(a) of the Federal Rules of Evidence, the judge must conduct "a preliminary assessment of whether the reasoning or methodology underlying the testimony is

---

[2] A few motions in limine argue for the exclusion of evidence besides expert testimony. The court will address any other standards within the discussion of those individual motions.

scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. In essence, the trial court must perform a two-pronged analysis in order to satisfy its gatekeeping function. The first question is whether the proffered scientific evidence is reliable. *United States v. Barnette*, 211 F.3d 803, 815 (4th Cir. 2000). The second question is whether it will help the trier of fact, which is generally a question of relevance. *Id.* In *Daubert*, the Supreme Court identified several factors to assist in evaluating the proposed expert testimony: (1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether a technique has a high known or potential rate of error and whether there are standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community. *Cooper*, 259 F.3d at 199 (citing *Daubert*, 509 U.S. at 592-94). This list is neither definitive nor exhaustive, however, and some factors may be more pertinent than others "depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Cooper*, 259 F.3d at 200.

## ANALYSIS

Thirteen motions in limine are currently pending. The court will address each in turn.

I.    Burkhart's Motions

    **a.  Motion in limine to exclude expert testimony of Dr. Daly or, in the alternative, requesting a *Daubert* hearing**

The defendants seek to call Dr. Barry Daly ("Daly"), a radiologist, to testify that Burkhart had severe osteoporosis at the time of her arrest. This testimony will be permitted. Whether Daly can testify that osteoporosis was the cause of Burkhart's injuries is a moot question, as the defendants agreed at the hearing that Daly is not an expert in, and therefore would not testify to,

the mechanisms of injury.[3]

Daly's report states that a CT scan from August 15, 2011, showed "severe reduced mineral density of [Burkhart's] bone tissue in the tibia and femur, consistent with the presence of osteoporosis." (Daly Report 1.) Daly also writes that a review of subsequent X-rays of Burkhart's knee reveals similar findings, and that the presence of several risk factors in Burkhart's medical history explains why the plaintiff developed osteoporosis at an unusually young age. (*Id.* at 1-2.) Burkhart takes issue with Daly's opinion. In particular, she argues that he cannot, without bone density studies or CT scans with quantitative imaging, determine based on an August 2011 CT scan whether Burkhart was osteoporotic at the time of her arrest in July. (Daly Mot. Lim. 18-21, ECF No. 73.) She notes that no other physicians found Burkhart to be osteoporotic, and that X-rays and MRIs from July 2011 did not show signs of osteoporosis. (*Id.* at 10-18.) Daly, however, testified at his deposition that, "to a reasonable degree of medical certainty," he believed the presentation of Burkhart's bone in the August CT scan was the same as the condition of her bone when she was arrested in July. (Daly Mot. Lim., Daly Dep. 63:16-21, ECF No. 73-15.) He said he could reach this conclusion based on his experience and training looking at bone images, even without bone density studies. (*Id.* at 70:20-71:9.) Daly further testified that he believed he reasonably could rule out disuse osteoporosis, which can occur when an individual does not bear weight on a bone, as an explanation for the reduced bone density seen in the August CT scan because it takes "many months" before disuse osteoporosis becomes visible. (*Id.* at 63:5.)

Daly's opinion that Burkhart suffered from osteoporosis when she was arrested will not be excluded. As a radiologist, Daly is qualified to offer this opinion and the potential presence of

---

[3] Daly's report concluded that "the severe osteoporosis-induced weakness of Ms. Burkhart's bone as demonstrated on the CT scan of her left knee on 8/15/11 is the reason that she sustained injuries to her left knee on 7/23/11." (Daly Mot. Lim. Ex. 16, Daly Report 3, ECF No. 73-16.)

osteoporosis is relevant. He, however, will not be permitted to testify that osteoporosis was a cause of Burkhart's injuries.[4] Any other issues with Daly's testimony and report may be brought out by Burkhart on cross examination.

### b. Motion in limine to exclude expert testimony of Dr. Fowler

The defendants seek to call Dr. David R. Fowler ("Fowler"), a pathologist and the chief medical examiner for Maryland. Fowler has offered two reports based on his review of Burkhart's medical records, her deposition, and a police report. In his first report, dated September 20, 2013, Fowler writes that "[t]wisting forces on the knee typically cause soft tissue injury," which was not documented in Burkhart's clinical records, and the twisting and popping sounds she described are not consistent with her fractures. (Fowler Mot. Lim. Ex. 1, Fowler 2013 Report 2, ECF No. 72-1.) In his addendum report, dated May 13, 2015, Fowler writes that, in light of the "osteoporotic bone changes in Ms. Burk[h]art's knee" and statements that indicate she was placed on her knees as part of the restraint process, her injuries are consistent with a "backward directed compressive force" and not a pulling or twisting. (Fowler Mot. Lim. Ex. 2, Fowler 2015 Report 1, ECF No. 72-2.) Fowler will be allowed to testify to the conclusions found in his 2013 report. The extent to which Fowler will be permitted to testify to the conclusions in his 2015 report will be determined at a later date based on the evidence presented by the parties.

Regarding Fowler's 2013 report, Burkhart conceded in the hearing that Fowler is qualified to testify that twisting or pulling alone could not cause Burkhart's injuries. Further, the basis for Fowler's conclusion—his knowledge and experience, and his examination of relevant medical literature and Burkhart's records—is permissible under the Federal Rules of Evidence. *See* Fed. R. Evid. 702, 703. For his 2015 report, Fowler is permitted to rely on Daly's conclusion

---

[4] Defense counsel agreed at the motions hearing that Daly is not an expert in, and therefore would not testify to, the mechanism of injury.

that Burkhart was osteoporotic. *See* Fed. R. Evid. 703 advisory committee notes (If in line "with the practice of the experts themselves when not in court," an expert may rely on outside sources such as "other doctors."). This court, however, will reserve final judgment on whether Fowler can testify that Burkhart was placed on her knees. On the one hand, Burkhart is correct that if there is no basis for that conclusion in the record, Fowler cannot use it to support his opinion. *See Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 142 (4th Cir. 1994) ("An expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record."). On the other hand, it is not as clear as Burkhart contends that the defendants conceded in their depositions that Burkhart was never placed on her knees during her arrest.[5] Accordingly, this court will reserve final judgment on the extent to which Fowler's conclusions in his 2015 report will be admitted: he may rely on Daly to testify that Burkhart was osteoporotic at the time of her arrest, but whether he may testify that the osteoporosis contributed to the injury because Burkhart was placed on her knees will depend on the evidence presented by both parties.

### c.   Motion in limine to exclude expert testimony of Dr. Belkoff

The defendants also seek to call Dr. Stephen M. Belkoff ("Belkoff"), a biomechanics expert. According to Belkoff, biomechanics is a field of engineering mechanics that analyzes the effect of forces on hard (bone) and soft (skin, ligaments, and tendons) tissues. (Belkoff Mot. Lim. Ex. 2, Belkoff Report 1, ECF No. 74-2.) In his August 16, 2013, report, Belkoff writes that "the injuries sustained by Ms. Burkhart are not consistent with the mechanism described by her,"

---

[5] Vlach testified that he never saw Burkhart strike her knees against the ground. (Daly Mot. Lim., Vlach Dep. 61:9-11, ECF No. 73-1.) Dickel testified that he "[did] not recall" which part of Burkhart's body first made contact with the ground, (*id.*, Dickel Dep. 117:8-10, ECF No. 73-7); that they would have put her torso down first and there would have been no reason for her knee "[i]ntentionally" to have made contact with the ground, (*id.* at 117:21-118:1); and he "[did not] recall" whether her leg ever struck the ground, (*id.* at 122:9-11).

(*id.* at 1), and that "[w]ithin a reasonable degree of engineering certainty, the injuries sustained by Ms. Burkhart's left leg were not the result of twisting," (*id.* at 2), but that her injuries are consistent with a "posterior translation" of the tibia causing a dislocation of the knee, (*id.* at 1). His report includes several mechanisms by which knee dislocations caused by posterior translations of the tibia can occur. (*Id.* at 2-3.) In his February 4, 2014, affidavit, Belkoff adds that "a posterior translation requires sufficient force being applied directly to the front of the knee resulting in the knee being pushed back." (Belkoff Mot. Lim. Ex. 4, Belkoff Aff. ¶ 5, ECF No. 74-4.) He also avers that "based on a reasonable degree of engineering certainty, [] the Baltimore County Police are not the proximate cause of the injuries suffered by the Plaintiff." (*Id.* ¶ 10.) During the hearing, the plaintiff explained that she does not take issue with Belkoff's report, only with the additional opinions in his affidavit.

Belkoff will be permitted to testify to his original opinion that Burkhart's injuries are not consistent with the twisting of her leg as she described it. He will not, however, be allowed to testify to his opinions in the affidavit that a posterior translation requires an application of force directly to the front of the knee, or that the defendants were not the proximate cause of Burkhart's injuries. These portions of the affidavit are counter to his report, which lists several potential causes of a knee dislocation like the one Burkhart suffered. Further, in his deposition, Belkoff testified that he could not offer an opinion with a reasonable degree of certainty on what kind of force caused Burkhart's knee dislocation. (Belkoff Mot. Lim. Ex. 1, Belkoff Dep. 37:5-22, 41:8-42:19, ECF No. 74-1.) In particular, he said he could testify that the mechanism of Burkhart's injury was a posterior translation, and that this mechanism is not consistent with the twisting Burkhart described, but he has "no evidence to suggest specifically [what was the cause of the posterior translation]." (*Id.* at 96:5-6.) Accordingly, Belkoff will be permitted to testify

that there are many potential causes of a posterior translation and that twisting Burkhart's leg would not be one of them, but he may not testify that only a force to her knee could have caused, and that the defendants were not the proximate cause of, Burkhart's injuries.

### d. Motion in limine to exclude expert testimony of Mr. Key, or in the alternative, requesting a *Daubert* hearing

The defendants have proposed that Charles J. Key, Sr. ("Key"), a retired police officer with the Baltimore Police Department, testify that the officers' arrest of and use of force on Burkhart was objectively reasonable and consistent with accepted standards of police procedures and training. Burkhart objects to Key's testimony on several grounds: Key worked for Baltimore City and not Baltimore County; he does not have the expertise to testify to Burkhart's level of intoxication at the time of her arrest because he is not a toxicologist; his testimony that Burkhart's arrest was objectively reasonable is not based on facts in the record; and his expert report improperly cites to Supreme Court case law. (Key Mot. Lim., ECF No. 75.)

Key will be permitted to testify, but his testimony on intoxication and the Supreme Court's interpretation of "reasonableness" under the Fourth Amendment will be restricted. As an initial matter, Key is qualified to testify to police procedures and training. He was a supervisor at the Baltimore Police Department for more than twenty years, has written materials on police use of force and other operational protocols, and has trained police officers in the use of force.[6] (Key Mot. Lim. Ex. 8, Key Report 1-3, ECF No. 75-8.) Key also may testify that, in his opinion, Burkhart's arrest was objectively reasonable. As part of that testimony, Key can opine on how factors such as intoxication and being near potential "weapons of opportunity" in a kitchen would affect a reasonable officer's response, (*see id.* at 17), although he may not testify to the significance of Burkhart's blood ethanol level without toxicology expertise. And because the

---

[6] If Key were to be excluded for not having worked with the Baltimore County Police Department, the plaintiff's police procedures expert, who never worked in Maryland, also would have to be excluded.

reasonable officer standard is an objective one, any evidence that the defendants in fact did not consider such factors may be brought out by the plaintiff on cross examination but need not result in excluding Key's opinions. Finally, while Key may testify to what he thinks is reasonable based on his knowledge and experience, any aspects of Key's report that involve pure legal analysis, such as quotations from the Supreme Court's opinion in *Graham v. Connor*, 490 U.S. 386 (1989), (*id.* at 12), must be excluded. *See United States v. Perkins*, 470 F.3d 150, 159 (4th Cir. 2006) (Testimony, to be helpful to the jury, must "avoid the baseline legal conclusion of reasonableness.").

### e. Motion in limine to exclude evidence of ethanol value from Franklin Square blood draw

After her injury, Burkhart was taken to Franklin Square Hospital Center, where a blood draw at 4:15 am indicated her blood ethanol level was 138 mg/dL. (Blood Draw Mot. Lim. Ex. 11, Toxicology Report, ECF No. 76-11; *id.* Ex. 12, 24-Hour Critical Care Sheet, ECF No. 76-12.) Burkhart seeks to exclude oral testimony regarding her blood ethanol concentration, and to redact the portions of the Franklin Square Hospital Center records that document her blood ethanol level the night of her arrest. (Blood Draw Mot. Lim., ECF No. 76.) She argues: (1) the ethanol report is not relevant because the blood was drawn four hours after the events at issue, and the obstructed blood flow in her leg could have affected the results; (2) if relevant, the blood draw should be excluded as unfairly prejudicial under Rule 403 of the Federal Rules of Evidence; and (3) the defendants must produce a toxicologist to introduce the blood draw evidence. (*Id.* at 6-11.)

Testimony about, and the introduction of records documenting, Burkhart's blood ethanol level after she was admitted to the hospital will be allowed. Burkhart's intoxication level is relevant to the officers' explanations for their actions in arresting Burkhart, and it is not unfairly

prejudicial under Rule 403. Burkhart acknowledges that the toxicology report is an admissible medical record. (Blood Draw Mot. Lim. 6.) Unless they intend to introduce testimony on the significance of the precise blood ethanol level, and what it means for Burkhart's intoxication at the time of her arrest, the defendants do not need an expert to introduce the toxicology report. Further, although Burkhart puts forward a theory that her obstructed blood flow affected the blood draw results, it is only a theory and she has offered no expert testimony to support that theory. As a result, this court will not exclude information about Burkhart's blood ethanol level.

### f. Motion in limine to exclude references to narcotics use, alcohol abuse, and/or alcohol withdrawal

Many of Burkhart's medical documents and parts of her deposition testimony refer to her history of alcohol and drug abuse, and the precautions the hospital took to prevent Burkhart from experiencing alcohol withdrawal on the night of her arrest. The plaintiff seeks to exclude such references and any related oral testimony as irrelevant and for failing to pass the Rule 403 balancing test. (Abuse History Mot. Lim., ECF No. 77.) Burkhart has stated her intention to provide this court with suggested redactions to her medical documents. Until it reviews those documents, the court will reserve final judgment on whether the references at issue should be excluded. As a general principle, however, any reference to Burkhart's history of substance abuse or alcohol withdrawal that is not relevant to how the defendants may have confronted her on the day of her arrest,[7] or to any potential damages Burkhart suffered, should be excluded under Rule 403.

### g. Motion in limine to exclude references to the plaintiff's 911 call

---

[7] From an initial review of Burkhart's medical records, there appear to be a few references to drug and alcohol use shortly before her arrest. In particular, Burkhart may have consumed alcohol and taken Lorazepam the day before. (*See, e.g.*, Abuse History Mot. Lim. Ex. 8, Admission Note, ECF No. 77-8.) Some records indicate that Burkhart used cocaine in the week before her arrest, whereas others indicate only "distant" cocaine use. (Abuse History Mot. Lim. Ex. 11, Collective Medical R., ECF No. 77-11.) Even with these more recent incidents, unless the defendants can demonstrate they are relevant to their actions during Burkhart's arrest or any damages she suffered, any reference to them likely will be excluded.

After Henninger called the police, Burkhart told a 911 dispatcher that her children were playing with the phone and there was no reason to send the police. The plaintiff concedes this statement was a lie, but wants that fact excluded either as (1) irrelevant, because the lie did not affect whether the defendants had probable cause or used unreasonable force, (2) unfairly prejudicial under Rule 403, or (3) impermissible character evidence.[8] (911 Call Mot. Lim., ECF No. 78.) Burkhart's statement to the 911 dispatcher is part of the facts of this case, provides context for why and how the officers responded to the call, and also goes to Burkhart's credibility, in a case where credibility will be important. Therefore, the motion to exclude will be denied.

### h. Motion in limine to exclude calls for service not related to the subject occurrence on July 23, 2011

Barber testified in his deposition that he had been to Burkhart's residence before the incident on July 23, 2011, for incorrigible and runaway problems related to the plaintiff's daughter. (Prior Service Calls Mot. Lim. Ex. 1, Barber Dep. 8:12-10:17, ECF No. 79-1.) He testified that these prior interactions influenced his decision to visit the Burkhart residence on July 23, 2011. He also testified that he was aware of a call to Burkhart's house subsequent to her arrest involving an alleged narcotics violation. (*Id.* at 13:16-14:6.) The plaintiff seeks to exclude Barber's testimony about the other calls to Burkhart's house, and a report the defendants have produced that shows several calls for service from Burkhart's residence subsequent to July 23, 2011. (Prior Service Calls Mot. Lim. Ex. 3, Calls for Service, ECF No. 79-3.)

Any calls for service to Burkhart's home subsequent to her arrest on July 23, 2011, will be excluded as irrelevant. At this time, the court reserves final judgment regarding any prior calls

---

[8] The defendants oppose this motion in part because the recording of the 911 call also includes a recording of the interaction between the plaintiff and officers during the arrest. (Opp'n 911 Call Mot. Lim. 2, ECF No. 81.) During the hearing, the plaintiff stated that she was not seeking to exclude the recording of the arrest itself, therefore, this court will not address that issue.

to the address. It is unclear whether Dickel and Vlach knew that Barber had responded to calls at the Burkhart residence prior to the incident at issue. For example, Barber testified in his deposition that he "got back on the radio and said . . . I have been to that location before. I'm going to continue." (Suppl. Resp. Opp'n Summ. J. Ex. 4, Barber Dep. 21:11-13, ECF No. 22-3.) Vlach in turn testified that he was "sure" he heard Barber respond to the 911 dispatcher about the Burkhart call, but "[couldn't] specifically remember." (911 Call Mot. Lim. Ex. 6, Vlach Dep. 11:20-12:1, ECF No. 78-6.) If it turns out that Dickel and Vlach were aware of Barber's previous visits to Burkhart's home, that information may be relevant to their states of mind in confronting the plaintiff. On the other hand, if the defendants were unaware of Barber's prior calls to the residence, the parties either will not be allowed to go into the details of why Barber responded to the 911 call, or must explain that those reasons did not stem from interactions with the plaintiff herself.

II.     Defendants' Motions

   a. **Motion in limine to exclude expert testimony of Dr. Sarkar**

Burkhart has designated Dr. Rajabrata Sarkar ("Sarkar"), chief of the Vascular Surgery Division at the University of Maryland Medical Center, as an expert witness. (Sarkar Mot. Lim. Ex. 1, Rule 26 Expert Designation 1, ECF No. 66-1.) Burkhart intends to call him as a hybrid expert to offer testimony both about the medical care he provided Burkhart, and his opinion that Burkhart's injuries are more in line with her version of events than the defendants'. (*See* Opp'n Sarkar Mot. Lim. Ex. 3, Sarkar Report, ECF No. 87-3; *id.* Ex. 4, Sarkar Dep., ECF No. 87-4.) The defendants have moved to exclude Sarkar's testimony about the type of trauma and force that would be necessary to cause the injuries Burkhart suffered. (Sarkar Mot. Lim. 1, ECF No. 66.) The defendants allege that Sarkar has not demonstrated any specialized knowledge in

causation or the amount of force required because his expertise is vascular surgery. (*Id.*)

The facts on which Sarkar relies are supported by the record (Sarkar reviewed Burkhart's medical records and this case's records, and provided treatment to her), and what caused the specific types of injuries Burkhart suffered are not within a reasonable juror's knowledge. The question is whether a vascular surgeon, rather than an orthopedic surgeon, may testify about the cause of Burkhart's injuries. With regard to an expert's qualifications, the Advisory Committee's notes to Rule 702 of the Federal Rules of Evidence provide that experience alone, or in conjunction with "other knowledge, skill, training or education," can provide sufficient foundation for expert testimony. *See also Kumho Tire*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."). Sarkar clearly is qualified within the field of vascular surgery. Given that Burkhart suffered from a "complete severance of the artery and vein" and "thrombosis," (Opp'n Sarkar Mot. Lim. Ex. 2, Medical Records 1, ECF No. 87-2), there are overlapping orthopedic and vascular issues with her knee, and Sarkar has a "fair amount of experience taking care of people with combined orthopedic and vascular injuries," (Sarkar Dep. 13:17-18), Sarkar appears to be qualified and his testimony is relevant. Further, Sarkar is not giving an exact mechanical description of the cause of Burkhart's injuries, or opining on the precise amount of force that was placed on her leg. (Sarkar Dep. 20:4-20, 30:5-16.) Instead, he will testify that "the mechanical motion that is most associated with this type of injury in my personal experience as a vascular surgeon . . . is twisting of the limb," and that testimony is entirely proper. (*Id.* at 44:10-14.)

### b. Motion in limine to exclude deposition transcripts of Officer Barber, John Burkhart, Brianna Burkhart, and Leon Bell

In the pretrial statement, Burkhart lists the depositions of Barber, John Burkhart, Brianna Burkhart, and Leon Bell as "discovery materials" under the category of anticipated exhibits.

13

(Pretrial Statement, ECF No. 71.) The defendants interpreted the list to mean Burkhart intends to read those transcripts into evidence to the jury, which they say would be a violation of Rule 32 of the Federal Rules of Civil Procedure. (Dep. Tr. Mot. Lim., ECF No. 67.) At the hearing, Burkhart confirmed she does not intend to read the deposition transcripts into evidence. Therefore, this motion will be denied as moot.

### c.   Motion in limine to exclude expert testimony of Dr. Chapman

Burkhart plans to call Dr. Christopher G. Chapman ("Chapman"), a former police officer in Cranford, New Jersey and a former task force officer with the Department of Homeland Security ("DHS"), to testify as a police practices and procedures expert. The defendants take issue with three aspects of Chapman's proposed testimony: (1) probable cause to arrest Burkhart was lacking; (2) the practices and procedures of the Baltimore County Police Department were violated; and (3) the defendants used excessive force. (Chapman Mot. Lim., ECF No. 68.)

At the hearing, Burkhart said Chapman would not testify to whether the defendants had probable cause to arrest Burkhart for assault. It is not clear there is any difference between allowing testimony about whether the officers had probable cause to arrest Burkhart for assault and whether they had probable cause to arrest her for obstructing and hindering, as the plaintiff seems to be arguing. The court will reserve final judgment on whether Chapman can testify to any probable cause issues.

Chapman is qualified to testify to the practices and procedures of the Baltimore County Police Department. Although Chapman did not work for Baltimore County, he worked as a police officer in New Jersey; was a task force officer with DHS, participating in arrests in New York, New Jersey, Connecticut, and Vermont; was a police academy instructor and conducted internal investigations; is currently a professor at City University of New York; has several

advanced degrees; and reviewed Baltimore County Police Department policies and documents specific to this case. (Opp'n Chapman Mot. Lim. Ex. 2, Chapman CV 2-6, ECF No. 88-2.) This experience is sufficient under Rules 702 and 703 of the Federal Rules of Evidence.

Chapman also will be permitted to testify whether, in his opinion, the defendants used excessive force. The defendants allege that "it is well established that expert testimony is not proper in excessive force cases involving only the use of hands." (Chapman Mot. Lim. 5-6 (citing *Harrell v. Purcell*, 236 F. Supp. 2d 526, 534 (M.D.N.C. 2002)).) However, the Fourth Circuit case that *Harrell* cites only states that, "[w]here force is reduced to its most primitive form—the bare hands—expert testimony might not be helpful." *Kopf v. Skrym*, 993 F.2d 374, 379 (4th Cir. 1993). Further, the *Kopf* Court also said that if "handcuffs, a gun, a slapjack, mace, *or some other tool*" is added, then expert testimony may be helpful to the jury. *Id.* (emphasis added). Here, Burkhart is alleging that Dickel drew on his martial arts training to subdue her. Burkhart argues that Chapman would be a particularly useful expert witness because he, like Dickel, is trained in martial arts and can testify that the leg manipulation Burkhart alleges she suffered is a "fulcrum leg lock" used in some martial arts and police training courses (including those with which Dickel is familiar). (Opp'n Chapman Mot. Lim. 14-19, ECF No. 88.) According to Burkhart, "Dr. Chapman stands to explain the training underlying the leg manipulation described by Plaintiff Burkhart, as well as, the fact that martial arts practitioners and police officers would understand the potential of serious physical injury by the application of such force." (*Id.* at 19.) Chapman is qualified to testify about these martial arts maneuvers, and the intended effects of moves such as the "fulcrum leg lock" would be helpful to the jury in determining whether the defendants used excessive force.[9]

---

[9] At the hearing, the defendants argued that any mention of martial arts or the fulcrum leg lock should be excluded as not based in fact and unfairly prejudicial. Chapman would testify that Burkhart's description of what was done to

**d. Motion in limine to exclude Baltimore County Police Department records 66-86, and documents 89-179 reviewed by Dr. Chapman**

The defendants argue that these documents—which include, *inter alia*, portions of the Baltimore County Police Department's Administrative and Field Manuals, personnel information about the defendants, training and expertise questionnaires, accident reports, and police academy lesson plans and answer sheets—should be excluded as irrelevant. (R. Mot. Lim., ECF No. 69.) Burkhart has informed the court that she will narrow down the list of documents. Therefore, the court will reserve final judgment.

**e. Motion in limine to exclude expert testimony of Dr. Zakai**

The defendants have brought a motion in limine to exclude the expert testimony of Dr. Ziaul Zakai ("Zakai") on the issue of what caused the plaintiff's injuries. In particular, they claim that Zakai's conclusion that Burkhart's injuries are consistent with Dickel forcibly twisting her leg is based only on Burkhart's deposition testimony. (Zakai Mot. Lim. 2, ECF No. 70.) However, Zakai was the orthopedic surgeon on call at Franklin Square Hospital Center and treated Burkhart when she was admitted after the encounter with the defendants. (*Id.* Ex. 1, Zakai Report 1, ECF No. 70-1.) His expert report states that "[b]ased upon my observations during the course of Mrs. Burkhart's vascular surgery, my clinical participation in her case and [radiographic] studies," he concluded that "Mrs. Burkhart's presentation is consistent with trauma." (*Id.* at 2.) In his opinion, Burkhart's injuries "are not consistent with impaction forces (falling or being placed on her knees); there was no injury to her patella or femur," but they are consistent with Burkhart's version of the events. (*Id.* at 2.) Therefore, it appears that Zakai's report was not based solely on Burkhart's deposition testimony, but on his treatment of her and

---

her leg is consistent with the fulcrum leg lock. Therefore, this testimony would be based on facts in the record. Further, Chapman's testimony would not be unfairly prejudicial but, for the reasons stated above, would be helpful to the jury. Testimony about martial arts and the fulcrum leg lock will be permitted.

his experience as an orthopedic surgeon. It is within the realm of admissible expert testimony to draw from professional experience and opine that Burkart's injuries, which he treated, are consistent with a forcible twisting of her leg.

A separate order follows.


<u>December 29, 2015</u>                    <u>                    /s/                    </u>
Date                                        Catherine C. Blake
                                            United States District Judge